**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| ALARM DETECTION SYSTEMS, INC., an Illinois corporation, | |
| Plaintiff, | Case No.: 14-cv-00876 |
| vs. | |
| BLOOMINGDALE FIRE PROTECTION DISTRICT; LEMONT FIRE PROTECTION DISTRICT; ORLAND FIRE PROTECTION DISTRICT; TYCO INTEGRATED SECURITY, LLC; CROSS POINTS, INC.; and CHICAGO METROPOLITAN FIRE PREVENTION COMPANY, | Judge:  Thomas M. Durkin<br>Magistrate:  Jeffrey T. Gilbert |
| Defendants. | |

**AMENDED VERIFIED COMPLAINT**

Plaintiff Alarm Detection Systems, Inc. ("Plaintiff" or "ADS"), by and through its

attorney, brings this action against Defendants and states as follows:

**INTRODUCTION AND SUMMARY OF CLAIM**

1.      ADS is a private alarm contractor in the business of installing, maintaining,

testing and monitoring its customers' fire alarm systems.  ADS brings this action for injunctive

relief to restrain the Defendants from their ongoing illegal and anticompetitive conduct.

Defendants have conspired and contracted to prevent ADS from providing fire alarm monitoring

(the "Business")[1] to commercial and multifamily buildings required by ordinance to maintain fire

alarm systems ("Commercial Accounts") within the boundaries of each of the Districts.  Such

---

[1] All capitalized terms are defined within this Complaint.

conduct represents unauthorized and anti-competitive behavior which: (1) restrains trade in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, and (2) illegally monopolizes or attempts to do the same, all in violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2, and (3) has the effect of substantially lessening competition thus tending to create a monopoly in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18. Defendants also deprived ADS of its constitutional rights to due process and equal protection under the Fourteenth Amendment to the U.S. Constitution by depriving ADS of its property right to fully engage in the Business. Defendants' actions also involve a pattern of behavior that is unauthorized by the enabling authority of the Districts under the Illinois Fire Protection District Act, 70 ILCS 705/1 *et seq.* ("District Act") and violate the licensing requirements of the Private Detective, Private Alarm, Private Security, and Locksmith Act of 2004 (225 ILCS § 447/5-5 *et seq.*) ("Alarm Act").

2.     For a number of years, the Bloomingdale Fire Protection District ("Bloomingdale"), the Lemont Fire Protection District ("Lemont"), and the Orland Fire Protection District ("Orland") (collectively, the "Districts") all participated in the selling, maintaining, testing, and monitoring of fire alarm monitoring systems (the "Business") by conspiring with a single licensed private alarm contractor in each District to the exclusion of all other private alarm contractors, including ADS. These practices also barred ADS and other private alarm contractors from contracting with Commercial Accounts for the Business.

3.     To eviscerate private competition, each District adopted one or more ordinances that prohibited private alarm contractors, including ADS, from participating in the Business by making the District the sole authorized provider of the Business. After enacting these anticompetitive ordinances, the Districts immediately began charging all Commercial Accounts a supra-competitive monthly fee for this service.

2

4.     In 2010, ADS and four other alarm companies including Defendant Tyco Integrated Security, LLC ("Tyco"), formerly ADT Security Services, Inc.,[2] challenged the takeover of the Business in this fashion in a different Illinois fire protection district in *ADT Security Services, Inc. et al v. Lisle-Woodridge Fire Protection District, et al*, 10 cv-4382 (N.D. Ill.).

5.     The District Court there ruled that it was illegal for an Illinois fire protection district to be in the Business; to charge residents for fire alarm monitoring; or to create a governmental monopoly.  As a result, the District Court enjoined such conduct by the Lisle-Woodridge Fire Protection District ("Lisle-Woodridge").  *See ADT Sec. Servs., Inc. v. Lisle-Woodridge Fire Prot. Dist.*, 799 F. Supp. 2d 880 (N.D. Ill. 2011).

6.     This ruling was affirmed in part, with the Seventh Circuit instructing the District Court to modify the scope of injunctive relief granted.  *See ADT Sec. Servs., Inc. v. Lisle-Woodridge Fire Prot. Dist.*, 672 F.3d 492 (7th Cir. 2012) ("*ADT I*").

7.     Upon remand and following an evidentiary hearing, the District Court entered a thirty-two (32) page Modified Permanent Injunction ("Order") barring Lisle-Woodridge from engaging in the Business and restoring the Commercial Accounts taken away by Lisle-Woodridge back to the alarm company plaintiffs there, including ADS and Tyco.  A true and correct copy of the Order is attached as Exhibit 1.

8.     In July 2013, the Seventh Circuit affirmed the Order in a fifty (50) page decision, finding Lisle-Woodridge's practices unlawful under the District Act as well as "monopolistic" and "anti-competitive".  *See ADT Sec. Servs., Inc. v. Lisle-Woodridge Fire Prot. Dist.*, 724 F.3d

---

[2] ADT Security Services, Inc. was the legal entity for most of the time period at issue, but Tyco is now the legal entity and the name "Tyco" will be used throughout this Complaint.

3

854 (7th Cir. 2013) ("*ADT II*") (The collective rulings of the Northern District of Illinois and the Seventh Circuit are referred to herein as the "*Lisle-Woodridge* Case").

9.      By employing the same monopolistic, anticompetitive, and illegal means, each of the Districts made themselves the sole monopolist and provider of the Business in their respective Territories, an approach which thus suffers from the same legal infirmities as the one found illegal in the *Lisle-Woodridge* Case.

10.     In light of the Seventh Circuit's decision, Bloomingdale announced it intended to comply with the ruling and exit the Business.

11.     However, Bloomingdale did not exit the Business.   Instead, Bloomingdale retained control of the Business by entering into an illegal agreement with Tyco that effectively preserves Bloomingdale's monopoly over the Business and excludes other private alarm contractors, including ADS, from the Business in the Bloomingdale Territory (defined below).

12.     Lemont also announced it planned to comply with the *Lisle-Woodridge* Case.

13.     Lemont had operated the Business with the active participation of Cross Points, Inc. ("Cross Points"), but recently terminated its contract with Cross Points.

14.     Lemont has now followed the Bloomingdale approach with Tyco and has entered into an agreement pursuant to which its illegal monopoly was transferred to Tyco.

15.     Despite the Seventh Circuit's ruling in the *Lisle-Woodridge* Case, Orland has not announced any intention to exit the Business and thus it continues to operate an illegal monopoly over the Business with the active participation of the alarm contractor with whom it originally partnered, Tyco.

16.     The failure of any of the Districts to completely divest their illegal monopolies over the Business activities, thereby preventing free competition and depriving private alarm

4

contractors such as ADS the ability to contract for the Business with Commercial Accounts and maintaining the ability to charge supra-competitive prices to Commercial Accounts is at the heart of this Complaint.

**The Parties**

17.     ADS is an Illinois corporation with its principal place of business in Aurora, Illinois.  ADS is a licensed private alarm contractor under the provisions of the Alarm Act and under this license is authorized to provide fire alarm and burglar alarm services to residential and Commercial Accounts, including the Business, throughout the state of Illinois.

18.     Defendant Bloomingdale is a fire protection district organized under the District Act to provide fire protection within the geographic boundaries of the District ("Bloomingdale Territory").  The Bloomingdale Territory includes the Village of Bloomingdale and portions of the municipalities of Addison, Glendale Heights, Hanover Park, Itasca, Medinah, Roselle and also portions of unincorporated DuPage County.

19.     Defendant Lemont is a fire protection district organized under the District Act to provide fire protection within the geographic boundaries of the District ("Lemont Territory"). The Lemont Territory includes the Village of Lemont, portions of the municipalities of Woodridge, Darien, Bolingbrook, and Homer Glen and some unincorporated areas in Will, DuPage, and Cook Counties.

20.     Defendant Orland is a fire protection district organized under the District Act to provide fire protection within the geographic boundaries of the District ("Orland Territory").[3]

---

[3] Collectively, the Bloomingdale, Lemont, and Orland Territories are referred to as the "District Territories".

CHICAGO\4173582.4
ID\KBM - 110623\0003

The Orland Territory includes Orland Park, Orland Hills, Orland Township and some unincorporated areas in Cook County.

21.     Defendant Tyco is a limited liability company with its principal place of business in Boca Raton, Florida.  Tyco is a licensed private alarm contractor under the Alarm Act and under this license is authorized to provide fire alarm and burglar alarm services, including the Business, throughout the state of Illinois.

22.     Defendant Cross Points is a corporation with its principal place of business in Elgin, Illinois.  Cross Points is a licensed private alarm contractor under the Alarm Act and under this license is authorized to provide fire alarm and burglar alarm services, including the Business, throughout the state of Illinois.

23.     Defendant Chicago Metropolitan Fire Prevention Company ("Chicago Metro") is an Illinois corporation with its principal place of business in Elmhurst, Illinois.  Chicago Metro is a licensed private alarm contractor under the Alarm Act and under this license is authorized to provide fire alarm and burglar alarm services, including the Business, throughout the state of Illinois.

**Jurisdiction and Venue**

24.     The Claims in Counts I – VIII are all based on federal antitrust claims under Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1 and 2, or Section 7 of the Clayton Act, 15 U.S.C.§ 18, which are authorized under §§ 4 and 16 of the Clayton Act, 15 U.S.C.§§ 15 and 26; or on federal constitutional issues relying on causes of action authorized under the Civil Rights Act, 42 U.S.C. § 1983.  Therefore, this Court has federal question jurisdiction under 28 U.S.C. § 1331 and/or jurisdiction under 28 U.S.C. § 1337.  Jurisdiction over the remaining

6

claims for declaratory relief that the Districts exceeded their authority under state law is based on this Court's supplemental jurisdiction under 28 U.S.C. § 1367.

25.     Venue is proper in the Northern District of Illinois under 28 U.S.C. § 1391, as the Districts all reside in the Northern District of Illinois; Tyco operates its Illinois operations out of an office in Oak Brook, Illinois; Cross Points operates out of an office in Elgin, Illinois; ADS resides and does business in the Northern District of Illinois; the actions complained about occurred in the Northern District of Illinois; and the likely witnesses necessary for this case generally reside in the Northern District of Illinois.

## HISTORY OF FIRE ALARM MONITORING IN ILLINOIS AND THE DISTRICTS

26.     Private alarm contractors have been providing fire alarm and burglar alarm services since the late 1800's.

27.     A large number of national and local private alarm contractors, licensed by the State of Illinois under the Alarm Act, compete to provide fire alarm services including the sale or lease, installation, maintenance, and monitoring of fire alarm systems within the state.

28.     Since 1968, ADS has been a full service private alarm contractor offering, *inter alia*, sales and installation of fire alarm systems, maintenance and testing of such systems, and the monitoring of such systems.

29.     ADS opened an Underwriter's Laboratory ("UL") listed central station meeting NFPA Standards (as defined below) in 1974 to monitor the fire alarm and burglar alarm systems of its customers, including Commercial Accounts.

30.     ADS now installs, services, tests and monitors fire alarm systems in Commercial Accounts required to have fire alarm systems by local building or fire codes in over four hundred

7

(400) local jurisdictions within the Chicago metropolitan area. ADS has a number of Commercial Accounts in Bloomingdale, Orland and Lemont, but could not provide such customers the services associated with the Business due to the restrictions imposed by the Districts as described below.

### National Fire Alarm Standards and Operation of Fire Alarm Systems

31. Fire alarm systems are generally required to meet standards outlined in the National Fire Protection Association's National Fire Alarm and Signaling Code ("NFPA 72" or "NFPA Standards"). The NFPA Standards are nationally recognized standards promulgated by an association that represents governmental entities, testing laboratories, the alarm industry, and other stakeholders, and set forth standards for, *inter alia*, fire alarm signal transmission equipment and fire monitoring.

32. The NFPA Standards are generally treated as a primary source of standards for fire prevention across the country.

33. Pursuant to the District Act (70 ILCS § 705/11), Illinois fire protection districts are authorized to adopt fire prevention codes that parallel national standards. The Districts have adopted the NFPA Standards and are bound to follow these requirements.

34. Commercial Accounts in the Districts are required to have fire alarm systems that meet NFPA Standards. A fire alarm system installed in a Commercial Account generally includes an alarm panel, smoke and heat detectors, and a transmission device that sends any signals to either a central station or a remote supervising station.

35. Fire alarm systems generate alarm, trouble, and supervisory signals. Alarm signals indicate the possibility of a fire at the premises of a Commercial Account. Trouble and supervisory signals indicate either malfunctions of the system or some activation of a monitored

8

device (e.g., boiler temperature). Such signals are generally then transmitted to receiving equipment at a central station.

36.     Private alarm contractors like ADS use either their own central stations or third party monitoring facilities to address trouble and supervisory signals in order to ensure that Commercial Accounts' fire alarm systems are kept in working order.

37.     Central stations retransmit alarm signals to the Public Safety Answering Points (911 centers or "PSAP") which dispatch emergency personnel and equipment.

38.     ADS's central station is located in Aurora, Illinois.

39.     Tyco operates central stations outside of Illinois that monitor thousands of Commercial Accounts.

40.     ADS's and Tyco's central stations are regularly inspected by one of the national testing agencies recognized by the NFPA to assure that they are NFPA compliant.

41.     NFPA Standards recognize central station monitoring as the preferred means of monitoring fire alarm signals.

42.     For this reason and a long standing market preference for central station monitoring, in the vast majority of communities throughout the United States, central stations provide the sole means of monitoring fire alarm systems. In those markets, private alarm contractors actively compete for the Business.

43.     The practice of local governmental units displacing private alarm contractors from the Business is generally limited to some local governmental units in Illinois and areas of rural Connecticut.

44.     NFPA Standards allow for several different types of transmission devices to be used in fire alarm systems, including, *inter alia,* dedicated phone lines ("direct wire"), dual

9

digital dialers (regular phone lines[4]), wireless transmitters (radio and cellular devices), and IP transmitters (Internet Protocols).

45.     NFPA Standards put the responsibility on the owner of the premises (here Commercial Accounts) to handle all decisions regarding the fire alarm system in their premises, including the selection of transmission devices and the private alarm contractor responsible for the inspection, maintenance, and testing of those devices.

46.     The Districts usurped this responsibility from Commercial Accounts by taking over the control of the ownership and maintenance of the transmission devices in contravention of NFPA Standards, and in the cases of Bloomingdale and Lemont, then transferring control of all Bloomingdale's and Lemont's transmission equipment to Tyco.

47.     In 1997, ADS began using wireless transmitters (also known as "radio transmitters") manufactured by AES Corporation as a new transmission technology in place of direct wire phone lines to transmit fire alarm signals for some Commercial Accounts. ADS now operates one of the largest radio transmission networks in the country, with over ten thousand (10,000) transmitters.

48.     In the Chicago metropolitan area, Tyco, Cross Points, and Chicago Metro often use Keltron Corporation ("Keltron") wireless transmitters to handle transmission of fire alarm system signals when working with local governmental units like Bloomingdale, Lemont, and Orland.

49.     In 2007, Chicago Metro signed a Keltron dealer agreement memorializing a relationship of many years.

---

[4] These are sometimes referred to as POTS lines, an acronym for "Plain Old Telephone Service."

CHICAGO\4173582.4
ID\KBM - 110623\0003

50. In this agreement, Chicago Metro agreed to: (1) sell exclusively Keltron equipment to the municipal wireless market; and (2) commit to convert 100% of the municipalities' wire/fiber subscribers to wireless in order to obtain 100% participation within 24-36 months.

51. Keltron transmitters are manufactured by AES Corporation and private labeled to Keltron. But for the label, these transmitters are identical to the AES wireless transmitters used by ADS and other private alarm contractors in the Chicago metropolitan area.

## FACTS SPECIFIC TO BLOOMINGDALE

### Bloomingdale Enters Into An Agreement In Restraint of Trade and Acquires an Illegal Monopoly

52. In 2004, Bloomingdale entered into a Fire Alarm Monitoring System Agreement ("Bloomingdale Agreement") with private alarm contractor, Chicago Metro, to obtain the equipment necessary to set up a wireless network to monitor Commercial Accounts within the Bloomingdale Territory. A true and correct copy of the Bloomingdale Agreement is attached as Exhibit 2.

53. The principal manufacturer of the equipment, including the wireless transmitters, sold by Chicago Metro to Bloomingdale was Keltron.

54. Chicago Metro, as a "Keltron Dealer", had a business plan to enter into agreements with fire protection districts and municipalities to supply wireless transmitters (AES transmitters private-labeled by Keltron) and receiving equipment manufactured by Keltron. A true and correct copy of the Keltron Dealer Agreement is attached as Exhibit 3.

55. Chicago Metro promoted the Keltron business model to achieve 100% market share and exclude all other private alarm contractors from the Business.

11

56.     To establish the wireless network in Bloomingdale, Chicago Metro installed receiving equipment at Bloomingdale Fire Station Number 21 and at the DuPage Public Safety Communications Center ("DuComm"), which is the PSAP dispatching emergency personnel and equipment and providing fire alarm monitoring for Bloomingdale.

57.     Bloomingdale is a party to a joint venture between a number of fire protection districts and municipalities as memorialized in a document called Joint Public Safety Communications System Agreement, resulting in DuComm.  A true and correct copy of this agreement is attached as Exhibit 4.

58.     Under this agreement, DuComm is characterized as an "unit of intergovernmental cooperation" set up by Bloomingdale and other fire protection districts and municipalities within DuPage County.

59.     DuComm is not a separate legal entity but merely the alter ego of its participating members, including Bloomingdale.

60.     DuComm provided alarm monitoring services, using Keltron receiving equipment provided by Tyco, as outlined in the DuComm-Tyco Master Alarm Agreement ("Master Agreement").  A true and correct copy of the Master Agreement is attached as Exhibit 5.

61.     In 2005, Bloomingdale enacted Ordinance 05-229 ("Bloomingdale 2005 Ordinance") that required all Commercial Accounts to obtain fire alarm monitoring from Bloomingdale by means of wireless transmitters owned by and leased from Bloomingdale that could only be monitored by Bloomingdale.  A true and correct copy of the Bloomingdale 2005 Ordinance is attached as Exhibit 6.

62.     Bloomingdale's wireless network involved the transmission of all alarm, trouble and supervisory signals to receiving equipment at Fire Station Number 21 and the retransmission

12

of such signals to DuComm, using a frequency licensed by the FCC to Keltron, not Bloomingdale.

63.    The Bloomingdale 2005 Ordinance prevented all private alarm contractors other than Chicago Metro from competing for existing or new Commercial Accounts in Bloomingdale, as Bloomingdale's building code provided that: "The designated proprietary agent [i.e., Chicago Metro] shall be the only authorized installer and repair service for the approved radio transmitters."

64.    By adopting the Bloomingdale 2005 Ordinance and the Bloomingdale Agreement, Bloomingdale, with Chicago Metro's direct involvement, effectively required all Commercial Accounts to terminate their contracts for fire alarm monitoring with their private alarm contractors in order to contract with Bloomingdale for the Business, unless such Commercial Accounts were already using Bloomingdale for fire alarm monitoring via direct wire.

65.    Thus, although ADS has had Commercial Accounts in the Bloomingdale Territory for many years, it could not offer them fire alarm monitoring due to the Bloomingdale 2005 Ordinance.

66.    Uninhibited by competition, Bloomingdale, with Chicago Metro's active participation, proceeded to charge supra-competitive pricing to the Commercial Accounts.

67.    To enforce the provisions of the Bloomingdale 2005 Ordinance, Bloomingdale, with Chicago Metro's active participation, required all Commercial Accounts to enter into subscriber agreements ("Bloomingdale Subscriber Agreements") that obligated the Commercial Accounts to pay a monthly fee.  A true and correct copy of the subscriber agreement for direct wire customers is attached as Exhibit 7.

13

68.     The Bloomingdale 2005 Ordinance set the cost for this equipment and service at fifty-five dollars ($55) per month.  As an alternative, Commercial Accounts could continue to use direct wire provided by Bloomingdale at twenty dollars ($20) per month.

69.     If ADS were able to compete for the Business, ADS would have been able to offer many Commercial Accounts a monthly charge of less than the fifty-five dollars ($55) for wireless service set by Bloomingdale.

70.     Moreover, when ADS was able to bundle services with other fire alarm and burglar alarm services – an option for Commercial Accounts not provided for and effectively prohibited by Bloomingdale – the charge for fire alarm monitoring could be as low as five dollars ($5) per month.

### Bloomingdale Acknowledges Its Illegal Operation of The Business, But Enters Into Another Illegal Agreement Perpetuating The Illegal Monopoly

71.     After the same business model was ruled illegal in *ADT II*, Bloomingdale recognized that its participation in the Business was illegal. As a result, Bloomingdale terminated its contract with Chicago Metro.

72.     On January 9, 2014, Bloomingdale's Board, without any formal bidding process or request for proposals and without notice to the public or to private alarm contractors, met in executive session to discuss the sale of its wireless network, including its receiving equipment and wireless transmitters, to Tyco.

73.     In open session, the Board approved a purchase agreement ("Tyco Purchase Agreement").  A true and correct copy of the Tyco Purchase Agreement is attached as Exhibit 8.

14

74. Under this agreement, Bloomingdale sold Tyco all of its installed wireless transmitters, the receiving equipment at Fire Station 21 and at DuComm, and its inventory of fire monitoring equipment for Two Hundred Twenty-Five Thousand Dollars ($225,000).

75. Bloomingdale also assigned all the Bloomingdale Subscriber Agreements with Commercial Accounts to Tyco pursuant to the Tyco Purchase Agreement.

76. As a result, due to the illegal monopoly, one hundred percent (100%) of the Commercial Accounts in Bloomingdale Territory became customers of Tyco subject to the Bloomingdale Subscriber Agreements.

77. On the day of the assignment of the Bloomingdale Subscriber Agreements to Tyco, Tyco assumed a virtual one hundred percent (100%) market share of the Business in the Bloomingdale Territory.

78. Under the Tyco Purchase Agreement, to facilitate Tyco's participation in the control of the Business, Bloomingdale leased the room at Fire Station Number 21 which housed the receiving equipment so that Tyco could continue to use Bloomingdale's wireless network without any changes in the monitoring network, allowing Tyco to continue to control almost one hundred percent (100%) of the Business.

79. Thus, instead of returning competition to the market where they illegally and unilaterally imposed a monopoly, Bloomingdale has simply transferred ownership of the equipment used in its illegally obtained monopoly to Tyco.

80. By virtue of the Tyco Purchase Agreement, especially the assignment of the illegally acquired Bloomingdale Subscriber Agreements between Commercial Accounts and Bloomingdale, Tyco was able to command control over the Business without facing any competition.

CHICAGO\4173582.4
ID\KBM - 110623\0003

81.     The purchase price of the equipment and Bloomingdale Subscriber Agreements represented a fraction of the amount a private alarm contractor would pay to gain access to the over seven hundred (700) Commercial Accounts that Tyco was able to obtain under the Tyco Purchase Agreement.

82.     The Bloomingdale Board later passed Ordinance 14-291 and Ordinance 14-292 (together, the "2014 Bloomingdale Ordinances"), making certain changes to the Fire and Building Codes.  A true and correct copy of the 2014 Bloomingdale Ordinances is attached as Exhibit 9.

83.     The 2014 Bloomingdale Ordinances stated that Bloomingdale was no longer requiring Commercial Accounts to use an exclusive fire alarm monitoring provider, which between 2004 and 2014 had been Bloomingdale acting in conjunction with Chicago Metro.  *See* 2014 Bloomingdale Ordinances.

84.     On January 9, 2014, Bloomingdale sent a letter from its fire chief to all Commercial Accounts stating that the 2014 Bloomingdale Ordinances "require[] you to maintain an alarm with a licensed fire alarm company for the transmission of fire alarm signals to the [Bloomingdale] District's dispatch center.  This may be done directly with Tyco or another fire alarm company of your choice that is able to operate in accordance with the revised [Bloomingdale] District fire prevention code ordinances."  A true and correct copy of this letter is attached as Exhibit 10.

85.     Even though Tyco has an assignment of all the Bloomingdale Subscriber Agreements, in a letter dated January 10, 2014 from Tyco to all these Commercial Accounts, Tyco sought to negotiate new Customer Contracts with five (5) year terms.  A true and correct copy of this letter is attached as Exhibit 11.

16

86.     Given the timing of the Tyco Purchase Agreement, the immediate assignment of all the Bloomingdale Subscriber Agreements to Tyco, and the Tyco letter sent out the next day, Tyco effectively precluded any other private alarm contractor, including ADS, from competing for the Business of the Commercial Accounts in the Territory.

87.     For example, in order to take advantage of the 2014 Bloomingdale Ordinances, these Commercial Accounts would have to terminate their Bloomingdale Subscriber Agreements, return the wireless transmitters to Tyco, and find other private alarm contractors for monitoring services.

88.     Once a Commercial Account has a provider of the Business with the necessary equipment installed in the premises, it is commercially difficult for the Commercial Account to change providers, even with the prospect of getting a better price for monitoring due to a predisposition to keep what is in place.

89.     The cost to ADS and other private alarm contractors of purchasing and installing equivalent radio transmitters and equipment is considerably higher than the price Tyco paid Bloomingdale for the radio transmitters already installed on the walls.

90.     The assignment of all the Bloomingdale Subscriber Agreements to Tyco combined with the unfair pricing for the equipment presented an insurmountable hurdle to other private alarm contractors seeking to compete for Commercial Accounts.

91.     The Subscriber Agreements are void *ab initio*, because Bloomingdale never had any authority to enter into such agreements and Bloomingdale's wireless network was illegal. Thus Tyco's assumption of these unauthorized and illegal agreements should not have been allowed.

CHICAGO\4173582.4
ID\KBM - 110623\0003

92.     Having this contractual relationship with these Commercial Accounts gives Tyco a significant advantage in the ability to sell other alarm services to them, further impairing ADS and other private alarm contractors from competing for these Commercial Accounts.

93.     After the passage of the 2014 Bloomingdale Ordinances and after Tyco became the preferred private alarm contractor with virtually one hundred percent (100%) of the Business in the Bloomingdale Territory, ADS attempted to aggressively compete for the Business of Commercial Accounts in Bloomingdale.

94.     Tyco is using DuComm, the alter ego of the Bloomingdale District, to monitor fire alarm signals from its Commercial Accounts, and pays DuComm a fee for this service.

95.     DuComm has no authority under the District Act to monitor fire alarm systems or to charge a fee for such service.

96.     ADS offered a cost of service well below that required by the Bloomingdale Subscriber Agreement's fifty-five dollar ($55) monthly fee and in some instances offering its existing customers a fee as low as five dollars ($5) per month if bundled with other services. Despite offering all of these incentives, ADS was able to secure only a handful of accounts.

97.     Exacerbating the already difficult situation for ADS and other private alarm contractors, Tyco used its illegally acquired monopoly power to impose further barriers to entry in the form of harsh penalties on Commercial Accounts that tried to break their Bloomingdale Subscriber Agreements in favor of services through another private alarm contractor.  For example, ADS contracted with a Commercial Account for the Business and when the Commercial Account notified Tyco of the switch, Tyco advised the Commercial Account that it would incur a termination fee of two thousand nine hundred dollars ($2,900) per building.

18

98.    As a result, Tyco has restrained trade, substantially lessened competition, and monopolized the Business in conjunction with Bloomingdale in the relevant geographic market of the Bloomingdale Territory.

## FACTS SPECIFIC TO LEMONT

### Lemont Enters Into An Agreement In Restraint of Trade and Acquires an Illegal Monopoly

99.    In 2002, Lemont and Cross Points worked together to set up a mandated wireless network in Lemont.  A true and correct copy of the Alarm Services Agreement ("Lemont Agreement"), dated May 3, 2002, is attached as Exhibit 12.

100.    Lemont contracted with Cross Points to provide monitoring and maintain the monitoring equipment for a period of five (5) years, as formalized in the Lemont Agreement. *Id.*

101.    The purpose of this agreement was to sell Lemont receiving equipment and transmitters necessary to establish a wireless network. *Id.*

102.    Cross Points installed Keltron branded equipment in Lemont. *Id.*

103.    In the additional rider to the Lemont Agreement, Cross Points agreed to a "Schedule of Equipment/Protection" See Additional Rider attached to Lemont Agreement, attached hereto as Exhibit 12.[5]

104.    In 2002, Lemont implemented Ordinance 02-03 ("Lemont 2002 Ordinance") mandating the use of the Lemont-owned wireless network unless the Commercial Account continued to use direct wire.  A true and correct copy of the Lemont 2002 Ordinance is attached as Exhibit 13.

---

[5] ADS does not yet have the full Exhibit, as only one page of what appears to be a three-page document has been produced to date.

CHICAGO\4173582.4
ID\KBM - 110623\0003

105.    By entering into the Lemont Agreement and committing to implementing the Lemont 2002 Ordinance, it was necessary for Lemont and Cross Points to bar all other private alarm contractors from the Business.

106.    Lemont began actively seeking to convert all Commercial Accounts in the Lemont District to wireless transmitters owned by Lemont, monitored through Lemont's fire board and serviced by Cross Points.

107.    In a letter from Lemont's Fire Chief, Andrew O'Donnell, he stated that because Lemont now owned the equipment in the wireless network, Commercial Accounts had to sign new Subscriber Agreements. A true and correct copy of the Letter from Fire Chief Andrew O'Donnell, dated August 30, 2002, is attached as Exhibit 14.

108.    The Lemont 2002 Ordinance required that Commercial Accounts using wireless transmitters send all alarm, supervisory and trouble signals directly to the communications center of Lemont via Lemont's wireless radio network.  The signals would then be retransmitted to DuComm.

109.    The Lemont 2002 Ordinance also provided that all fire extinguishing systems had to be monitored by a fire alarm system directly connected to Lemont's communications center via the same wireless radio network.

110.    Under the Lemont Agreement, Commercial Accounts were required to contract with Lemont and pay fifty-five dollars ($55) per month, which Lemont and Cross Points shared.

111.    If ADS were able to compete for the Business, ADS could have offered fire alarm monitoring for less than fifty-five dollars ($55) per month to many Commercial Accounts and could offer this service for as low as five dollars ($5) per month if bundled with other services already being provided to such Commercial Accounts.

CHICAGO\4173582.4
ID\KBM - 110623\0003

112.    ADS has had Commercial Accounts in the Lemont Territory for many years, but could not offer them the Business from the time the Lemont 2002 Ordinance was adopted and implemented.

113.    To operate the wireless network, Lemont was required to secure an FCC license for the frequency used in the wireless network.

114.    Instead, Keltron holds the FCC license for the Lemont's wireless network. See Lemont Fire Protection Letter, dated May 16, 2007, a true and correct copy of which is attached as Exhibit 15.

115.    In March 2008, Lemont told Commercial Accounts that they had to pay five dollars ($5) more per month for alarm monitoring. See Lemont Fire Protection Letter, dated March 11, 2008, a true and correct copy of which is attached as Exhibit 16.

116.    From 2002 on, all Commercial Accounts were required to contract with Lemont and connect to Lemont's wireless network.

117.    Lemont and Cross Points knew or should have known that the result of their actions would be to exclude all other private alarm contractors from the Business in the Lemont District and interfere with these contractual relationships between the private alarm contractors and their Commercial Accounts in the District.

### Lemont Acknowledges Its Illegal Operation of The Business, But Enters Into Another Illegal Agreement Perpetuating The Illegal Monopoly

118.    In September 2013, Tyco's in-house counsel wrote a letter to Lemont Fire Chief George Rimbo advising him of the Seventh Circuit's decision and warning that Lemont was engaged in the same type of conduct that the District Court and Seventh Circuit determined to be

21

illegal in the *Lisle-Woodridge* Case. See Michael Epstein Letter, dated September 3, 2013, a true and correct copy of which is attached as Exhibit 17.

119.　This letter stated, among other things, that under the rulings of the District Court and Seventh Circuit, Lemont's ordinance requiring a sole provider of fire alarm transmitters and monitoring using Keltron equipment violated both the District Act and federal antitrust laws. *Id.*

120.　In November 2013, Lemont gave notice that the monitoring requirements of the Lemont 2002 Ordinance were "suspended due to pending litigation," apparently referring to the *Lisle-Woodridge* Case and the Seventh Circuit's July 2013 decision. See November 6, 2013 Lemont Fire Protection District Memo, a true and correct copy of which is attached as Exhibit 18.

121.　In exiting the Business, Lemont told Commercial Accounts that they had a choice of licensed alarm companies going forward and that monitoring could be done through an approved or listed central station service. *Id.*

122.　ADS contacted Lemont to confirm that it would be allowed to provide central station monitoring to Commercial Accounts in Lemont. Lemont advised ADS that the notice of November 2013 was "premature" and that there had been no change in Lemont's mandate that all Commercial Accounts had to connect to Lemont's wireless network, with the possible exception of new facilities.

123.　On March 20, 2014, Lemont amended its Ordinances, and thereby did away with the requirement that Commercial Accounts in the District use the District's vendor for transmission of fire alarm signals. A true and correct copy of Ordinance No. 14-02 (pp. 21-24), dated March 20, 2014, is attached as Exhibit 19.

CHICAGO\4173582.4
ID\KBM - 110623\0003

124. On April 17, 2014, Lemont entered into an Agreement with Tyco for the purchase of all of its fire alarm monitoring equipment for $70,000. See Minutes of April 17, 2014, attached hereto as Exhibit 20 and Lemont's Letter to Radio Alarm Subscribers, dated April 25, 2013, attached hereto as Exhibit 21. The agreement between Lemont and Tyco will be referred to herein as the "Lemont-Tyco Agreement". (Plaintiff has been unable to secure a copy of said agreement and therefore a copy is not attached.)

125. Pursuant to the foregoing, Lemont has transferred all of its equipment for its network and assigned all Subscriber Agreements to Tyco.

126. These Subscriber Agreements have no term limit. See Lemont Fire Alarm Monitoring Subscriber Agreement, a true and correct copy of which is attached as Exhibit 22.

127. Tyco now owns and maintains the equipment to operate the wireless network in the Lemont District and is using Orland to monitor its Commercial Accounts and pays Orland a fee for such monitoring. See Randall Justin Testimony at April 11, 2014 TRO Hearing, pp. 301-05, excerpt attached hereto as Exhibit 23.

128. Orland has no authority under the District Act to monitor these Commercial Accounts or to charge for this service.

129. As a result, ADS is effectively barred from competing for of the Business in Lemont.

## FACTS SPECIFIC TO ORLAND

### Orland Enters Into An Agreement In Restraint of Trade and Acquires an Illegal Monopoly

23

130. In August 2003, Orland entered into a seven (7) year contract with Tyco to provide alarm services in the Orland Territory ("Orland Agreement"). A true and correct copy of the Orland Agreement, dated August 13, 2003, is attached as Exhibit 24.

131. The contractual relationship between Tyco and Orland dates back to at least July 1996. *Id.*

132. Pursuant to the Orland Agreement, Tyco has the exclusive right to install, maintain, replace, upgrade and operate an alarm monitoring and receiving system in Orland Park's Public Safety Department Communications Center ("Orland Communications Center"), where all transmissions from the wireless network are directed. *Id.*

133. The Orland Communications Center is a PSAP that handles dispatching of emergency personnel and equipment.

134. Tyco also owns all the equipment installed at the Orland Communications Center.

135. Tyco owns and maintains the equipment to establish a wireless network for Orland.

136. Orland provides fire alarm monitoring, including communication with Commercial Accounts regarding trouble and supervisory signals.

137. Orland has no authority under the District Act to monitor fire alarm systems and to charge for such services.

138. Any new Commercial Account desiring to be monitored at the Orland Communications Center must contract directly with Tyco.

139. Under the Orland Agreement, Tyco charges other alarm companies an initial connection fee of one hundred fifty dollars ($150) and it charges Commercial Accounts a

24

monthly monitoring fee of twenty-one dollars ($21) for dedicated phone line and digital signals, or thirty-eight dollars ($38) for radio-transmitted signals.

140.    ADS recently contacted Tyco's Municipal Services Department to determine the current arrangement for connection to the wireless network and was advised that the costs were as follows: (1) to buy the wireless transmitter, a charge of one hundred fifty dollar ($150) connection fee and one thousand five hundred eighty dollars ($1580) for an AES radio installed and then a monthly charge of forty-seven dollars ($47) per month for monitoring; or (2) the leasing of the wireless transmitter and monitoring of the fire alarm system for eighty-nine dollars ($89) per month.

141.    ADS can buy an AES radio for four hundred fifty dollars ($450) and install it for about two hundred dollars ($200). The charge of one thousand seven hundred thirty ($1730) for the connection fee and an installed radio is so far above market rates that it could only be achieved by the monopoly that Orland and Tyco exercise over the Business.

142.    The fees charged to Commercial Accounts are exclusive of any fees of Orland, which may be "passed to" Commercial Accounts by Tyco.

143.    In addition, Tyco must collect from Commercial Accounts a seven dollar ($7) to nine dollar ($9) monthly service charge, and those funds must be remitted to Orland by Tyco.

144.    The Orland Agreement states that Orland "shall endeavor to monitor" the alarm monitoring system, provided that Orland is not liable in the event that it fails to monitor the alarm monitoring system or to promptly respond to an alarm transmitted through the alarm monitoring system.

CHICAGO\4173582.4
ID\KBM - 110623\0003

145.    In 2006, Orland adopted Ordinance 2006-003 ("Orland 2006 Ordinance")[6] which required that all fire alarm systems in Commercial Accounts be monitored by the District. A true and correct copy of the Orland 2006 Ordinance is attached as Exhibit 25.

146.    The Ordinance is in effect today, with Commercial Accounts monitored by Orland.

147.    In order to take over all the Business and preclude new Commercial Accounts from using private alarm contractors like ADS, Tyco needed Orland to adopt and enforce an ordinance like the Orland 2006 Ordinance.

148.    Pursuant to the Orland Agreement, only Tyco could provide the transmission of alarm signals from Commercial Accounts to the Orland Communications Center.

149.    ADS has had Commercial Accounts in Orland for many years, but could not provide the Business to such Commercial Accounts due to the Orland Agreement and the Orland 2006 Ordinance with the exception of a few older customers who were effectively grandfathered.

150.    If ADS were permitted to engage in the Business in the Orland Territory, ADS could offer its services for less than the fees charged by Orland and Tyco.

151.    For Commercial Accounts with bundled services, ADS charges as little as five dollars ($5) per month for fire alarm monitoring.

152.    On September 17, 2010, Orland and Tyco executed a rider to the Orland Agreement extending its term through December 31, 2012. A true and correct copy of the rider is attached as Exhibit 26.

---

[6] The Bloomingdale 2005 Ordinance, the 2014 Bloomingdale Ordinances, the Lemont 2002 Ordinance, and the Orland 2006 Ordinance are collectively referred to as the "Ordinances."

26

153.    Under the terms of the rider, the amount Tyco passed through to Orland for direct wire accounts was increased to fourteen dollars ($14) and radio accounts to twenty-three dollars and fifty cents ($23.50). *Id.*

154.    On October 10, 2013, Orland approved a new agreement with Tyco ("Second Orland Agreement") in which it again granted Tyco the exclusive right to install, maintain, and monitor all the Business of Commercial Accounts in the Orland Territory for three (3) years beginning January 1, 2014. A true and correct copy of the Second Orland Agreement is attached as Exhibit 27.

155.    The Second Orland Agreement contained the same fee structure and pricing as the rider to the Orland Agreement and also provided that, absent notice from either party, the Second Orland Agreement would be extended beyond the three (3) year term in yearly increments in perpetuity. *Id.*

156.    As a result of the Second Orland Agreement, ADS may be excluded from the Business in the Orland Territory forever.

## THE RELEVANT MARKET

157.    Each combination of a District and a private alarm contractor creates a distinct anticompetitive environment so that the relevant geographic market is the boundaries of each District's Territory.

158.    Each of the Districts, in conjunction with either Tyco, Cross Points, or Chicago Metro, has entered into an agreement and a complementary ordinance that effectively bars any other private alarm contractor, including ADS, from engaging in the Business in each relevant geographic market.

27

159.  The relevant product market affected by Defendants' anticompetitive conduct is the Business.

160.  The relevant geographic market and relevant product market are collectively referred to herein as the Relevant Market for each District Territory respectively.

## INTERSTATE COMMERCE

161.  The Districts, Chicago Metro, Tyco, and Cross Points' anticompetitive activities have impacted or will impact the substantial and uninterrupted flow of products, services, contracts, and claims in interstate commerce and the transfer of substantial sums of money across state lines.  In particular, the sale of fire alarm monitoring, including central station monitoring, and other fire alarm services, as well as the equipment and products attendant thereto, are all undertaken across state lines as both local and national companies compete for all alarm business including the Business.

162.  Additionally, commercial fire alarm transmission and monitoring services in the Districts are sold in interstate commerce.  Defendants' actions substantially adversely impact the flow of such interstate commerce by, among other things, substantially impacting the price, quantity and availability of services in the Relevant Market.

## BARRIERS TO ENTRY ESTABLISHED BY THE DISTRICTS

163.  Industry-wide, Commercial Accounts contract for fire alarm monitoring and other alarm services by entering into agreements ("Customer Contracts") with fire alarm monitoring companies, including ADS.  These Customer Contracts typically have multi-year terms.  Such agreements are automatically renewable and remain in force unless terminated by either party, in

28

order to maintain consistent and continuous fire alarm monitoring services. As a result, private alarm contractors like ADS enjoy long-lasting relationships with their Commercial Accounts.

164. When a fire protection district sells its subscriber agreements along with its wireless network intact with the wireless transmitters on the walls of the premises of the Commercial Accounts, the buyer (i.e., Tyco in the case of Bloomingdale) will have an advantage in being able to enforce the assigned (but illegal) agreements and in seeking new contracts from these Commercial Accounts for the Business, as Commercial Accounts are traditionally reluctant to seek other private alarm contractors when they can contract for the Business with the private alarm contractor that owns the wireless transmitters already in place.

165. Frequently, Commercial Accounts seek all their fire alarm system needs from a single vendor. The private alarm contractor which installs a fire alarm system often provides maintenance, testing, and monitoring.

166. In contrast, where all Commercial Accounts, including those which have Customer Contracts with ADS or other private alarm contractors for services other than the Business, have been required to contract with fire protection districts for the Business, it is virtually impossible for new participants, or those who have previously been excluded, to gain a foothold in the Relevant Market to engage in the Business.

167. Whether Bloomingdale, Lemont, or Orland owns the wireless network or whether it transfers the wireless network to Tyco or some other private alarm contractor while retaining an interest in the form of a share of the revenue, each such arrangement creates a monopoly or near monopoly over the Business.

168. The improper transfer of the ownership of Bloomingdale's wireless network or the designation of a sole provider of the Business in both Lemont and Orland, will perpetuate an

29

insurmountable barrier to entry into the Relevant Market due to Tyco's and Cross Points' control of the Business of all or virtually all of the Commercial Accounts in each District with the active participation of the affected District.

169. The Districts have been operating a monopoly over consumers in the Relevant Market.

170. After the passage and implementation of the relevant Ordinances, the Districts were able to charge Commercial Accounts monopoly prices that were substantially higher prices than private competitors were able to offer for similar services, such as those offered in other areas where free and open competition existed.

171. Commercial Accounts were unable to negotiate prices or services for fire alarm monitoring in the Districts, as the Districts dictated equipment, price and terms by the Ordinances and controlled the Relevant Market through mandatory subscriber agreements and Customer Contracts.

172. The actions of Bloomingdale and Tyco in the transfer of the ownership of the wireless network to Tyco have the effect of substantially lessening competition and creating a monopoly controlled by Tyco.

173. The actions of Lemont and Tyco in the transfer of the ownership of the wireless network to Tyco have the effect of substantially lessening competition and create a potential monopoly controlled by Tyco.

174. The District Act does not contain any specific grant of authority to allow the Districts to monopolize the Business, and there exists no basis at law which would otherwise authorize the Districts to establish a monopoly in the Business.

CHICAGO\4173582.4
ID\KBM - 110623\0003

175.    Any provider of fire alarm services must be licensed by the state of Illinois under the Alarm Act.

176.    None of the Districts hold licenses under the Alarm Act.

177.    In entering into the Business and entering into agreements to transfer ownership of the fire alarm monitoring business from the District to a single private alarm contractor, Bloomingdale, in conjunction with Chicago Metro and Tyco, has engaged in state action in violation of ADS's constitutional rights which has resulted in ongoing harm to ADS.

178.    In entering into the Business and entering into agreements to transfer ownership of the fire alarm monitoring business from the District to a single private alarm contractor, Lemont, in conjunction with Cross Points, has engaged in state action in violation of ADS's constitutional rights which has resulted in ongoing harm to ADS.

179.    In entering into the Business and entering into agreements to transfer ownership of the fire alarm monitoring business from the District to a single private alarm contractor, Orland, in conjunction with Tyco, has engaged in state action in violation of ADS's constitutional rights which has resulted in ongoing harm to ADS.

180.    To the extent that Tyco is the successor to the position of Chicago Metro in Bloomingdale, Tyco is engaged in state action, with Bloomingdale, in violation of ADS's constitutional rights which has resulted in ongoing harm to ADS.

181.    To the extent that Tyco is the successor to the position of Cross Points in Lemont District, Tyco is engaged in state action, with Lemont, in violation of ADS's constitutional rights which has resulted in ongoing harm to ADS.

182.    In addition, as none of the Districts ever had the authority to be in the Business, the Subscriber Agreements in these Districts are void *ab initio*.

31

183.    As a result, neither Bloomingdale nor Lemont have any legal interest to transfer to Tyco in the form of the Subscriber Agreements.

**The Impact of the *Lisle-Woodridge* Case on the Districts' Takeover of the Business**

184.    On February 28, 2012, the Seventh Circuit found that provisions in an ordinance adopted and implemented by Lisle-Woodridge to take over the Business in that district exceeded the authority given to fire protection districts under the District Act. The Court characterized this takeover as an "illegal monopoly." *See ADT I*, 672 F.3d at 495.

185.    In August, 2012, Judge Shadur entered the Order requiring Lisle-Woodridge to exit the fire alarm monitoring market and concluded that the district's actions constituted an illegal monopoly. See Exhibit 1.

186.    In affirming the Order, the Seventh Circuit ruled that Lisle-Woodridge's actions were beyond its legal authority under the District Act and represented "anti-competitive" behavior. *ADT II*, 724 F.3d at 858, 873-876.

187.    Although the District Act authorizes the Districts to acquire and maintain fire stations, facilities, vehicles, apparatus, and equipment for the prevention and control of fire, it provides no express authority for the Districts to purchase and operate fire alarm transmission and monitoring equipment in order to exclude licensed private alarm contractors, including ADS, from the Relevant Market. See Exhibit 1 (Order at 26 & 28) and *ADT II* at 863.

188.    Moreover, the Seventh Circuit ruled that even if Lisle-Woodridge had the authority to adopt NFPA Standards, it did not have the authority to take away the right of the Commercial Accounts to choose the equipment and alarm company to provide the Business. *ADT I* at 503.

32

189.     Like the Ordinances here, the Lisle-Woodridge ordinance analyzed in *ADT I* and *ADT II* "attempted to overhaul alarm signaling and monitoring" in a fire protection district by requiring "all commercial property owners to terminate their contracts with private alarm contractors and instead to adopt and pay for an alarm and monitoring system provided by the district." *ADT II* at 859.

190.     The Seventh Circuit explained that the "more dramatic effect of the challenged [o]rdinance was to make the [Lisle-Woodridge] District . . . the exclusive provider and servicer of the necessary equipment." In flatly rejecting Lisle-Woodridge's authority to pass such an ordinance, the Seventh Circuit explained that "[n]either the NFPA code nor the [District Act] even tacitly endorses so drastic a policy change as the establishment of a *local governmental monopoly* over fire alarm transmitter devices. In view of fire protection districts' limited powers, *supplanting a competitive private market* is far too significant a change to infer from statutory silence." *ADT I* at 503 (emphasis added).

191.     In *ADT II*, the Seventh Circuit explained that, like the challenged Ordinances here, an ordinance "[e]xcluding alarm companies from the monitoring business or making it unduly burdensome for them to participate raises significant concerns about the anti-competitive effects of [that ordinance] . . . ."[7] *ADT II* at 865.

192.     Moreover, the District Act does not allow the Districts to charge residents for any fire protection services. Lemont was directly charging all its residents for the Business and Bloomingdale, Orland and Lemont are now sharing in the revenue of the Tyco wireless networks

---

[7] The Court specifically found that (1) fire alarm monitoring was not authorized by the District Act; (2) the district could not charge its residents for any fire protection service, including fire alarm monitoring; and (3) the system in place was not parallel to national standards as required by the District Act. The Court noted in numerous comments that this Business was an inhibition to free competition. *ADT II* at 861-65, 875.

33

and therefore all three Districts are effectively charging for services without authority under the District Act.

193.    Bloomingdale's takeover of the Business in conjunction with its private alarm contractor partner, Chicago Metro, is basically the same type of conduct ruled illegal and enjoined by the District Court in the *Lisle-Woodridge* Case and upheld by the Seventh Circuit.

194.    Lemont's takeover of the Business in conjunction with its private alarm contractor partner, Cross Points, is basically the same type of conduct ruled illegal and enjoined by the District Court in the *Lisle-Woodridge* Case and upheld by the Seventh Circuit.

195.    Orland's takeover of the Business in conjunction with its private alarm contractor partner, Tyco, is basically the same type of conduct ruled illegal and enjoined by the District Court in the *Lisle-Woodridge* Case and upheld by the Seventh Circuit.

196.    To the extent that Tyco has taken the position of Chicago Metro in Bloomingdale, it is engaged in conduct in violation of the rulings of the District Court and Seventh Circuit in the *Lisle-Woodridge* Case.

197.    To the extent that Tyco has taken the position of Cross Points in Lemont, it is engaged in conduct in violation of the rulings of the District Court and Seventh Circuit in the *Lisle-Woodridge* Case.

**COUNT I – BLOOMINGDALE'S, CHICAGO METRO'S, AND TYCO'S VIOLATION OF SHERMAN ACT § 1 – (Contract or Combination in Restraint of Trade)**

198.    ADS realleges and incorporates by reference paragraphs 1 through 98 and 157 through 197 as though fully set forth herein.

199.    Bloomingdale and Tyco have combined, conspired and contracted, through the anticompetitive means described above, to restrain trade and commerce among the several states

34

and to suppress and prevent competition in the Relevant Market in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

200.    Bloomingdale and Chicago Metro have combined, conspired and contracted, through the anticompetitive means described above, to restrain trade and commerce among the several states and to suppress and prevent competition in the Relevant Market in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

201.    The combinations, conspiracies and contracts entered into between Bloomingdale and Tyco were undertaken with the express purpose and intent of unlawfully restraining competition, and thereby excluding ADS and other potential market competitors from the Relevant Market.

202.    The combinations, conspiracies and contracts entered into between Bloomingdale and Chicago Metro were undertaken with the express purpose and intent of unlawfully restraining competition, and thereby excluding ADS and other potential market competitors from the Relevant Market.

203.    Bloomingdale's and Tyco's anticompetitive agreements, schemes, acts, and practices described herein have substantially and adversely impacted and unreasonably restrained, and continue to substantially and adversely impact and restrain, interstate commerce in the Relevant Market.

204.    Bloomingdale's and Chicago Metro's anticompetitive agreements, schemes, acts, and practices described herein have substantially and adversely impacted and unreasonably restrained, and continue to substantially and adversely impact and restrain, interstate commerce in the Relevant Market.

35

205. No valid reasons exist for Bloomingdale's and Tyco's anticompetitive agreements, schemes, acts and/or practices.

206. No valid reasons exist for Bloomingdale's and Chicago Metro's anticompetitive agreements, schemes, acts and/or practices.

207. As a direct and proximate result of Bloomingdale's and Tyco's unlawful conduct as described herein, ADS has previously suffered and will continue to suffer economic injury and damage in its business, property, and other economic interests in an amount difficult to determine given the substantial exclusion of competition created by Bloomingdale and transferred to Tyco making such injury irreparable.

208. As a direct and proximate result of Bloomingdale's and Chicago Metro's unlawful conduct as described herein, ADS has previously suffered and will continue to suffer economic injury and damage in its business, property, and other economic interests in an amount difficult to determine given the substantial exclusion of competition created by Bloomingdale and transferred to Tyco making such injury irreparable.

209. In addition, as a direct and proximate result of Bloomingdale's and Tyco's unlawful conduct as described herein, ADS has suffered lost profits.

210. In addition, as a direct and proximate result of Bloomingdale's and Chicago Metro's unlawful conduct as described herein, ADS has suffered lost profits.

211. There exists no express grant of authority under the District Act to allow Bloomingdale to monopolize the Business.

212. Bloomingdale is immune from antitrust damages under the Local Government Antitrust Immunity Act, 15 U.S.C. §§ 34-36, and therefore ADS has no adequate remedy at law against Bloomingdale.

36

213.  Unless enjoined, Bloomingdale's transfer of the assets used in the Relevant Market to Tyco will cause irreparable harm and damage to ADS and the general public, for which ADS and the general public have no adequate remedy at law.

WHEREFORE, Plaintiff moves this Honorable Court for the following relief:

1.  A declaratory judgment that the 2014 Bloomingdale Ordinances and Tyco Purchase Agreement violate ADS's rights under Section 1 of the Sherman Act;

2.  An order preliminarily and permanently enjoining Bloomingdale, Tyco, and Chicago Metro from engaging in the Business;

3.  An order preliminarily and permanently requiring Tyco to completely divest itself from the Business in a manner that will ensure that all private alarm contractors in the Business will be able to freely and openly compete for Commercial Accounts in the Relevant Market and that the provider in the Business selected by such Commercial Accounts;

4.  An award of monetary damages against Chicago Metro in the amount of ADS's lost profits from ADS's loss of business with Commercial Accounts and treble that amount as authorized under the Clayton Act, 15 U.S.C. § 15(a);

5.  An award of monetary damages against Tyco in the amount of ADS's lost profits from ADS's loss of business with Commercial Accounts and treble that amount as authorized under the Clayton Act, 15 U.S.C. § 15(a); and,

6.  An award of costs and reasonable attorney's fees as authorized under 15 U.S.C. § 15(a);

7.  Such other relief as this Court may deem just and reasonable.

**COUNT II – LEMONT'S, CROSS POINTS', AND TYCO'S VIOLATION**

CHICAGO\4173582.4
ID\KBM - 110623\0003

## OF SHERMAN ACT § 1 –
### (Contract or Combination in Restraint of Trade)

214.     ADS realleges and incorporates by reference paragraphs 1 through 48, 90 through 110, and 135 through 161 as though fully set forth herein.

215.     Lemont and Cross Points have combined, conspired and contracted, through the anticompetitive means described above, to restrain trade and commerce among the several states and to suppress and prevent competition in the Relevant Market in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

216.     Lemont and Tyco have combined, conspired and contracted, through the anticompetitive means described above, to restrain trade and commerce among the several states and to suppress and prevent competition in the Relevant Market in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

217.     The combinations, conspiracies and contracts entered into between Lemont and Cross Points were undertaken with the express purpose and intent of unlawfully restraining competition and thereby excluding ADS and other potential market competitors from the Relevant Market.

218.     The combinations, conspiracies and contracts entered into between Lemont and Tyco were undertaken with the express purpose and intent of unlawfully restraining competition and thereby excluding ADS and other potential market competitors from the Relevant Market.

219.     Lemont's and Cross Points' anticompetitive agreements, schemes, acts, and practices described herein have substantially and adversely impacted and unreasonably restrained, and continue to substantially and adversely impact and restrain, interstate commerce in the Relevant Market.

CHICAGO\4173582.4
ID\KBM - 110623\0003

220.    Lemont's and Tyco's anticompetitive agreements, schemes, acts, and practices described herein have substantially and adversely impacted and unreasonably restrained, and continue to substantially and adversely impact and restrain, interstate commerce in the Relevant Market.

221.    No valid reasons exist for Lemont's and Cross Points' anticompetitive agreements, schemes, acts and/or practices.

222.    No valid reasons exist for Lemont's and Tyco's anticompetitive agreements, schemes, acts and/or practices.

223.    As a direct and proximate result of Lemont's unlawful conduct as described herein, ADS has previously suffered and will continue to suffer economic injury and damage in its business, property, and other economic interests in an amount difficult to determine given the substantial exclusion of competition created by Lemont, where Cross Points was the sole provider of fire alarm monitoring equipment, pursuant to the Lemont 2002 Ordinance and the Lemont Agreement, and where Tyco is now the sole provider of fire alarm monitoring equipment, pursuant to the Lemont-Tyco Agreement.

224.    As a direct and proximate result of Tyco's unlawful conduct as described herein, ADS has previously suffered and will continue to suffer economic injury and damage in its business, property, and other economic interests in an amount difficult to determine given the absolute exclusion of competition created by Lemont, where Tyco is the sole or principal provider of fire alarm monitoring equipment, pursuant to the Lemont-Tyco Agreement.

225.    In addition, as a direct and proximate result of Lemont's unlawful conduct as described herein, ADS has suffered lost profits.

CHICAGO\4173582.4
ID\KBM - 110623\0003

226. In addition, as a direct and proximate result of Cross Points' unlawful conduct as described herein, ADS has suffered lost profits.

227. In addition, as a direct and proximate result of Tyco's unlawful conduct as described herein, ADS has suffered lost profits.

228. There exists no express grant of authority under the District Act to allow Lemont to monopolize the Business.

229. Lemont is immune from antitrust damages under the Local Government Antitrust Immunity Act, 15 U.S.C. §§ 34-36, and therefore ADS has no adequate remedy at law against Lemont.

230. Unless enjoined immediately, Lemont's agreement with Tyco to transfer the Business and assign all Subscriber Agreements to Tyco, will cause irreparable harm and damage to ADS and the general public for which ADS and the general public have no adequate remedy at law.

WHEREFORE, Plaintiff moves this Honorable Court for the following relief:

1. A declaratory judgment that the Lemont 2002 Ordinance, the Lemont Agreement, and Lemont-Tyco Agreement violate ADS's rights under Section 1 of the Sherman Act;

2. An order preliminarily and permanently enjoining Lemont and Tyco from engaging in the Business;

3. An order preliminarily and permanently enjoining Lemont from enforcing the Lemont 2002 Ordinance, the Lemont Agreement, and the Lemont-Tyco Agreement and requiring Lemont and Tyco to completely divest themselves from the Business in a manner that will ensure that all private alarm contractors in the Business will be able to freely and openly

CHICAGO\4173582.4
ID\KBM - 110623\0003

compete for Commercial Accounts in the Relevant Market and that the provider in the Business selected by such Commercial Accounts;

4.     An award of monetary damages against Cross Points in the amount of ADS's lost profits from ADS's loss of business with Commercial Accounts and treble that amount as authorized under the Clayton Act, 15 U.S.C. § 15(a);

5.     An award of monetary damages against Tyco in the amount of ADS's lost profits from ADS's loss of business with Commercial Accounts and treble that amount as authorized under the Clayton Act, 15 U.S.C. § 15(a);

6.     An award of costs and reasonable attorney's fees as authorized under 15 U.S.C. § 15(a); and,

7.     Such other relief as this Court may deem just and reasonable.

### COUNT III – ORLAND'S AND TYCO'S VIOLATION OF SHERMAN ACT § 1 – (Contract or Combination in Restraint of Trade)

231.     ADS realleges and incorporates by reference paragraphs 1 through 48 and 111 through 161 as though fully set forth herein.

232.     Orland and Tyco have combined, conspired and contracted, through the anticompetitive means described above, to restrain trade and commerce among the several states and to suppress and prevent competition in the Relevant Market in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

233.     The combinations, conspiracies and contracts entered into between Orland and Tyco were undertaken with the express purpose and intent of unlawfully restraining competition, and thereby excluding ADS and other potential market competitors from the Relevant Market.

CHICAGO\4173582.4
ID\KBM - 110623\0003

234. Orland's and Tyco's anticompetitive agreements, schemes, acts, and practices described herein have substantially and adversely impacted and unreasonably restrained, and continue to substantially and adversely impact and restrain, interstate commerce in the Relevant Market.

235. No valid reasons exist for Orland's and Tyco's anticompetitive agreements, schemes, acts and/or practices.

236. As a direct and proximate result of Orland's and Tyco's unlawful conduct as described herein, ADS has previously suffered and will continue to suffer economic injury and damage in its business, property, and other economic interests in an amount difficult to determine given the absolute exclusion of competition created by Orland and Tyco through the Orland 2006 Ordinance and various contractual agreements for many years.

237. In addition, as a direct and proximate result of Orland's and Tyco's unlawful conduct as described herein, ADS has suffered lost profits.

238. There exists no express grant of authority under the District Act to allow Orland to monopolize the Business.

239. Orland is immune from antitrust damages under the Local Government Antitrust Immunity Act, 15 U.S.C. §§ 34-36, and therefore ADS has no adequate remedy at law against Orland.

240. Unless enjoined immediately, the Orland 2006 Ordinance, Orland Agreement, and the Second Orland Agreement, will cause irreparable harm and damage to ADS and the general public, for which ADS and the general public have no adequate remedy at law.

WHEREFORE, Plaintiff moves this Honorable Court for the following relief:

CHICAGO\4173582.4
ID\KBM - 110623\0003

1.     A declaratory judgment that the Orland 2006 Ordinance, Orland Agreement, and Second Orland Agreement violate ADS's rights under Section 1 of the Sherman Act;

2.     An order preliminarily and permanently enjoining Orland and Tyco from engaging in the Business;

3.     An order preliminarily and permanently requiring Orland and Tyco to completely divest themselves from the Business in a manner that will ensure that all private alarm contractors in the Business will be able to freely and openly compete for Commercial Accounts in the Relevant Market and that the provider in the Business selected by such Commercial Accounts;

4.     An award of monetary damages against Tyco in the amount of ADS's lost profits from ADS's loss of business with Commercial Accounts and treble that amount as authorized under the Clayton Act, 15 U.S.C. § 15(a);

5.     An award of costs and reasonable attorney's fees as authorized under 15 U.S.C. § 15(a); and,

6.     Such other relief as this Court may deem just and reasonable.

## COUNT IV – BLOOMINGDALE'S, CHICAGO METRO'S, AND TYCO'S VIOLATION OF SHERMAN ACT § 2 –
### (Unlawful Monopolization, Attempted Monopolization and Conspiracy to Monopolize)

241.     ADS realleges and incorporates by reference paragraphs 1 through 89 and 135 through 161 as though fully set forth herein.

242.     Bloomingdale's, Chicago Metro's and Tyco's anticompetitive conduct, agreements, schemes, acts and practices constitute intentional and unlawful monopolization of interstate trade and commerce in the Relevant Market, and the intentional and unlawful

43

maintenance and use of monopoly power in the Relevant Market, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

243.    Bloomingdale's, Chicago Metro's and Tyco's anticompetitive conduct, agreements, schemes, acts and practices constitute intentional and unlawful attempted monopolization of interstate trade and commerce in the Relevant Market defined above, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

244.    Bloomingdale, Chicago Metro and Tyco have acted with the specific intent to attempt to monopolize the Relevant Market, and have sufficient market power to create a dangerous probability of success of monopolizing the Relevant Market.

245.    Additionally, Bloomingdale's, Chicago Metro's and Tyco's active participation in various agreements and combinations constitutes a conspiracy to monopolize the Relevant Market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

246.    Bloomingdale, Chicago Metro and Tyco have excluded, or attempted to exclude, competition in the Relevant Market by preventing or impeding competition in the Relevant Market.

247.    As described above, the acquisition or attempted acquisition of a monopoly in the Relevant Market has been secured by illegal means.

248.    Bloomindale's, Chicago Metro's and Tyco's anticompetitive conduct, agreements, schemes, acts and practices have injured competition and consumers in the Relevant Market by eliminating all competition in the Relevant Market and increasing prices to customers.

249.    As a direct and proximate result of Bloomingdale's, Chicago Metro's and Tyco's unlawful conduct as described herein, ADS has suffered economic injury and has been damaged

44

in its business, property, and other economic interests in an amount difficult to determine given the absolute exclusion of competition created by Bloomingdale and transferred to Tyco.

250. In addition, as a direct and proximate result of Bloomingdale's, Chicago Metro's and Tyco's unlawful conduct as described herein, ADS has suffered lost profits.

251. There exists no express grant of authority under the District Act to allow Bloomingdale to monopolize the Business.

252. Bloomingdale is immune from antitrust damages under the Local Government Antitrust Immunity Act, 15 U.S.C. §§ 34-36, and therefore ADS has no adequate remedy at law against Bloomingdale.

253. Unless enjoined immediately, Bloomindale's, Chicago Metro's and Tyco's continued monopolization, attempted monopolization, and conspiracy to monopolize the Relevant Market will cause irreparable harm and damage to ADS and the consumers in the Relevant Market, for which ADS and such consumers have no adequate remedy at law.

WHEREFORE, Plaintiff moves this Honorable Court for the following relief:

1. A declaratory judgment that the 2014 Bloomingdale Ordinances and Tyco Purchase Agreement violate ADS's rights under Section 2 of the Sherman Act;

2. An order preliminarily and permanently enjoining Bloomindale and Tyco from engaging in the Business;

3. An order preliminarily and permanently requiring Tyco to completely divest itself from the Business in a manner that will ensure that all private alarm contractors in the Business will be able to freely and openly compete for Commercial Accounts in the Relevant Market and that Commercial Accounts will have the benefits of free competition in their selections of private alarm contractors, including ADS, to provide them with the Business;

4.      An award of monetary damages against Tyco in the amount of ADS's lost profits from ADS's loss of business with Commercial Accounts and treble that amount as authorized under the Clayton Act, 15 U.S.C. § 15(a);

5.      An award of monetary damages against Chicago Metro in the amount of ADS's lost profits from ADS's loss of business with Commercial Accounts and treble that amount as authorized under the Clayton Act, 15 U.S.C. § 15(a);

6.      An award of costs and reasonable attorney's fees as authorized under 15 U.S.C. § 15(a); and,

7.      Such other relief as this Court may deem just and reasonable.

## COUNT V – LEMONT'S, TYCO'S, AND CROSS POINTS' VIOLATION OF SHERMAN ACT § 2 –
### (Unlawful Monopolization, Attempted Monopolization and Conspiracy to Monopolize)

254.      ADS realleges and incorporates by reference paragraphs 1 through 48, 90 through 110, and 135 through 161 as though fully set forth herein.

255.      Lemont's, Tyco's and Cross Points' anticompetitive conduct, agreements, schemes, acts and practices constitute intentional and unlawful monopolization of interstate trade and commerce in the Relevant Market, and the intentional and unlawful maintenance and use of monopoly power in the Relevant Market, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

256.      Lemont's, Tyco's and Cross Points' anticompetitive conduct, agreements, schemes, acts and practices constitute intentional and unlawful attempted monopolization of interstate trade and commerce in the Relevant Market defined above, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

46

257.    Lemont, Tyco and Cross Points have acted with the specific intent to attempt to monopolize the Relevant Market, and have sufficient market power to create a dangerous probability of success of monopolizing the Relevant Market.

258.    Additionally, Lemont's, Tyco's and Cross Points' active participation in various agreements and combinations constitutes a conspiracy to monopolize the Relevant Market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

259.    Lemont, Tyco and Cross Points have excluded, or attempted to exclude, competition in the Relevant Market by preventing or impeding competition in the Relevant Market.

260.    As described above, the acquisition or attempted acquisition of a monopoly in the Relevant Market has been secured by illegal means.

261.    Lemont's, Tyco's and Cross Points' anticompetitive conduct, agreements, schemes, acts and practices have injured competition and consumers in the Relevant Market by eliminating all competition in the Relevant Market and increasing prices to customers.

262.    As a direct and proximate result of Lemont's, Tyco's and Cross Points' unlawful conduct as described herein, ADS has suffered economic injury and has been damaged in its business, property, and other economic interests in an amount difficult to determine given the absolute exclusion of competition created by Lemont in cooperation with Cross Points.

263.    In addition, as a direct and proximate result of Lemont's, Tyco's and Cross Points' unlawful conduct as described herein, ADS has suffered lost profits.

264.    There exists no express grant of authority under the District Act to allow Lemont to monopolize the Business.

CHICAGO\4173582.4
ID\KBM - 110623\0003

265. Lemont is immune from antitrust damages under the Local Government Antitrust Immunity Act, 15 U.S.C. §§ 34-36, and therefore ADS has no adequate remedy at law against Lemont.

266. Unless enjoined immediately, the continued monopolization, attempted monopolization, and conspiracy to monopolize the Relevant Market by Lemont and Cross Points will cause irreparable harm and damage to ADS and the consumers in the Relevant Market, for which ADS and such consumers have no adequate remedy at law.

WHEREFORE, Plaintiff moves this Honorable Court for the following relief:

1. A declaratory judgment that the Lemont 2002 Ordinance, the Lemont Agreement, and Lemont-Tyco Agreement violate ADS's rights under Section 2 of the Sherman Act;

2. An order preliminarily and permanently enjoining Lemont and Tyco from engaging in the Business;

3. An order preliminarily and permanently requiring Lemont and Tyco to completely divest itself from the Business in a manner that will ensure that all private alarm contractors in the Business will be able to freely and openly compete for Commercial Accounts in the Relevant Market and that Commercial Accounts will have the benefits of free competition in their selections of private alarm contractors, including ADS, to provide them with the Business;

4. An award of monetary damages against Cross Points in the amount of ADS's lost profits from ADS's loss of business with Commercial Accounts and treble that amount as authorized under the Clayton Act, 15 U.S.C. § 15(a);

5. An award of monetary damages against Tyco in the amount of ADS's lost profits from ADS's loss of business with Commercial Accounts and treble that amount as authorized under the Clayton Act, 15 U.S.C. § 15(a); and,

48

6.     An award of costs and reasonable attorney's fees as authorized under 15 U.S.C. § 15(a);

7.     Such other relief as this Court may deem just and reasonable.

## COUNT VI – ORLAND'S AND TYCO'S VIOLATION OF SHERMAN ACT § 2 – (Unlawful Monopolization, Attempted Monopolization and Conspiracy to Monopolize)

267.     ADS realleges and incorporates by reference paragraphs 1 through 48 and 111 through 161 as though fully set forth herein.

268.     Orland's and Tyco's anticompetitive conduct, agreements, schemes, acts and practices constitute intentional and unlawful monopolization of interstate trade and commerce in the Relevant Market, and the intentional and unlawful maintenance and use of monopoly power in the Relevant Market, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

269.     Orland's and Tyco's anticompetitive conduct, agreements, schemes, acts and practices constitute intentional and unlawful attempted monopolization of interstate trade and commerce in the Relevant Market defined above, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

270.     Orland and Tyco have acted with the specific intent to attempt to monopolize the Relevant Market, and have sufficient market power to create a dangerous probability of success of monopolizing the Relevant Market.

271.     Additionally, Orland's and Tyco's active participation in various agreements and combinations constitutes a conspiracy to monopolize the Relevant Market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

272.     Orland and Tyco have excluded, or attempted to exclude, competition in the Relevant Market by preventing or impeding competition in the Relevant Market.

49

273. As described above, the acquisition or attempted acquisition of a monopoly in the Relevant Market has been secured by illegal means.

274. Orland's and Tyco's anticompetitive conduct, agreements, schemes, acts and practices have injured competition and consumers in the Relevant Market by eliminating all competition in the Relevant Market and increasing prices to customers.

275. As a direct and proximate result of Orland's and Tyco's unlawful conduct as described herein, ADS has suffered economic injury and has been damaged in its business, property, and other economic interests in an amount difficult to determine given the absolute exclusion of competition created by Orland and transferred to Tyco.

276. In addition, as a direct and proximate result of Orland's and Tyco's unlawful conduct as described herein, ADS has suffered lost profits.

277. There exists no express grant of authority under the District Act to allow Orland to monopolize the Business.

278. Orland is immune from antitrust damages under the Local Government Antitrust Immunity Act, 15 U.S.C. §§ 34-36, and therefore ADS has no adequate remedy at law against Orland.

279. Unless enjoined immediately, Orland's mandate of Tyco as the sole provider of the Business in the Relevant Market, and the continued monopolization, attempted monopolization, and conspiracy to monopolize the Relevant Market will cause irreparable harm and damage to ADS and the consumers in the Relevant Market, for which ADS and such consumers have no adequate remedy at law.

WHEREFORE, Plaintiff moves this Honorable Court for the following relief:

CHICAGO\4173582.4
ID\KBM - 110623\0003

1.  A declaratory judgment that the Orland 2006 Ordinance, Orland Agreement, and Second Orland Agreement violate ADS's rights under Section 2 of the Sherman Act;

2.  An order preliminarily and permanently enjoining Orland and Tyco from engaging in the Business;

3.  An order requiring Orland to completely divest itself from the Business in a manner that will ensure that all private alarm contractors in the Business will be able to freely and openly compete for Commercial Accounts in the Relevant Market and that Commercial Accounts will have the benefits of free competition in their selections of private alarm contractors, including ADS, to provide them with the Business;

4.  An award of monetary damages against Tyco in the amount of ADS's lost profits from ADS's loss of business with Commercial Accounts and treble that amount as authorized under the Clayton Act, 15 U.S.C. § 15(a); and,

5.  An award of costs and reasonable attorney's fees as authorized under 15 U.S.C. § 15(a); and,

6.  Such other relief as this Court may deem just and reasonable.

## COUNT VII – LEMONT'S AND TYCO'S VIOLATION OF CLAYTON ACT § 7 – (Acquisition Lessening Competition and Creating a Monopoly)

280.  ADS realleges and incorporates by reference paragraphs 1 through 89 and 135 through 161 as though fully set forth herein.

281.  The activities of Lemont and Tyco have impacted the substantial and uninterrupted flow of products, services, contracts, and claims in interstate commerce and the transfer of substantial sums of money across state lines. Both are involved in activities affecting commerce in the United States.

51

282. Tyco's acquisition of the Lemont wireless network, including the wireless transmitters in Commercial Accounts and receiving equipment used in the wireless network from Lemont, are asset acquisitions within the meaning of Section 7 of the Clayton Act, 15 U.S.C. § 18.

283. The effect of this acquisition has been to substantially lessen competition and to create or maintain a monopoly in this Relevant Market within the United States in violation Section 7 of the Clayton Act, 15 U.S.C. § 18.

284. The effect of the acquisition has directly diminished ADS's ability to provide full services to its Commercial Accounts or to engage its customer base, and therefore has impaired past and future sales and profit opportunities, as well as increased ADS's marginal operating costs and prevented ADS from offering competing products and lower prices to Commercial Accounts in the Relevant Market.

285. There exists no express grant of authority under the District Act to allow Lemont to monopolize the Business.

286. Lemont is immune from antitrust damages under the Local Government Antitrust Immunity Act, 15 U.S.C. §§ 34-36, and therefore ADS has no adequate remedy at law against Lemont.

287. Lemont's transfer of the wireless network to Tyco and Lemont and Tyco's perpetuation of the monopoly in the Relevant Market will cause irreparable harm and damage to ADS and the general public, for which ADS and the general public have no adequate remedy at law.

288. In addition, as a direct and proximate result of Lemont's and Tyco's unlawful conduct as described herein, ADS has suffered lost profits.

52

WHEREFORE, Plaintiff moves this Honorable Court for the following relief:

1.     A declaratory judgment that the Lemont-Tyco Agreement violates ADS's rights under Section 7 of the Clayton Act;

2.     An order preliminarily and permanently enjoining Lemont and Tyco from transferring the Business to Tyco;

3.     An order requiring Tyco to completely divest itself from the Business in a manner that will ensure that all private alarm contractors in the Business will be able to freely and openly compete for Commercial Accounts in the Relevant Market and that Commercial Accounts will have the benefits of free competition in their selections of private alarm contractors, including ADS, to provide them with the Business;

4.     An award of monetary damages against Tyco in the amount of ADS's lost profits from ADS's loss of business with Commercial Accounts and treble that amount as authorized under the Clayton Act, 15 U.S.C. § 15(a); and,

5.     An award of costs and reasonable attorney's fees as authorized under 15 U.S.C. § 15(a);

6.     Such other relief as this Court may deem just and reasonable.

### COUNT VIII – BLOOMINGDALE'S AND TYCO'S VIOLATION OF CLAYTON ACT § 7
### (Acquisition Lessening Competition and Creating a Monopoly)

289.     ADS realleges and incorporates by reference paragraphs 1 through 89 and 135 through 161 as though fully set forth herein.

290.     The activities of Bloomingdale and Tyco have impacted the substantial and uninterrupted flow of products, services, contracts, and claims in interstate commerce and the

53

transfer of substantial sums of money across state lines. Both are involved in activities affecting commerce in the United States.

291.    Tyco's acquisition of the Bloomingdale wireless network, including the wireless transmitters in Commercial Accounts and receiving equipment used in the wireless network from Bloomingdale, are asset acquisitions within the meaning of Section 7 of the Clayton Act, 15 U.S.C. § 18.

292.    The effect of this acquisition has been to substantially lessen competition and to create or maintain a monopoly in this Relevant Market within the United States in violation Section 7 of the Clayton Act, 15 U.S.C. § 18.

293.    The effect of the acquisition has directly diminished ADS's ability to provide full services to its Commercial Accounts or to engage its customer base, and therefore has impaired past and future sales and profit opportunities, as well as increased ADS's marginal operating costs and prevented ADS from offering competing products and lower prices to Commercial Accounts in the Relevant Market.

294.    In addition, as a direct and proximate result of Bloomingdale's and Tyco's unlawful conduct as described herein, ADS has suffered lost profits.

295.    There exists no express grant of authority under the District Act to allow Bloomingdale to monopolize the Business.

296.    Bloomingdale is immune from antitrust damages under the Local Government Antitrust Immunity Act, 15 U.S.C. §§ 34-36, and therefore ADS has no adequate remedy at law against Bloomingdale.

CHICAGO\4173582.4
ID\KBM - 110623\0003

297.    Bloomindale's transfer of the wireless network to Tyco and the perpetuation of the monopoly in the Relevant Market will cause irreparable harm and damage to ADS and the general public, for which ADS and the general public have no adequate remedy at law.

WHEREFORE, Plaintiff moves this Honorable Court for the following relief:

1.    A declaratory judgment that the 2014 Bloomingdale Ordinances and Tyco Purchase Agreement violate ADS's rights under Section 7 of the Clayton Act;

2.    An order preliminarily and permanently enjoining Bloomingdale and Tyco from engaging in the Business;

3.    An order requiring Tyco to completely divest itself from the Business in a manner that will ensure that all private alarm contractors in the Business will be able to freely and openly compete for Commercial Accounts in the Relevant Market and that Commercial Accounts will have the benefits of free competition in their selections of private alarm contractors, including ADS, to provide them with the Business;

4.    An award of monetary damages against Tyco in the amount of ADS's lost profits from ADS's loss of business with Commercial Accounts and treble that amount as authorized under the Clayton Act, 15 U.S.C. § 15(a);

5.    An award of costs and reasonable attorney's fees as authorized under 15 U.S.C. § 15(a); and,

6.    Such other relief as this Court may deem just and reasonable.

## COUNT IX – BLOOMINGDALE'S, CHICAGO METRO'S, AND TYCO'S VIOLATION OF ADS'S RIGHTS AS PROTECTED BY THE DUE PROCESS AND EQUAL PROTECTION CLAUSES OF THE U.S. CONSTITUTION
### (Different Treatment of Similarly Situated Entities Under the Color of Law)

CHICAGO\4173582.4
ID\KBM - 110623\0003

298.    ADS realleges and incorporates by reference paragraphs 1 through 89 and 135 through 161 as though fully set forth herein.

299.    ADS, as a licensed private alarm contractor, is authorized by the Alarm Act to install and monitor fire alarm and burglar alarm systems anywhere in the State of Illinois, including within the Bloomingdale Territory.

300.    Bloomingdale, in conjunction with Chicago Metro, interfered with and took away ADS's rights under its license under the Alarm Act to provide fire alarm services, including the Business, to existing Commercial Accounts or offering the Business to prospective customers, which actions were irrational and wholly arbitrary as private alarm contractors are the only ones licensed to provide fire alarm services, including the Business.

301.    Bloomingdale, in conjunction with Tyco, interfered with and took away ADS's rights under its license under the Alarm Act to provide fire alarm services, including the Business, to existing Commercial Accounts or offering the Business to prospective customers, which actions were irrational and wholly arbitrary as private alarm contractors are the only ones licensed to provide fire alarm services, including the Business.

302.    Bloomingdale has been operating as an alarm contractor in contravention of the due process and equal protection provisions of the Fourteenth Amendment to the U.S. Constitution.

303.    Bloomingdale has been operating the Business without a license under the Alarm Act even though all others engaged in the business as a private alarm contractor are required to be licensed in order to engage in the Business.

304.    ADS and other private alarm contractors were being treated differently than Chicago Metro and Tyco as similarly situated entities in violation of the Equal Protection Clause.

305. The actions of Bloomingdale in conjunction with Tyco are actions under color of law within the meaning of the Fourteenth Amendment to the U.S. Constitution.

306. The actions of Bloomingdale in conjunction with Chicago Metro are actions under color of law within the meaning of the Fourteenth Amendment to the U.S. Constitution.

307. Bloomingdale's and Tyco's joint actions constitute violations of ADS's constitutional rights under the Fourteenth Amendment.

308. Bloomingdale's and Chicago Metro's joint actions constitute violations of ADS's constitutional rights under the Fourteenth Amendment.

309. As a result thereof, ADS has suffered harm including loss of: (1) revenue from their existing Commercial Accounts for their Business or alarm services; (2) referrals from existing customers for new Business; (3) reputation and standing in the commercial community and the interruption of long-standing relationships with their Commercial Accounts and the expectation that these relationships would continue for many years; (4) the ability to sell the Business to new Commercial Accounts and other fire alarm and burglar alarm services as well; and (5) good will.

310. As the nature of the harm suffered is difficult to calculate due to the exclusion of ADS from contracting for the Business with Commercial Accounts, the harm is irreparable.

311. In addition, as a direct and proximate result of Bloomingdale's and Tyco's unlawful conduct as described herein, ADS has suffered lost profits.

312. In addition, as a direct and proximate result of Bloomingdale's and Chicago Metro's unlawful conduct as described herein, ADS has suffered lost profits.

WHEREFORE, Plaintiff moves this Honorable Court for the following relief:

CHICAGO\4173582.4
ID\KBM - 110623\0003

1.    A declaratory judgment that the 2014 Bloomingdale Ordinances and the Tyco Purchase Agreement violate ADS's rights under the Fourteenth Amendment to the U.S. Constitution;

2.    An order preliminarily and permanently enjoining Bloomingdale from enforcing the 2014 Bloomingdale Ordinances and the continuation of its business relationship with Tyco;

3.    An award of monetary damages against Bloomingdale as authorized under 42 U.S.C. § 1983;

4.    An award of monetary damages against Chicago Metro as authorized under 42 U.S.C. § 1983;

5.    An award of monetary damages against Tyco as authorized under 42 U.S.C. § 1983; and,

6.    An award of costs and reasonable attorney's fees as authorized under 42 U.S.C. § 1988;

7.    Such other relief as this Court may deem just and reasonable.

## COUNT X – LEMONT'S, CROSS POINTS', AND TYCO'S VIOLATION OF ADS'S RIGHTS AS PROTECTED BY THE DUE PROCESS AND EQUAL PROTECTION CLAUSES OF THE U.S. CONSTITUTION
### (Different Treatment of Similarly Situated Entities Under the Color of Law)

313.    ADS realleges and incorporates by reference paragraphs 1 through 48, 90 through 110, and 135 through 161 as though fully set forth herein.

314.    ADS, as a licensed private alarm contractor, is authorized by the Alarm Act to install and monitor fire alarm and burglar alarm systems anywhere in the State of Illinois, including within the Lemont Territory.

58

315. Lemont, in conjunction with Cross Points, interfered with and took away ADS's rights under its license under the Alarm Act to provide fire alarm services, including the Business, to existing Commercial Accounts or offering the Business to prospective customers, which actions are irrational and wholly arbitrary as private alarm contractors are the only ones licensed to provide fire alarm services, including the Business.

316. Lemont, in conjunction with Tyco, interfered with and took away ADS's rights under its license under the Alarm Act to provide fire alarm services, including the Business, to existing Commercial Accounts or offering the Business to prospective customers, which actions are irrational and wholly arbitrary as private alarm contractors are the only ones licensed to provide fire alarm services, including the Business.

317. Lemont has been operating as an alarm contractor in contravention of the due process and equal protection provisions of the Fourteenth Amendment to the U.S. Constitution.

318. Lemont has been operating the Business without a license under the Alarm Act even though all others engaged in the business as a private alarm contractor are required to be licensed in order to engage in the Business.

319. ADS and other private alarm contractors are being treated differently than Cross Points and Tyco as similarly situated entities in violation of the Equal Protection Clause.

320. The actions of Lemont in undertaking the Business, to be installed and serviced by Cross Points, are actions under color of law within the meaning of the Fourteenth Amendment to the U.S. Constitution.

321. The actions of Lemont in conjunction with Tyco are actions under color of law within the meaning of the Fourteenth Amendment to the U.S. Constitution.

CHICAGO\4173582.4
ID\KBM - 110623\0003

322.     Lemont's and Cross Points' joint actions constitute violations of ADS's constitutional rights under the Fourteenth Amendment.

323.     Lemont's and Tyco's joint actions constitute violations of ADS's constitutional rights under the Fourteenth Amendment.

324.     As a result thereof, ADS has suffered harm including loss of: (1) revenue from their existing Commercial Accounts for their Business or alarm services; (2) referrals from existing customers for new Business; (3) reputation and standing in the commercial community and the interruption of long-standing relationships with their Commercial Accounts and the expectation that these relationships would continue for many years; (4) the ability to sell the Business to new Commercial Accounts and other fire alarm and burglar alarm services as well; and (5) good will.

325.     As the nature of the harm suffered is difficult to calculate due to the exclusion of ADS from contracting for the Business with Commercial Accounts, the harm is irreparable.

326.     In addition, as a direct and proximate result of Lemont's and Cross Points' unlawful conduct as described herein, ADS has suffered lost profits.

327.     In addition, as a direct and proximate result of Lemont's and Tyco's unlawful conduct as described herein, ADS has suffered lost profits.

WHEREFORE, Plaintiff moves this Honorable Court for the following relief:

1.     A declaratory judgment that the Lemont 2002 Ordinance, the Lemont Agreement, and Lemont-Tyco Agreement violate ADS's rights under the Fourteenth Amendment to the U.S. Constitution;

2.     An order preliminarily and permanently enjoining Lemont and Cross Points from enforcing the Lemont 2002 Ordinance, the Lemont Agreement, or Lemont-Tyco Agreement;

60

3. An award of monetary damages against Lemont as authorized under 42 U.S.C. § 1983;

4. An award of monetary damages against Cross Points as authorized under 42 U.S.C. § 1983;

5. An award of monetary damages against Tyco as authorized under 42 U.S.C. § 1983;

6. An award of costs and reasonable attorney's fees as authorized under 42 U.S.C. § 1988; and,

5. Such other relief as this Court may deem just and reasonable.

## COUNT XI – ORLAND'S AND TYCO'S VIOLATION OF ADS'S RIGHTS AS PROTECTED BY THE DUE PROCESS AND EQUAL PROTECTION CLAUSES OF THE U.S. CONSTITUTION
### (Different Treatment of Similarly Situated Entities Under the Color of Law)

328. ADS realleges and incorporates by reference paragraphs 1 through 48 and 111 through 161 as though fully set forth herein.

329. ADS, as a licensed private alarm contractor, is authorized by the Alarm Act to install and monitor fire alarm and burglar alarm systems anywhere in the State of Illinois, including within the Orland Territory.

330. Orland, in conjunction with Tyco, is interfering with and taking away ADS's rights under its license under the Alarm Act to provide fire alarm services, including the Business, to existing Commercial Accounts or offering the Business to prospective customers, which actions are irrational and wholly arbitrary as private alarm contractors are the only ones licensed to provide fire alarm services, including the Business.

CHICAGO\4173582.4
ID\KBM - 110623\0003

331.   Orland has been operating as an alarm contractor in contravention of the due process and equal protection provisions of the Fourteenth Amendment to the U.S. Constitution.

332.   Orland has been operating the Business without a license under the Alarm Act even though all others engaged in the business as a private alarm contractor are required to be licensed in order to engage in the Business.

333.   ADS and other private alarm contractors are being treated differently than Orland and Tyco as similarly situated entities in violation of the Equal Protection Clause.

334.   The actions of Orland in transferring the Business to Tyco are actions under color of law within the meaning of the Fourteenth Amendment to the U.S. Constitution.

335.   Orland's and Tyco's joint actions constitute violations of ADS's constitutional rights under the Fourteenth Amendment.

336.   As a result thereof, ADS has suffered harm including loss of: (1) revenue from their existing Commercial Accounts for their Business or alarm services; (2) referrals from existing customers for new Business; (3) reputation and standing in the commercial community and the interruption of long-standing relationships with their Commercial Accounts and the expectation that these relationships would continue for many years; (4) the ability to sell the Business to new Commercial Accounts and other fire alarm and burglar alarm services as well; and (5) good will.

337.   As the nature of the harm suffered is difficult to calculate due to the exclusion of ADS from contracting for the Business with Commercial Accounts, the harm is irreparable.

338.   In addition, as a direct and proximate result of Orland's and Tyco's unlawful conduct as described herein, ADS has suffered lost profits.

WHEREFORE, Plaintiff moves this Honorable Court for the following relief:

1.  A declaratory judgment that the Orland 2006 Ordinance, Orland Agreement, and Second Orland Agreement violate ADS's rights under the Fourteenth Amendment to the U.S. Constitution;

2.  An order preliminarily and permanently enjoining Orland from enforcing the Orland 2006 Ordinance, Orland Agreement, and Orland Second Agreement;

3.  An award of monetary damages against Orland as authorized under 42 U.S.C. § 1983;

4.  An award of monetary damages against Tyco as authorized under 42 U.S.C. § 1983;

5.  An award of costs and reasonable attorney's fees as authorized under 42 U.S.C. § 1988; and,

6.  Such other relief as this Court may deem just and reasonable.

## COUNT XII – PENDENT CLAIM FOR DECLARATORY JUDGMENT THAT BLOOMINGDALE DOES NOT HAVE THE AUTHORITY TO ADOPT AND ENFORCE THE AGREEMENT AND THAT THE BLOOMINGDALE SUBSCRIBER AGREEMENTS ARE VOID AB INITIO

339.  ADS incorporates by reference and restates paragraphs 1 through 89 and 135 through 161 as though more fully set forth herein.

340.  ADS has a clearly ascertainable right and/or protectable interest in its Customer Contracts with its Commercial Accounts within the Bloomingdale Territory as granted by Article 1, § 10 of the U.S. Constitution and under Article 1, § 16 of the Illinois Constitution.

341.  Bloomingdale had no authority to enter into the Subscriber Agreements in the first place.

CHICAGO\4173582.4
ID\KBM - 110623\0003

342.     As a result, the Subscriber Agreements are void *ab initio* and Bloomingdale has no legal interest to transfer to Tyco.

343.     Bloomingdale has no authority under the District Act to take over the Business from private alarm contractors, and yet Bloomingdale is now barring ADS and private alarm contractors other than Tyco from the Business.

344.     Bloomingdale has no authority under the District Act to effectively subvert the limitations under the District Act on charging residents by charging Commercial Accounts in the Bloomingdale Territory for services provided by Tyco and sharing in the revenue collected by Tyco for the same service Bloomingdale is barred by the District Act from providing.

345.     By effectively excluding the ability of private alarm contractors other than Tyco to provide fire alarm monitoring to their Commercial Accounts consistent with NFPA Standards, Bloomingdale has adopted a standard that does not parallel the NFPA Standards and thus violates the District Act.

346.     By effectively requiring the use of the radios installed by Chicago Metro and now owned by Tyco and excluding the use of identical radio transmitters or comparable radio transmitters installed by private alarm contractors, Bloomingdale has adopted a standard that does not parallel the NFPA Standards and thus violates the District Act.

347.     By engaging in a pattern of behavior that favors the use of radio transmitters owned by Tyco other than radio transmitters that are either identical to Tyco's radio transmitters or the functional equivalent, Bloomingdale is adopting a standard that does not parallel the NFPA Standards and thus violates the District Act.

348.     ADS will suffer irreparable injury if it is barred from being able to offer its Commercial Accounts the Business or unable to offer the Business to new Commercial Accounts

in the Bloomingdale Territory as ADS will lose: (1) revenue from their existing Commercial Accounts for their Business; (2) referrals from existing customers for new Business; (3) reputation and standing in the commercial community and the interruption of long-standing relationships with their Commercial Accounts and the expectation that these relationships would continue for many years; and (4) the ability to sell the Business to new Commercial Accounts and other fire alarm and burglar alarm services as well.

349.    There is no adequate remedy at law to fully and adequately compensate ADS, as the denial of a constitutional and statutory right constitutes irreparable injury.

WHEREFORE, Plaintiff moves this Honorable Court for the following relief:

1.    A declaratory judgment that Bloomingdale is exceeding its authority under the District Act therefore is engaged in unlawful activity;

2.    The Subscriber Agreements are void *ab initio* and Bloomingdale has no legal interest to transfer to Tyco; and,

3.    Such other relief as this Court may deem just and reasonable.

### COUNT XIII – PENDENT CLAIM FOR DECLARATORY JUDGMENT THAT LEMONT DOES NOT HAVE THE AUTHORITY TO ADOPT AND ENFORCE THE ORDINANCE OR THE AGREEMENT AND THAT THE LEMONT SUBSCRIBER AGREEMENTS ARE VOID AB INITIO

350.    ADS incorporates by reference and restates paragraphs 1 through 48, 90 through 110, and 135 through 161 as though more fully set forth herein.

351.    ADS has a clearly ascertainable right and/or protectable interest in its Customer Contracts with its Commercial Accounts within the Lemont Territory as granted by Article 1, § 10 of the U.S. Constitution and under Article 1, § 16 of the Illinois Constitution.

65

352.    Lemont had no authority to enter into the Subscriber Agreements in the first place.

353.    As a result, the Subscriber Agreements are void *ab initio* and Lemont has no legal interest to transfer to Tyco.

354.    Lemont has no authority under the District Act to take over the Business from private alarm contractors, and yet Lemont barred ADS and private alarm contractors other than Cross Points from the Business.

355.    Lemont has no authority under the District Act to take over the Business from private alarm contractors, and yet Lemont is barring ADS and private alarm contractors other than Tyco from the Business.

356.    Lemont has no authority under the District Act to effectively subvert the limitations under the District Act on charging residents by charging Commercial Accounts in the Lemont Territory for services provided by Cross Points, and remitting that payment to Cross Points, for the same service Lemont is barred by the District Act from providing.

357.    By excluding the ability of private alarm contractors other than Cross Points to provide fire alarm monitoring to their Commercial Accounts consistent with NFPA Standards, Lemont adopted a standard in the Lemont 2002 Ordinance and the Lemont Agreement that does not parallel the NFPA Standards and thus violates the District Act.

358.    By requiring the installation of radio transmitters by Cross Points as established by the Lemont 2002 Ordinance and the Lemont Agreement and excluding the use of identical radio transmitters or comparable radio transmitters installed by private alarm contractors, Lemont adopted a standard that does not parallel the NFPA Standards and thus violates the District Act.

66

359. By engaging in a pattern of behavior that favors the use of radio transmitters owned by Lemont or Cross Points over other radio transmitters that are either identical to Lemont's or Cross Points' radio transmitters or the functional equivalent under the Lemont 2002 Ordinance and the Lemont Agreement, indicating a pattern of behavior to deny any licensed alarm company other than Cross Points the right to provide radio transmitters or fire alarm monitoring services to Commercial Accounts, even if the alarm companies use the same or comparable equipment as specified in the Lemont 2002 Ordinance and meet the NFPA Standards, Lemont is adopting a standard that does not parallel the NFPA Standards and thus violates the District Act.

360. ADS will suffer irreparable injury if it is barred from being able to offer its Commercial Accounts the Business or unable to offer the Business to new Commercial Accounts in the Lemont Territory as ADS will lose: (1) revenue from their existing Commercial Accounts for their Business; (2) referrals from existing customers for new Business; (3) reputation and standing in the commercial community and the interruption of long-standing relationships with their Commercial Accounts and the expectation that these relationships would continue for many years; and (4) the ability to sell the Business to new Commercial Accounts and other fire alarm and burglar alarm services as well.

361. There is no adequate remedy at law to fully and adequately compensate ADS, as the denial of a constitutional right constitutes irreparable injury.

WHEREFORE, Plaintiff moves this Honorable Court for the following relief:

1. A declaratory judgment that the Lemont 2002 Ordinance, the Lemont Agreement, and Lemont-Tyco Agreement exceed the authority of Lemont and therefore are unlawful;

67

2.    Subscriber Agreements are void *ab initio* and Lemont has no legal interest to transfer to Tyco; and,

3.    Such other relief as this Court may deem just and reasonable.

## COUNT XIV – PENDENT CLAIM FOR DECLARATORY JUDGMENT THAT ORLAND DOES NOT HAVE THE AUTHORITY TO ADOPT AND ENFORCE THE ORDINANCE OR THE AGREEMENTS

362.    ADS incorporates by reference and restates paragraphs 1 through 48 and 111 through 161 as though more fully set forth herein.

363.    ADS has a clearly ascertainable right and/or protectable interest in its Customer Contracts with its Commercial Accounts within the Orland Territory as granted by Article 1, § 10 of the U.S. Constitution and under Article 1, § 16 of the Illinois Constitution.

364.    Orland has no authority under the District Act to take over the Business from private alarm contractors, and yet Orland is now barring ADS and private alarm contractors other than Tyco from the Business.

365.    Orland has no authority under the District Act to effectively subvert the limitations under the District Act on charging residents by having Tyco charge all Commercial Accounts in the Orland Territory for the same service Orland is barred by the District Act from providing.

366.    By excluding the ability of private alarm contractors other than Tyco to provide fire alarm monitoring to their Commercial Accounts consistent with NFPA Standards, Orland has adopted a standard in the Orland 2006 Ordinance, Orland Agreement, and Second Orland Agreement that does not parallel the NFPA Standards and thus violates the District Act.

367.    By requiring the installation of radio transmitters by Tyco as established by the Orland 2006 Ordinance, Orland Agreement, and Second Orland Agreement and excluding the

CHICAGO\4173582.4
ID\KBM - 110623\0003

use of identical radio transmitters or comparable radio transmitters installed by private alarm contractors, Orland has adopted a standard that does not parallel the NFPA Standards and thus violates the District Act.

368.    By engaging in a pattern of behavior that favors the use of radio transmitters owned by Orland or transferred to Tyco over other radio transmitters that are either identical to Orland's radio transmitters or the functional equivalent under the Orland 2006 Ordinance, Orland Agreement, and Second Orland Agreement indicating a pattern of behavior to deny any licensed alarm company other than Tyco the right to provide radio transmitters or fire alarm monitoring services to Commercial Accounts, even if the alarm companies use the same or comparable equipment as specified in the Orland Ordinance and meet the NFPA Standards, Orland is adopting a standard that does not parallel the NFPA Standards and thus violates the District Act.

369.    ADS will suffer irreparable injury if it is barred from being able to offer its Commercial Accounts the Business or unable to offer the Business to new Commercial Accounts in the Orland Territory as ADS will lose: (1) revenue from their existing Commercial Accounts for their Business; (2) referrals from existing customers for new Business; (3) reputation and standing in the commercial community and the interruption of long-standing relationships with their Commercial Accounts and the expectation that these relationships would continue for many years; and (4) the ability to sell the Business to new Commercial Accounts and other fire alarm and burglar alarm services as well.

370.    There is no adequate remedy at law to fully and adequately compensate ADS, as the denial of a constitutional right constitutes irreparable injury.

WHEREFORE, Plaintiff moves this Honorable Court for the following relief:

69

1.    A declaratory judgment that the Orland 2006 Ordinance, Orland Agreement, and

Second Orland Agreement exceed the authority of Orland and therefore are unlawful; and,

2.    Such other relief as this Court may deem just and reasonable.


Dated: May 16, 2014

                                  Respectfully submitted,


| | By:  Bruce L. Goldsmith_____ |
| | |
| | Bruce L. Goldsmith – ARDC No. 0996939 |
| | David J. Bressler – ARDC No. 6182549 |
| | Michele K. Schindler – ARDC No. 6293710 |
| | Kara B. Murphy - ARDC No. 6309748 |
| | DYKEMA GOSSETT PLLC |
| | 4200 Commerce Court, Suite 300 |
| | Lisle, Il  60532 |
| | 630-245-0400 |
| | |
| | *Attorneys for Alarm Detection Systems, Inc.* |

STATE OF ILLINOIS  )
                   )   SS.
COUNTY OF KANE     )

### VERIFICATION

ROBERT LUBIC, Vice President of ALARM DETECTION SYSTEMS, INC., being duly sworn on oath states that to the best of his knowledge, the information set forth in the foregoing Amended Verified Complaint is true and correct and that he has the authority to make this verification on behalf of himself and ALARM DETECTION SYSTEMS, INC.

Robert Lubic, Vice President
Alarm Detection Systems, Inc.

SUBSCRIBED & SWORN to
Before me this 16th day of
May, 2014

Notary Public

> OFFICIAL SEAL
> LINDA S HAMILTON
> Notary Public - State of Illinois
> My Commission Expires Aug 1, 2015

LISLE\156202.1
ID\DJBR - 110623\0003

## CERTIFICATE OF SERVICE

The undersigned certifies that on May 16, 2014, he caused the foregoing Amended Verified Complaint to be filed electronically with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all parties to this action via their counsel of record at their e-mail addresses on file with the Court.

                                                 Bruce L. Goldsmith

Bruce L. Goldsmith – ARDC No. 0996939
David J. Bressler – ARDC No. 6182549
Michele K. Schindler – ARDC No. 6293710
Kara B. Murphy - ARDC No. 6309748
DYKEMA GOSSETT PLLC
4200 Commerce Court, Suite 300
Lisle, Il  60532
630-245-0400

*Attorneys for Alarm Detection Systems, Inc.*