ALARM DETECTION SYSTEMS, INC.,

    Plaintiff,

    v.

ORLAND FIRE PROTECTION DISTRICT;
TYCO INTEGRATED SECURITY, LLC;
CROSS POINTS, INC.; and CHICAGO
METROPOLITAN FIRE PREVENTION
COMPANY,

    Defendants.

No. 14 C 876

Judge Thomas M. Durkin

## MEMORANDUM OPINION AND ORDER

Alarm Detection Systems, Inc. is a company that provides fire alarm services to commercial and multi-unit residential buildings. *See* R. 76 ¶¶ 1, 17. Alarm Detection alleges that three municipal fire protection districts in Illinois—Bloomingdale, Lemont, and Orland—exceeded their authority under Illinois's Fire Protection District Act, 70 ILCS 705 (the "District Act"), when they contracted with three fire alarm services companies—Tyco Integrated Security, LLC ("Tyco"); Cross Points, Inc. ("Cross Points"); and Chicago Metropolitan Fire Prevention Company ("Chicago Metro")—with respect to provision of certain fire alarm services and equipment. *See* R. 76 (Counts XII-XIV). Alarm Detection also alleges that this conduct constitutes anticompetitive business practices and a conspiracy to restrain trade in violation of the Sherman and Clayton Acts, *see id.* (Counts I-VIII), and violates the Equal Protection and Due Process Clauses of the Fourteenth

Amendment. *See id.* (Counts IX-XI). Alarm Detection filed a motion for a temporary restraining order on March 28, 2014, R. 50, which the Court denied on April 14, 2014. *See* R. 71; R. 72. Subsequently, Defendants filed motions to dismiss for failure to state a claim. *See* R. 86; R. 91; R. 92; R. 95; R. 97; R. 99. Alarm Detection settled its claims with Bloomingdale and Lemont, *see* R. 177; R. 211, but their actions remain relevant to determining the liability of the remaining defendants—Chicago Metro, Cross Points, Tyco, and Orland—and the remaining defendants have adopted their arguments in their briefs. For the following reasons, Chicago Metro and Cross Points's motions to dismiss are granted, and Orland and Tyco's motions are granted in part and denied in part.

## Legal Standard

A Rule 12(b)(6) motion challenges the sufficiency of the complaint. *See, e.g., Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). A complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), sufficient to provide defendant with "fair notice" of the claim and the basis for it. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). This standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While "detailed factual allegations" are not required, "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. The complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"

*Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). "'A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Mann v. Vogel*, 707 F.3d 872, 877 (7th Cir. 2013) (quoting *Iqbal*, 556 U.S. at 678). In applying this standard, the Court accepts all well-pleaded facts as true and draws all reasonable inferences in favor of the non-moving party. *Mann*, 707 F.3d at 877.

## Background

### I.     Fire Protection Regulation

The District Act "allows two or more local governments to consolidate fire protection and related services by creating a fire protection district." *ADT Sec. Servs., Inc. v. Lisle-Woodridge Fire Prot. Dist.*, 672 F.3d 492, 495 (7th Cir. 2012) (citing 70 ILCS 705/1). "Such districts operate with their own elected boards that exercise the powers spelled out in the [District] Act." *ADT Sec.*, 672 F.3d at 495. "These include the powers to buy or lease firefighting equipment, employ firefighters, and impose civil fines for setting false fire alarms, 70 ILCS 705/6, as well as the authority to tax district residents to pay for the fire protection services in the district. 70 ILCS 705/14." *ADT Sec.*, 672 F.3d at 495.

Section 11 of the District Act also gives fire protection districts like Bloomingdale, Lemont, and Orland "the express power to adopt and enforce fire prevention codes and standards parallel to national standards." 70 ILCS 705/11. Pursuant to Section 11, Bloomingdale, Lemont, and Orland have adopted the National Fire Protection Association's National Fire Alarm and Signaling Code

("NFPA Standards"). *See* R. 76 ¶ 33. "The NFPA Standards are nationally recognized standards . . . [that] set forth standards for, *inter alia*, fire alarm signal transmission equipment and fire monitoring." *Id.* ¶ 31.

Fire alarm signal transmission and monitoring is a service that is often provided by private alarm contractors. *See id.* ¶ 26. Alarm Detection and defendants Tyco, Cross Points, and Chicago Metro are all licensed private alarm contractors that provide such services to commercial and residential customers.[1] *Id.* ¶¶ 1, 21-23, 28.

"A fire alarm system in a [commercial or multi-unit residential building] generally includes an alarm panel, smoke and heat detectors, and a transmission device that sends [fire alarm] signals to either a central station or remote supervising station." *Id.* ¶ 34; *see also ADT Sec. Servs., Inc. v. Lisle-Wodridge Fire Prot. Dist.*, 724 F.3d 854, 860 (7th Cir. 2013) ("The [NFPA Standards] contemplate[] the use of either a Remote Supervising Station system or a Central Station system."). Private alarm contractors customarily design their alarm systems to send alarm signals to a central station. *See* R. 76 ¶¶ 35-36. When a private alarm contractor uses a central station to receive alarm signals from a building, the "[c]entral stations retransmit [the] alarm signals to the Public Safety Answering Points (911 centers or 'PSAP') which dispatch emergency personnel and equipment." *Id.* ¶ 37. Alternatively, fire protection districts can mandate that alarm signals skip the middle step of a central station and be sent directly to a remote supervising

---

[1] Such licensure is pursuant to the Private Detective, Private Alarm, Private Security, and Locksmith Act of 2004, 225 ILCS 447/5-5. *See* R. 76 ¶ 1.

station, "such as a municipal dispatch board." *ADT Sec.*, 724 F.3d at 859. The DuPage Public Safety Communications Center (known as "DuComm") is the PSAP dispatcher for Bloomingdale and Lemont. R. 76 ¶¶ 56, 108. Orland has its own PSAP dispatcher in its Public Safety Department's Communications Center (the "Orland Communications Center"). *Id.* ¶¶ 132-33.

## II.    Prior Ordinances

Bloomingdale, Lemont, and Orland each passed ordinances requiring that fire alarm signals be sent directly to their remote supervising stations. In 2005, Bloomingdale enacted Ordinance 05-229 "requir[ing] all [commercial or multi-unit residential buildings] to obtain fire alarm monitoring from Bloomingdale by means of wireless transmitters owned by and leased from Bloomingdale that could only be monitored by Bloomingdale." R. 76 ¶ 61. "Bloomingdale's wireless network involved the transmission of all . . . signals to receiving equipment at [Bloomingdale's] Fire Station 21 and the retransmission of such signals to DuComm." *Id.* ¶ 62. Bloomindale's ordinance also provided that "Chicago Metro shall be the only authorized installer and repair service." *Id.* ¶ 63. In enforcing its ordinance, Bloomingdale also required all commercial and multi-unit residential buildings "to enter into subscriber agreements . . . that obligated [the subscriber] to pay a monthly fee." *Id.* ¶ 67. Alarm Detection alleges that it lost its accounts in Bloomingdale due to the 2005 ordinance and agreement with Chicago Metro. *Id.* ¶¶ 64-65.

In 2002, Lemont enacted Ordinance 02-03 "mandating the use of the Lemont-owned wireless network." *Id.* ¶ 104. The Lemont ordinance "required [commercial or multi-unit residential buildings] using wireless transmitters [to] send all alarm . . . signals directly to the communications center of Lemont via Lemont's wireless radio network. The signals would then be retransmitted to DuComm." *Id.* ¶ 108. Additionally, Lemont signed an agreement with Cross Points to be the exclusive servicer of Lemont's network. *Id.* ¶¶ 99, 105. Lemont required commercial and multi-unit residential buildings "to sign new [s]ubscriber [a]greements," *id.* ¶ 107, and "to contract with Lemont and pay [a fee], which Lemont and Cross Points shared." *Id.* ¶ 110.

"In 2006, Orland adopted Ordinance 2006-003 . . . which required that all fire alarm systems in [commercial and multi-unit residential buildings] be monitored by [Orland]." *Id.* ¶ 145. Alarm Detection alleges that Orland also signed an agreement with Tyco providing that "[o]nly Tyco [can] provide the transmission of alarm signals from [commercial and multi-unit residential buildings] to the Orland Communications Center." *Id.* ¶ 148. The express terms of the agreement itself—which Alarm Detection attached to its complaint—gives Tyco "the exclusive right to install, maintain, replace, upgrade and operate . . . [Orland's] Public Safety Department communications center." R. 76-3 at 49 (¶ 1). The agreement also provides that "Tyco shall monitor existing Customers and any new Customers who in the future desire to be monitored at the Communications Center, provided that such existing and new Customers meet reasonable application criteria and enter

into a direct agreement with Tyco." *Id.* (¶ 2). Tyco is also required to "provide" the "equipment . . . required to operate [an alarm monitoring and receiving system] and provide monitoring services to . . . residents of [Orland's] service area." *Id.* (¶¶ 1-2). The agreement also provides that "Tyco charges other alarm companies an initial connection fee of [$150] and it charges [commercial or multi-unit residential buildings] a monthly monitoring fee of [$21] for dedicated phone line and digital signals, or [$38] for radio-transmitted signals." R. 76 ¶ 139.[2] "The fees charged to [commercial and multi-unit residential buildings] are exclusive of any fees of Orland, which may be 'passed to' [the commercial and multi-unit residential building accounts] by Tyco. In addition, Tyco must collect from [commercial and multi-unit residential building accounts] a [$7] to [$9] monthly service charge, and those funds must be remitted to Orland by Tyco." *Id.* ¶¶ 142-43.[3] Alarm Detection alleges that Tyco and Orland interpret this agreement to mean that Orland has authorized Tyco to require Orland subscribers "to buy" or lease the "wireless transmitter" necessary to connect to Orland's Communication Center from Tyco, and to pay Tyco for its installation. *Id.* ¶ 140.

---

[2] Alarm Detection's allegations reference the fees as they were in Orland's agreement with Tyco signed in 2003. *See* R. 76-3 at 56 (¶ 4). The current agreement, which took effect in 2014, provides that the "initial connection fee" is $200, and the "monthly monitoring fee" for "radio transmitted signals" is $23.50, and for "dedicated circuits" is $14. *See* R. 76-3 at 49 (¶ 4).

[3] The 2014 agreement provides that these fees are $14 and $23.50, respectively. *See* R. 76-3 at 50 (¶ 5).

## III.    Prior Litigation

This case can only be understood in the context of certain prior litigation about the fire alarm business. In 2009, the Lisle-Woodridge Fire Protection District (an entity not a party to this litigation) passed an ordinance similar to those at issue here "under which it took over fire alarm monitoring for all commercial property in [Lisle-Woodridge]," *ADT Sec.*, 724 F.3d at 858, and declared that any contracts the affected commercial property owners had with "other [private] fire alarm companies . . . were superseded and thus 'null and void.'" *ADT Sec. Servs., Inc. v. Lisle-Wodridge Fire Prot. Dist.*, 799 F. Supp. 2d 880, 883 (N.D. Ill. 2011). Lisle-Woodridge's ordinance required (1) that all fire alarm systems in the district connect to Lisle-Woodridge's remote supervising station, known as Station 3 (before then being relayed to DuComm); (2) that all fire alarm systems use a wireless connection; and (3) that "all account holders rely exclusively on [Lisle-Woodridge] and its chosen vendor [Chicago Metro] for providing alarm equipment and monitoring services." *ADT Sec.*, 672 F.3d at 498.

In 2010, Alarm Detection and Tyco jointly sued Lisle-Woodridge regarding its ordinance, bringing claims similar to those Alarm Detection has brought in this case. *See ADT Sec. Servs., Inc. v. Lisle-Wodridge Fire Prot. Dist.*, 10 C 4382, R. 1 (N.D. Ill. July 14, 2010). The district court permanently enjoined enforcement of the ordinance in its entirety, finding the District Act did not give Lisle-Woodridge the authority to enforce it. *See ADT Sec.*, 799 F. Supp. 2d at 881. The Seventh Circuit affirmed the district court's injunction to the extent that the district court found

that the District Act did not authorize Lisle-Woodridge "to make [itself and] Chicago Metro, the exclusive provider and servicer of the necessary equipment." *ADT Sec.*, 672 F.3d at 502-03. The court held that Lisle-Woodridge had "identified no provision in [the NFPA Standards] that authorizes such an arrangement, nor have we found one. . . . Neither the [NFPA Standards] nor the Act even tacitly endorses so drastic a policy change as the establishment of a local governmental monopoly over fire alarm transmitter devices." *Id.* at 503. The court also noted that the District Act did not provide Lisle-Woodridge the authority "to charge fees to the alarm companies for the privilege of connecting to [Lisle-Woodridge's alarm monitoring] board." *Id.* at 504.

The Seventh Circuit, however, also *reversed* the district court's injunction to the extent that the ordinance required commercial and multi-unit residential buildings to connect to Lisle-Woodridge's remote supervising station (Station 3), and that the connection be wireless. The court held, "Because the Ordinance selects among permissible alternatives by requiring alarm devices to direct-connect to the board at [Lisle-Woodridge's] own remote supervising station, it corresponds to and is therefore parallel to national standards." *Id.* at 501. The court also held that Lisle-Woodridge's "selection of wireless radio frequency as an exclusive form of communications technology is consistent with and therefore 'parallel' to these standards." *Id.* at 502.

Since the Seventh Circuit held that these two provisions of the ordinance did not exceed Lisle-Woodridge's authority under the District Act, the court remanded

the case for consideration of whether these requirements violated antitrust laws, issues that the district court had not reached. *Id.* at 503. In doing so, the court "acknowledge[d] [the] possibility" that Lisle-Woodridge's requirement for "direct connection to its own [alarm monitoring] board . . . [may] effectively perpetuate a monopoly over alarm monitoring that displaces competition—presumably by setting restrictive technical specifications to enable compatibility with its board." *Id.* The Court of Appeals expected that the district court would address these issues in the first instance on remand.

After remand Lisle-Woodridge repealed its 2009 ordinance and passed a new one in 2012. "Under the new 2012 ordinance, [Lisle-Woodridge] would not own any transmitters and would permit property owners to contract with private companies for alarm transmission and monitoring and the necessary equipment. But the signals would still need to be transmitted via [Lisle-Woodridge's] wireless network to [Lisle-Woodridge's] receiver at Station 3 to be transmitted to the receiver at DuComm. Under this arrangement, [Lisle-Woodridge] would collect no fees from property owners but DuComm would collect fees on its behalf." *ADT Sec.*, 724 F.3d at 861. Although the new statute required private alarm companies to transmit fire alarm signals directly to Station 3, the ordinance also permitted them to simultaneously transmit the signal to a private alarm company's own central station. *Id.* at 865. Lisle-Woodridge also required private alarm companies to use "only one specific type of transmitter" in order to "join [Lisle-Woodridge's] wireless network." *Id.* at 864-65.

After an evidentiary hearing, the district court determined that the private alarm companies used signal transmission technology that was not compatible with the signal reception program used at Station 3, *see* R. 76-1 at 27-28 (¶¶ 85-87), and that most commercial and multi-unit residential buildings did not have transmitters that could transmit a signal to more than one receiver simultaneously. The district court also found that Station 3 did not comply with NFPA Standards because it was not properly staffed and relied on a hard-wired connection to DuComm without a redundant connection. *See id.* at 23-24 (¶¶ 63-65). The district court issued a new permanent injunction, finding that Lisle-Woodridge did not have the authority to mandate connection with Station 3, *see id.* 76-1 at 30 (¶¶ 16-19), and that Lisle-Woodridge's "requirement that all fire alarm signals be directly transmitted to Station Number 3 would result in an illegal monopoly over fire alarm monitoring." *Id.* ¶ 9. The district court ordered Lisle-Woodridge to contact any building owners for which it continued to provide alarm signal transmitters and inform them that they were required to convert to a transmitter supplied by a private alarm company, at which point their contract with Lisle-Woodridge would become "null and void." R. 76-1 at 32 (¶ 11).

The Seventh Circuit affirmed the injunction. The court agreed that Lisle-Woodridge did not have authority under the District Act to mandate connection to Station 3 because it is "unsupervised" and "without back-up equipment" such that it "does not meet the basic safety requirements to function as an intermediary station under the [NFPA Standards]." *ADT Sec.*, 724 F.3d at 864. The court also had

"significant concerns about the anti-competitive effects of" the fact that Lisle-Woodridge's "network is accessible with only one specific type of transmitter." *Id.* at 864-65. The court noted, "This requirement means that alarm companies must either replace all of their existing equipment and transmission technology or they cannot provide alarm monitoring services to customers in [Lisle-Woodridge]," thereby effectively "[e]xcluding alarm companies from the monitoring business or making it unduly burdensome for them to participate." *Id.* at 865. The court also noted that the requirement that alarm signals be sent to Station 3 "effectively precluded" alarm companies from using their own central station because "current alarm transmitters for commercial properties generally are incapable of sending two signals simultaneously." *Id.*

## IV.     Response to the Lisle-Woodridge Decisions

"In September 2013, Tyco's in-house counsel wrote a letter to Lemont Fire Chief George Rimbo advising him of the Seventh Circuit's decision and warning that Lemont was engaged in the same type of conduct that that the District Court and Seventh Circuit determined to be illegal in the *Lisle-Woodridge* Case." R. 76 ¶ 118; *see also* R. 76-3 at 9-10. Two months later, Lemont issued a written public notice dated November 6, 2013, stating that the 2002 ordinance was "suspended due to pending litigation." R. 76-3 at 11. In response to the November 6 notice, Alarm Detection "contacted Lemont to confirm that it would be allowed to provide central station monitoring . . . in Lemont." R. 76 ¶ 122. Lemont responded that the November 6 notice was premature and that "there had been no change in Lemont's

mandate that all [commercial and multi-unit residential buildings] had to connect to Lemont's wireless network." *Id.* ¶ 122.

Then, on March 20, 2014, Lemont amended its 2002 ordinance to reflect that its residents were no longer required to use Cross Points to service their alarm transmission systems. *Id.* ¶ 123. Lemont also sold all of its fire alarm monitoring equipment, and assigned all its service subscriber agreements to Tyco. *Id.* ¶¶ 124-25. On April 25, 2014, Lemont sent a letter to its subscribers informing them their subscriber agreements had been assigned to Tyco "on an interim basis," and that the subscribers were "free to choose any qualified, licensed alarm vendor . . . to maintain, install and monitor your alarm." R. 76-3 at 41. This phrase (in sum and substance) was repeated twice in the letter, printed in bold, capital letters. *See id.* Alarm Detection alleges that "Tyco now owns and maintains the equipment to operate the wireless network in [Lemont] and is using Orland to monitor its Commercial Accounts and pays Orland a fee for such monitoring." R. 76 ¶ 127.

Similarly, Bloomingdale sold its alarm monitoring equipment and assigned its service contracts to Tyco on January 9, 2014. *Id.* ¶¶ 73-75; *see also* R. 76-2 at 40-42. Bloomingdale's agreement with Tyco includes a lease of Fire Station 21 where Bloomingdale receives alarm signals. R. 76 ¶ 78. Alarm Detection alleges that this agreement provided Tyco with "a virtual [100%] market share of [the fire alarm monitoring and servicing business] in the Bloomingdale Territory." *Id.* ¶ 77.

After the sale to Tyco, Bloomindale passed a new ordinance providing that it "was no longer requiring Commercial Accounts to use an exclusive fire alarm

monitoring provider." *Id.* ¶ 83. The same day Bloomindale signed its agreement with Tyco, Bloomingdale's fire chief sent a letter to all of Bloomingdale's subscribers stating that the new 2014 ordinance "requires you to maintain an alarm with a licensed fire alarm company for the transmission of fire alarm signals to the [Bloomingdale] dispatch center. This may be done directly with Tyco or another fire alarm company of your choice." *Id.* ¶ 84; *see also* R. 76-2 at 58. Tyco followed this letter the next day with a letter of its own that stated, "If you would prefer to contract with another alarm monitoring company, you are free to do so." R. 76-3 at 1.

Alarm Detection alleges that Bloomingdale and Lemont's agreements with Tyco have "effectively precluded any other private alarm contractor . . . from competing" for accounts, R. 76 ¶ 86, because "[o]nce [a building owner] has a provider . . . with the necessary equipment installed in the premises, it is commercially difficult for the [building owner] to change providers, even with the prospect of getting a better price for monitoring due to a predisposition to keep what is in place." *Id.* ¶ 88. Alarm Detection alleges this is true, in part, because the "cost . . . of purchasing and installing equivalent radio transmitters and equipment is considerably higher than the price Tyco paid Bloomingdale for the radio transmitters already installed on the walls." *Id.* ¶ 89. Alarm Detection also alleges that Tyco has threatened a building owner who sought to switch to a different private alarm company with a termination fee of $2,900. *Id.* ¶ 97. However, Bloomingdale's subscriber agreements provide for termination without penalty with

60 days' written notice. *See* R. 76-2 at 37 (¶ 2). Despite these alleged obstacles, Alarm Detection also alleges that it has been able to acquire "a handful of accounts" in Bloomingdale since the sale to Tyco. R. 76 ¶ 96.

## V. Alarm Detection's Claims

In Counts XII, XIII, and XIV, Alarm Detection claims that the subscriber agreements Tyco bought from Bloomingdale and Lemont are void *ab initio* because the District Act did not give Bloomindale and Lemont the authority to enter into those subscriber agreements in the first place. *See* R. 76 ¶¶ 341-42, 352-53. Similarly, Alarm Detection claims that "Orland has no authority under [the District Act] to take over [the fire alarm monitoring and servicing business] from private contractors [other than Tyco]." *Id.* ¶ 364. Alarm Detection also claims that Bloomindale, Lemont, and Orland "effectively subvert the limitations under the District Act [by] charging residents . . . for services provided by Tyco and sharing the revenue collected by Tyco for the same service [Bloomingdale, Lemont and Orland are] barred by [the District Act] from providing." *Id.* ¶¶ 344, 356, 365. Further, Alarm Detection claims that by "effectively requiring the use of . . . radios . . . owned by Tyco and excluding the use of identical radio transmitters or comparable radio transmitters," Bloomingdale, Lemont, and Orland have adopted standards that "do[] not parallel the NFPA Standards and thus violate[] [the Act]." *Id.* ¶ 346; *see also id.* ¶¶ 358, 366-368.

In Counts I-VIII, Alarm Detection claims that Defendants' actions are illegally anti-competitive. In support of these claims, Alarm Detection alleges that

Bloomingdale, Lemont, and Orland maintained or maintain illegal monopolies over the fire alarm monitoring markets in their districts. *Id.* ¶ 169. Alarm Detection alleges that Bloomingdale and Lemont transferred these monopolies to Tyco, and that Tyco now has "an advantage" because commercial and multi-unit residential building owners "are traditionally reluctant to seek other private alarm contractors when they can contract for [alarm services] with the private alarm contractor that owns the wireless transmitters already in place." *Id.* ¶ 164.

In Counts IX, X, and XI, Alarm Detection claims that Defendants have violated the Due Process and Equal Protection Clauses of the Fourteenth Amendment. Alarm Detection claims that Defendants "interfered with and took away [Alarm Detection's] rights under [the District Act] to provide fire alarm services," *see id.* ¶¶ 300-01, 315-16, 330, and that Alarm Detection was "treated differently than [Tyco, Chicago Metro, and Cross Points] as similarly situated entities." *Id.* ¶¶ 304, 319, 333.

The Court addresses in turn each of these sets of claims under the District Act, the Sherman and Clayton Acts, and the Fourteenth Amendment. Nevertheless, although Alarm Detection's claims can be organized into the three sets just described, a number of the counts in Alarm Detection's complaint comprise multiple legal claims based on distinct (albeit related) conduct. The following chart is intended to succinctly set forth the Court's understanding of the basic allegations, the claims based on those allegations, and where in this opinion and order the Court has addressed those claims:

| Count | Statute or Right Allegedly Violated | Claims | Section of Court's Decision |
|---|---|---|---|
| XII | District Act | ▪ Bloomingdale did not have the authority to assign the subscriber agreements to Tyco. | I.A |
| XIII | District Act | ▪ Lemont did not have the authority to assign the subscriber agreements to Tyco. | I.A |
| XIV | District Act | ▪ Orland did not have the authority to adopt it ordinance or enter its agreement with Tyco. | I.B |
| I | Sherman Act § 1 | ▪ Bloomingdale's 2005 ordinance and agreement with Chicago Metro was a conspiracy to restrain trade. | II.A |
| | | ▪ Bloomingdale's agreement to assign its subscriber agreements to Tyco was a conspiracy to restrain trade. | II.B.1 |
| II | Sherman Act § 1 | ▪ Lemont's 2002 ordinance and agreement with Cross Points was a conspiracy to restrain trade. | II.A |
| | | ▪ Lemont's agreement to assign its subscriber agreements to Tyco was a conspiracy to restrain trade. | II.B.1 |
| III | Sherman Act § 1 | ▪ Orland's 2006 ordinance and agreement with Tyco was a conspiracy to restrain trade. | II.B.2 |
| IV | Sherman Act § 2 | ▪ Bloomingdale's 2005 ordinance and agreement with Chicago Metro was unlawful monopolization. | II.A |
| | | ▪ Bloomingdale's agreement to assign its subscriber agreements to Tyco was unlawful monopolization. | II.B.1 |
| V | Sherman Act § 2 | ▪ Lemont's 2002 ordinance and agreement with Cross Points was unlawful monopolization. | II.A |

| Count | Statute or Right Allegedly Violated | Claims | Section of Court's Decision |
|---|---|---|---|
| V | Sherman Act § 2 | ▪ Lemont's agreement to assign its subscriber agreements to Tyco was unlawful monopolization. | II.B.1 |
| VI | Sherman Act § 2 | ▪ Orland's 2006 ordinance and agreement with Tyco was unlawful monopolization. | II.B.2 |
| VII | Clayton Act § 7 | ▪ Lemont's agreement to assign its subscriber agreements to Tyco was an unlawful acquisition lessening competition and creation of a monopoly. | II.B.1 |
| VIII | Clayton Act § 7 | ▪ Bloomingdale's agreement to assign its subscriber agreements to Tyco was an unlawful acquisition lessening competition and creation of a monopoly. | II.B.1 |
| IX | Fourteenth Amendment | ▪ Bloomingdale's agreement with Chicago Metro was a violation of due process and equal protection. | III.A |
| | | ▪ Bloomingdale's agreement with Tyco was a violation of due process and equal protection. | II.B |
| X | Fourteenth Amendment | ▪ Lemont's agreement with Cross Points was a violation of due process and equal protection. | III.A |
| | | ▪ Lemont's agreement with Tyco was a violation of due process and equal protection. | II.B |
| XI | Fourteenth Amendment | ▪ Orland's agreement with Tyco was a violation of due process and equal protection. | III.A |

As is reflected in this chart, within each set of claims—i.e., claims under (1) the District Act, (2) the Sherman and Clayton Acts, and (3) the Fourteenth Amendment—the Court generally has grouped certain claims across Alarm Detection's counts according to the similarity of the Court's analysis. Specifically,

the Court has generally combined its analysis of the Bloomingdale-Chicago Metro agreement and the Lemont-Cross Points agreement, because those agreements required subscribers to use only the districts' appointed private alarm companies prior to the Seventh Circuit's decisions in the *Lisle-Woodridge* case. Separate from the agreements with Chicago Metro and Cross Points, the Court analyzes the Bloomingdale-Tyco and Lemont-Tyco agreements together because they both concern the assignment of subscriber agreements to Tyco in the wake of the Seventh Circuit's decisions in the *Lisle-Woodridge* case. The Court addresses the Orland-Tyco agreement separately because it—unlike the Bloomingdale-Chicago Metro and Lemont-Cross Points agreements—purports to permit competition by private alarm companies other than Tyco, and has not materially changed in the wake of the *Lisle-Woodridge* case.

## Analysis

I. **The District Act**

   A. **Counts XII and XIII** against Bloomingdale and Tyco, and Lemont and Tyco, allege that Bloomindale and Lemont did not have the authority under the District Act to enter into the subscriber agreements, meaning the subscriber agreements are void *ab initio* such that Bloomingdale and Lemont did not have the authority to assign them to Tyco. The Court holds that Bloomingdale and Lemont had the authority to assign the subscriber agreements to Tyco.

In Counts XII and XIII, Alarm Detection makes a number of allegations that Bloomingdale and Lemont have exceeded their authority under the District Act in assigning their subscriber agreements and selling their alarm signal equipment to Tyco. Alarm Detection has settled its claims against Bloomingdale and Lemont, so

they are moot and the Court need not address them. Tyco, however, is also implicated by Alarm Detection's allegations in these Counts, so the Court will address them to that extent. Alarm Detection asks the Court to declare that the "subscriber agreements are void *ab initio* and [Bloomingdale and Lemont have] no legal interest to transfer to Tyco." *See id.* ¶¶ 342, 349.2, 353, 361.2. Thus, the only remaining issue in Counts XII and XIII is the legal status of the subscriber agreements and how that status affects Bloomingdale and Lemont's authority to assign them to Tyco.

On the basis of the Seventh Circuit's holding in the *Lisle-Woodridge* case, Alarm Detection argues that the District Act does not authorize Bloomingdale and Lemont to enter into subscriber agreements for alarm signal services in the first place. R. 140 at 16. If Bloomingdale and Lemont did not have authority to enter into the subscriber agreements, Alarm Detection contends that the subscriber agreements are void *ab initio. Id.* On this basis, Alarm Detection concludes that there is no legal interest for Bloomingdale and Lemont to assign to Tyco, and logically they could not have had authority to assign legal interests that do not exist.

As an initial matter, the Court does not believe that Alarm Detection has standing to seek a declaratory judgment regarding the legal status of the subscriber agreements since Alarm Detection is not a party to those agreements. Under the doctrine of prudential standing plaintiffs "must assert their own legal rights and interests, and cannot rest their claims to relief on the legal rights or interests of

third parties." *G&S Holdings LLC v. Continental Cas. Co.*, 697 F.3d 534, 540 (7th Cir. 2012). Here, Alarm Detection describes Counts XII and XIII as claims that Bloomingdale and Lemont did not have authority under the District Act to assign the subscriber agreements to Tyco. Despite these descriptions, Alarm Detection in fact seeks a declaratory judgment regarding the legal status of the subscriber agreements, revealing the true nature of its claims. *See id.* at 541 ("Although standing does not depend on the merits of the claims, it often hinges on the nature and source of the claim asserted."); *cf. Dreamscape Design, Inc. v. Affinity Network, Inc.*, 414 F.3d 665, 672 (7th Cir. 2005) ("it is helpful to look not only to the nature of the claims advanced, but also to the relief sought in order to determine whether the claims intrude upon the areas of communications law expressly reserved to the FCC's purview"). Declaratory judgments regarding the validity of a contract can only be brought by a party to the contract, which in this case Alarm Detection is not. *See Edgewood Manor Apartment Homes, LLC v. RSUI Indem. Co.*, 733 F.3d 761, 771 (7th Cir. 2013) (holding that the plaintiff lacked prudential standing where the "relief sought . . . [was] a ruling regarding the rights of the parties to [an] insurance policy," but the plaintiff was not a party to the policy). Since Alarm Detection lacks prudential standing to bring Counts XII and XIII as they pertain to Tyco, these claims are dismissed.

Alarm Detection of course contends that its allegation that the subscriber agreements are void *ab initio* flows from its challenges to Bloomingdale and

Lemont's ordinances, which Alarm Detection does have standing to bring.[4] By deciding to sell the subscriber agreements to Tyco, Bloomingdale and Lemont implicitly acknowledge that the Seventh Circuit's holding in the *Lisle-Woodridge* case means that they did not have authority to enter into the subscriber agreements. In support of its argument, Alarm Detection cites an Illinois appellate court case that held that "contracts [are void *ab initio*] where one of the contracting parties exceeded its authority in entering into the pact." *See* R. 140 at 16 (citing *Ill. State Bar Ass'n Mut. Ins. Co. v. Coregis Ins. Co.*, 821 N.E.2d 706, 712 (Ill. App. Ct. 2004)). But even if this lack of authority means that the subscriber agreements are void *ab initio*, it does not follow that Bloomingdale and Lemont had "no legal interest to transfer to Tyco," as Alarm Detection asks the Court to declare.

When a contract is void *ab initio* the contract is unenforceable, and the parties are left where they are with no obligation to perform on the part of either party. *Ill. State Bar Ass'n Mut. Ins. Co. v. Law Office of Tuzzolino*, 1 N.E.3d 1186, 1194 (Ill. App. Ct. 1st Dist. 2013) ("a contract that is void *ab initio* is treated as though it never existed"); *Penn Mut. Life Ins. Co. v. Greatbanc Trust Co.*, 887 F. Supp. 2d 822, 830 (N.D. Ill. 2012) ("'Enforcement of [an] illegal contract makes the court an indirect participant in the wrongful conduct,'" and "'[i]n the case of illegal contracts the courts would not, on one hand, undo what has been done, nor on the

---

[4] Alarm Detection's allegation that it has been excluded from the market for fire alarm signal services gives it constitutional standing to challenge the ordinances pursuant to which Bloomingdale and Lemont allegedly excluded Alarm Detection from that market—i.e., the 2002 and 2005 ordinances pursuant to which Bloomingdale and Lemont entered into the subscriber agreements, respectively.

other, perfect what has been left unfinished.'" (quoting *Kedzie & 103rd Currency Exchange, Inc. v. Hodge*, 619 N.E.2d 732, 738 (Ill. 1993), and *Sellers v. Phillips*, 37 Ill. App. 74, 76 (1st Dist. 1890)). Here, however, where the contracts at issue concerned provision of fire alarm signal monitoring and maintenance, it cannot be the case that Bloomingdale and Lemont are relieved of their obligation to perform under the subscriber agreements. For public safety, some entity—whether Bloomingdale and Lemont, or Tyco or another private alarm company—necessarily had to continue to monitor alarm signals from the subscribers and maintain their alarm equipment. As Bloomingdale and Lemont note in their briefs, the NFPA Standards require such continuous monitoring. *See* R. 92 at 10; R. 97 at 8 (citing NFPA Standards 72 § 26.3.5.2.5 ("Each communications channel shall be *continuously* supervised between the subsidiary station and the central station.") (emphasis added)). Thus, even if the subscriber agreements are unenforceable, the continued existence of Bloomingdale and Lemont's obligation to monitor their subscriber's fire alarms and maintain their subscriber's fire alarm equipment means that the usual outcome of a contract that is void *ab initio*—the destruction of any obligation to perform—is not possible here.

Moreover, the fact that the transactions between Bloomingdale and Tyco, and Lemont and Tyco, took place in the wake of the Seventh Circuit's decisions in the *Lisle-Woodridge* case, and in light of the readily apparent implications for public safety those decisions raise, it is inaccurate to interpret the transactions as assignments of the subscriber agreements to Tyco. Rather, Bloomingdale and

Lemont hired Tyco to perform the obligations that Bloomingdale and Lemont incurred pursuant to the subscriber agreements, which—as discussed—continue to exist even if the subscriber agreements are void *ab initio*. Even though the Seventh Circuit held that Bloomingdale and Lemont did not have authority enter into the subscriber agreements, Bloomingdale and Lemont remained responsible for maintaining and monitoring the fire alarms of its subscribers in the interim. Bloomingdale and Lemont reached agreements with Tyco to satisfy those obligations. Of course, Tyco was hired to perform those obligations *in accordance with* the terms of the subscriber agreements. But these terms were amended by the letters Bloomingdale, Lemont, and Tyco sent to the subscribers informing them that they are free to switch to a different private alarm contractor. Thus, in these unique circumstances, even if the Court were to declare the subscriber agreements void *ab initio* (which the Court has not done since Alarm Detection lacks standing to bring such claims), the Court would not declare that Bloomingdale and Lemont had "no legal interest to transfer to Tyco."[5]

---

[5] Lemont argues that Alarm Detection should be judicially estopped from seeking a declaration that the Lemont and Bloomingdale subscriber agreements are void *ab initio* because Alarm Detection argued in favor of the district court's injunction that Lisle-Woodridge's "subscriber contracts would continue, in force, until the subscribers had converted to a wireless transmitter supplied by a private alarm vendor of their choice." R. 97 at 25. Alarm Detection's position in the *Lisle-Woodridge* case is not contrary to its position here, because in both cases Alarm Detection advances the position that the subscriber agreements are no longer valid and must be divested in favor of agreements each subscriber reaches with a private alarm company. Thus, Alarm Detection is not estopped from pursing these claims.

Bloomingdale and Lemont also argue that they have authority to assign the subscriber agreements because Section 10a of the District Act provides fire protection districts like Bloomingdale and Lemont with the authority to sell

B. **Count XIV** against Orland and Tyco, alleges that Orland did not have the authority under the District Act to adopt its ordinance or enter into its agreement with Tyco. The Court holds that Orland has the authority to contract with Tyco to service and maintain its Communications Center, and to require subscribers to connect to its Communications Center. The Court also holds, however, that Alarm Detection's allegations regarding the technology and fees required to connect to Orland's Communication Center state a claim for violation of the District Act.

Alarm Detection alleges that Orland has exceeded its authority under the District Act because it took over the fire alarm monitoring business from private alarm companies in a similar fashion to Lisle-Woodridge, *see* R. 76 ¶¶ 362-70, and it is "barring" Alarm Detection from the fire alarm monitoring business, *id.* ¶ 364. Orland's agreement with Tyco gives Tyco "the exclusive right to install, maintain, replace, upgrade and operate . . . [Orland's] Public Safety Department communications center." R. 76-3 at 49 (¶ 1). The agreement also provides that "Tyco shall monitor existing Customers and any new Customers who in the future desire to be monitored at the Communications Center, provided that such existing and new Customers meet reasonable application criteria and enter into a direct agreement with Tyco." *Id.* (¶ 2). Tyco is also required to "provide" the "equipment . .

---

superfluous "personalty." 70 ILCS 705/10a ("The board of trustees of any fire protection district incorporated under this Act may sell, lease or exchange personalty . . . owned by the district and no longer needed for fire protection purposes."). "Personalty" is not defined in the District Act, but "personalty" would include valuable contracts like the subscriber agreements. *See* Black's Law Dictionary (2d pocket ed. 1996) (definitions for "personalty," "property," "ownership," and "conveyance"). Alarm Detection, however, does not appear to challenge Bloomingdale and Lemont's authority to assign legally enforceable contracts, but rather only argues that the assignments are not valid because Bloomingdale and Lemont lacked authority to enter those agreements.

. required to operate [an alarm monitoring and receiving system] and provide monitoring services to . . . residents of [Orland's] service area." *Id.* (¶¶ 1-2). Under the agreement Tyco will also "charge other alarm companies an initial connection fee of $200.00 for each of their customers for whom monitoring is provided," as well as a "monthly monitoring fee." *Id.* (¶ 4). Tyco is also responsible to "collect from each Direct Connect wired customer a $14.00 per month service charge and $23.50 for each Radio customer for each site that is provided monitoring services through the System. Tyco shall account for and remit to the District all funds collected as a result of the imposition of the service charge . . . ." *Id.* at 50 (¶ 5).[6]

---

[6] In its brief, Alarm Detection argues that it has stated claims under the Alarm Act, 225 ILCS 447/10-5, (as opposed to the District Act) because Orland is monitoring fire alarms at its Communications Center without a license. R. 140 at 10, 13. Although Alarm Detection alleges in its complaint that "Defendants' actions . . . violate the licensing requirements of the [Alarm Act], R. 76 ¶ 1, because "[n]one of the Districts hold licenses under the Alarm Act," id. ¶ 176, Alarm Detection does not seek any relief on the basis of these allegations. Rather, these allegations are the basis for Alarm Detection's claims that the ordinances adopted by Bloomingdale, Lemont, and Orland were without rational basis and thus violate the Fourteenth Amendment. *See* R. 76 ¶ 332. (And as will be discussed below, the Court holds that those claims are untimely.) Since Alarm Detection seeks no relief on the basis of an Alarm Act violation, the Court holds that Alarm Detection's complaint does not state a claim on the basis of the Alarm Act.

Even if Alarm Detection's complaint sought such relief, Alarm Detection's allegations fail to state a claim for violation of the Alarm Act. The Alarm Act provides that "it is unlawful for a person to act as or provide the functions of a . . . private alarm contractor . . . or to advertise or to assume to act as . . . one . . ." without a license. 225 ILCS 447/10-5. But as noted above, the Seventh Circuit has held that *the District Act* provides fire protection districts the authority to operate remote supervising stations. Since the District Act expressly grants fire protection districts the power to operate remote supervising stations, fire protection districts do not need to comply with the Alarm Act's requirements for "private alarm contractors." Thus, to the extent that Alarm Detection's complaint includes a claim that Orland violates the Alarm Act by operating its Communications Center without a license, that claim fails.

Contrary to Alarm Detection's allegations, this agreement does not exceed Orland's authority under the District Act as it relates to engaging in fire alarm monitoring. In the *Lisle-Woodridge* case, the Seventh Circuit held that the District Act authorizes fire protection districts to participate in the reception of fire alarm signals by requiring buildings within the fire protection district to send their fire alarm signals directly to a remote monitoring station. The Seventh Circuit held that such communications dispatch centers can function as remote monitoring stations pursuant to the District Act. *See ADT Sec.*, 724 F.3d at 868 ("Du-Comm is the Remote Supervising Station . . . ."). Here, Alarm Detection admits that Orland Communications Center is a Public Safety Answering Point, or 911 center, "that handles dispatching of emergency personnel and equipment." R. 76 ¶¶ 37, 133. In *Lisle-Woodridge*, the Seventh Circuit held that Lisle-Woodridge did not have authority to require connection to its remote supervising station because the station did not satisfy the requirements and standards to qualify as a remote supervising station under the District Act and the NFPA Standards. *See ADT Sec.*, 724 F.3d at 864. Alarm Detection does not allege that Orland's Communications Center does not qualify as a remote supervising station under the District Act. Absent such an allegation, Alarm Detection's claim that Orland engages in fire alarm monitoring in violation of the District Act fails.

Alarm Detection, however, also alleges that Tyco requires those desiring to connect to Orland's Communications Center "to buy the wireless transmitter" or lease it from Tyco, and pay Tyco for its installation. R. 76 ¶ 140. In the *Lisle-*

*Woodridge* case, the Seventh Circuit held that although the District Act contemplates that fire protection districts can engage in fire alarm monitoring through remote supervising stations, the District Act prohibits fire protection districts from engaging in the business of *transmission* of fire alarm signals. *See ADT Sec.*, 672 F.3d at 503 ("Although the [NFPA Standards] authorize[] a fire protection agency like [Lisle-Woodridge] to control the *receiver* end of the alarm signaling infrastructure—that is by owning and operating a remote supervising station—it does not authorize the takeover of the transmitter end, as well.") (emphasis in original). The court also held that one of the problems with Lisle-Woodridge's monitoring system in particular was that it required private alarm companies to use a specific type of transmission equipment in order to connect to Lisle-Woodridge's monitoring system. *See ADT Sec.*, 724 F.3d at 865. Here, not only does Alarm Detection allege that Orland requires a specific type of transmission equipment, Alarm Detection alleges that it is required to purchase the equipment directly from Tyco.

Further, the express terms of Tyco's agreement with Orland are ambiguous as to whether Tyco has the authority under the agreement to impose such requirements on Orland's subscribers. The term "Equipment" is defined as that which is "required to operate [Orland's alarm monitoring and receiving system] and provide monitoring services to . . . residents of [Orland's] service area." R. 76-3 at 49 (¶¶ 1-2). This definition could include the transmitters, and Alarm Detection has

alleged that Tyco has so interpreted the agreement. This is sufficient to state a claim that Orland is in violation of the District Act.

Additionally, the District Act also prohibits fire protection districts from assessing charges or fees for its services "against residents of the fire protection district . . . who pay to the fire protection district an amount equal to the district's Fire Protection Tax." 70 ILCS 705/11f(a)-(b). The Seventh Circuit held that this section did not authorize Lisle-Woodridge to "impose . . . fees to the alarm companies for services provided on behalf of [Lisle-Woodridge] residents." *ADT Sec.*, 672 F.3d at 504. The court also held that "[t]o the extent that the fees Du-Comm assesses are derivative fees that [Lisle-Woodridge] would not have the authority to assess on its own, and because [Lisle-Woodridge] cannot assess fees for fire alarm signaling and monitoring, Du-Comm cannot assess such fees on [Lisle-Woodridge's] behalf." *ADT Sec.*, 724 F.3d at 874.

Here, Alarm Detection alleges that Orland's agreement with Tyco permits Tyco to charge Orland residents and private alarm companies certain fees, *see* R. 76 ¶ 140, and a review of the agreement itself confirms these allegations. *See* R. 76-3 at 49-50 (¶¶ 4-5). Alarm Detection also alleges that "Orland has no authority under the District Act to effectively subvert the limitations under the District Act on charging residents by having Tyco charge all Commercial Accounts in the Orland Territory." R. 76 ¶ 365. To the extent that Alarm Detection alleges that Orland,

through Tyco, charges fees that are not authorized by the District Act, Alarm Detection has also stated a claim.[7]

## II.    The Sherman and Clayton Acts (Counts I – VIII)

Alarm Detection also alleges that Defendants' actions violate Sections 1 and 2 of the Sherman Act, and Section 7 of the Clayton Act. "The purpose of the Sherman Act is to protect consumers from injury that results from diminished competition." *Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 334-35 (7th Cir. 2012). In order to succeed under § 1 of the Sherman Act, a plaintiff must prove: "(1) a contract, combination, or conspiracy; (2) a resultant unreasonable restraint of trade in [a] relevant market; and (3) an accompanying injury." *Id.* at 335.

Section 2 requires "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Endsley v. City of Chicago*, 230 F.3d 276, 282 (7th Cir. 2000). Section 2 also requires that "the monopolization caused injury." *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1438 (2013).

---

[7] Orland argues that Alarm Detection is barred from raising claims based on the 2006 ordinance which authorized Orland's initial agreement with Tyco under the doctrine of laches. To dismiss a claim under the doctrine of laches, Alarm Detection's claim must on its face demonstrate that its delay in challenging Orland's arrangement with Tyco was unreasonable and that Orland suffered prejudice due to the delay. *See Suggs v. United States*, 256 Fed. App'x 804, 806 (7th Cir. 2007) ("Because [the plaintiff] did not allege that his delay caused prejudice to the government, the validity of laches was not apparent from the face of the complaint."). Alarm Detection's complaint does not allow for such a conclusion, so its claims will not be dismissed on the basis of laches.

Section 7 of the Clayton Act prohibits the acquisition of "assets . . . where . . . the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18. "Congress used the words 'may be substantially to lessen competition' . . . to indicate that its concern was with probabilities, not certainties." *Brown Shoe Co. v. United States*, 370 U.S. 294, 323 (1962); *cf. Hosp. Corp. of Am. v. Fed. Trade Comm.*, 807 F.2d 1381, 1389 (7th Cir. 1986) ("All that is necessary is that the merger create an appreciable danger of such consequences in the future. A predicative judgment, necessarily probabilistic and judgmental rather than demonstrative is called for."). "Antitrust injury" is also an element of a claim under Section 7 of the Clayton Act. *See Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 122 (1986); *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977).

> **A.** **Counts I and IV, and Counts II and V**, against Bloomingdale and Chicago Metro, and Lemont and Cross Points, allege that the Bloomingdale-Chicago Metro agreement, and the Lemont-Cross Points agreement, are conspiracies to restrain trade in violation of Sherman Act § 1 and unlawful monopolies in violation of Sherman Act § 2. The Court holds that these claims are untimely.

Alarm Detection claims that Bloomingdale's agreement with Chicago Metro, and Lemont's agreement with Cross Points, violated Sections 1 and 2 of the Sherman Act. Chicago Metro argues that Alarm Detection's claims based on its agreement with Bloomingdale are barred by the statute of limitations. *See* R. 101. Cross Points does not expressly make a statute of limitations argument with respect to its agreement with Lemont, but it has adopted Chicago Metro's argument. *See* R.

95 at 2. Thus, the Court will address the statute of limitations with respect to Cross Points as well as Chicago Metro.[8]

"Dismissing a complaint as untimely at the pleading stage is an unusual step, since a complaint need not anticipate and overcome affirmative defenses, such as the statute of limitations." *Cancer Found., Inc. v. Cerberus Capital Mgmt., LP*, 559 F.3d 671, 674 (7th Cir. 2009). Nevertheless, a court may dismiss a claim under Rule 12(b)(6) if "it is clear from the face of the . . . complaint that it is hopelessly time-barred." *Id.* at 675; *see also Grzanecki v. Bravo Cucina Italiana*, 408 Fed. App'x 993, 996 (7th Cir. 2011) (A court may dismiss the complaint if the plaintiff "mak[es] allegations that conclusively establish the action's untimeliness."); *Xechem, Inc. v. Bristol-Myers Squibb Co.*, 372 F.3d 899, 901 (7th Cir. 2004) ("Only when the plaintiff pleads itself out of court—that is, admits all the ingredients of an impenetrable defense—may a complaint that otherwise states a claim be dismissed under Rule 12(b)(6).").

Under the Sherman Act, a plaintiff must bring a lawsuit "within four years after the cause of action accrued." 15 U.S.C. § 15b. An antitrust "cause of action accrues and the statute of limitations begins to run when a defendant commits an act that injures a plaintiff's business." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971); *In re Copper Antitrust Litig.*, 436 F.3d 782, 789 (7th Cir. 2006). Thus, the "period of limitations for antitrust litigation runs from the most recent injury caused by the defendants' activities rather than from the

---

[8] Alarm Detection has filed a motion to strike Defendants' state of limitations argument. *See* R. 123. That motion is denied for the reasons that follow.

violation's inception." *Xechem,* 372 F.3d at 902. On this basis, Alarm Detection argues that its claims are timely despite the fact that the Cross Points agreement commenced in 2002, and the Chicago Metro agreement commenced in 2005, because Chicago Metro and Cross Points's "active participation" in the agreements constitutes "ongoing conduct that avoids the statute from running." R. 125 at 10.

The argument that Chicago Metro and Cross Points actively participated in performance of the agreements does not save Alarm Detection's claims. Alarm Detection alleges that its injuries were caused by its exclusion from the Bloomingdale and Lemont markets. With respect to such an injury, the Seventh Circuit has held that "[e]xclusion from a market is a conventional form of antitrust injury that . . . [accrues] *as soon as the exclusion occurs.*" *Brunswick Corp. v. Riegel Textile Corp.*, 752 F.2d 261, 271 (7th Cir. 1984) (emphasis added). Similarly, the Eighth and Sixth Circuits have held that "acts that 'simply reflect or implement a prior refusal to deal or acts that are merely inertial consequences (of a single act) do not restart the statute of limitations.'" *Midwestern Machinery Co., Inc. v. Nw. Airlines, Inc.*, 392 F.3d 265, 270 (8th Cir. 2004) (quoting *DXS Inc. v. Siemens Med. Sys., Inc.*, 100 F.3d 462, 467-68 (6th Cir. 1996)); *see also In re Ciprofloxacin Hydrochloride Antitrust Litig.*, 261 F. Supp. 2d 188, 229 (E.D.N.Y. 2003) (Mere "[p]erformance of the alleged anticompetitive contract[] during the limitations period . . . is not sufficient to restart the [limitations] period."). By contrast, the "typical antitrust continuing violation occurs in a price-fixing conspiracy, actionable under § 1 of the Sherman Act, . . . when conspirators continue to meet to fine-tune

their cartel agreement. These meetings are overt acts that begin a new statute of limitations because they serve to further the objectives of the conspiracy." *Midwestern Machinery*, 392 F.3d at 269 (internal citation omitted). Alarm Detection has made no allegations that the ordinances and agreements were "fine-tuned" in an analogous manner after they were enacted.

Despite Alarm Detection's failure to allege such "fine-tuning" or analogous antitrust injury-causing conduct, Alarm Detection argues that it "is under no such duty to plead facts that address possible statutes of limitation." R. 125 at 7. Indeed, the Seventh Circuit has held that the "right question" is not whether the plaintiff has alleged "facts that tend to defeat affirmative defenses," but "whether it is possible to imagine proof of the critical facts consistent with the allegations in the complaint" that would fall within the period of limitations. *U.S. Gypsum Co. v. Ind. Gas Co., Inc.*, 350 F.3d 623, 628 (7th Cir. 2003). In *Gypsum*, the Seventh Circuit reversed a district court's decision dismissing an antitrust action for failure to allege overt acts within the statute of limitations period, because "[p]roof that [the defendant] had committed an anticompetitive act [within four years prior to the complaint] would not contradict any of the complaint's allegations." *Id.* Unlike the plaintiff in *Gypsum*, however, Alarm Detection's allegations do not indicate that it "hopes to show that [the defendant] regularly keeps some capacity of the market . . . or performs other acts that could be thought to violate the antitrust laws." *Id.* To the contrary, on Alarm Detection's theory of its case, no actions other than the agreements and their enabling ordinances were necessary to effectuate Alarm

Detection's exclusion from the alleged markets.[9] Therefore, since the statute of limitations began to run in 2005 in Bloomingdale, and 2002 in Lemont, but Alarm Detection did not file its complaint until 2014, Alarm Detection's allegations demonstrate that its Sherman Act claims against Chicago Metro and Cross Points are barred by the four year statute of limitations.[10]

## B.    The Tyco Agreements (Counts I – VIII)

Alarm Detection claims that Bloomingdale's agreement with Tyco, Lemont's agreement with Tyco, and Orland's agreement with Tyco, violate Sections 1 and 2 of the Sherman Act, and that the agreements with Tyco also violate Section 7 of the Clayton Act. Tyco argues that these allegations fail for the following reasons: (1) Alarm Detection fails to allege an "antitrust injury"; (2) Alarm Detection fails to allege exclusionary conduct or unreasonable restraint of trade; (3) Alarm Detection fails to allege a relevant geographic market; (4) the agreements did not "lessen competition"; and (5) Alarm Detection fails to allege a conspiracy. Orland makes similar arguments with respect to its agreement with Tyco.

---

[9] The parties do not address whether the renewal of the agreements constitute overt acts sufficient to restart the statute of limitations. *See Xechem*, 372 F.3d at 902 (finding that an action taken to extend the five-year exclusivity period for marketing a pharmaceutical was sufficient to restart the statute of limitations). This is of no moment, however, because the Bloomingdale agreement was last renewed more than four years prior to the date Alarm Detection filed its complaint, and the Lemont agreement renewed automatically without any overt action required by Lemont or Cross Points beyond the terms to which they agreed in 2002.

[10] Since the Court has dismissed Counts I, II, IV, and V as they pertain to Chicago Metro and Cross Points as barred by the statute of limitations, the Court does not reach Defendants' arguments regarding mootness, laches, immunity, and the substantive elements of the Sherman Act, with respect to those Counts and defendants.

1. **Counts I, IV, and VIII, and Counts II, V, and VII**, allege that the Bloomingdale-Tyco agreement, and the Lemont-Tyco agreement, to assign subscriber agreements to Tyco, are conspiracies to restrain trade in violation of Sherman Act § 1, unlawful monopolies in violation of Sherman Act § 2, and an unlawful acquisition that lessens competition and constitutes creation of a monopoly in violation of Clayton Act § 7. The Court holds that Alarm Detection fails to allege an antitrust injury sufficient to state these claims.

Tyco argues that all of Alarm Detection's claims under the Sherman and Clayton Acts fail because Alarm Detection has failed to allege an "antitrust injury." Not simply any economic injury is sufficient to state a claim under the antitrust laws. Rather, the Supreme Court has "said that antitrust injuries must be 'of the type the antitrust laws were intended to prevent and that flo[w] from that which makes defendants' acts unlawful.'" *Comcast*, 133 S. Ct. at 1438 (quoting *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990), and *Brunswick*, 429 U.S. at 489). A "plaintiff must allege, not only an injury to himself, but an injury to the market as well." *Agnew*, 683 F.3d at 335. "The antitrust-injury doctrine was created to filter out complaints by competitors and others who may be hurt by productive efficiencies, higher output, and lower prices, all of which the antitrust laws are designed to encourage." *U.S. Gypsum*, 350 F.3d at 627. In other words, "the antitrust laws . . . are concerned 'with the protection of competition, not competitors.'" *Mercatus Group, LLC v. Lake Forest Hosp.*, 641 F.3d 834, 852 (7th Cir. 2011) (quoting *Brown Shoe*, 370 U.S. at 320).

Nonetheless, a "competitor" can state an antitrust claim by demonstrating that "its loss comes from acts" that decrease competition and thereby "reduce output

or raise prices to consumers." *Tri-Gen Inc. v. Int'l Union of Operating Eng'rs*, 433 F.3d 1024, 1031 (7th Cir. 2006). When an antitrust violator seeks to exclude a competitor from the market by anticompetitive means, "the harm suffered by a consumer forced to pay inflated prices, and the harm inflicted on an excluded competitor . . . (e.g., through predatory pricing) both result from the anti-competitive effect of the [violator's actions, and] they are both antitrust injuries." *Blackburn v. Sweeney*, 53 F.3d 825, 830 (7th Cir. 1995); *see also Serfecz v. Jewel Food Stores*, 67 F.3d 591, 597 (7th Cir. 1995) ("When the plaintiff's injury is linked to the injury inflicted upon the market, such as when consumers pay higher prices because of a market monopoly or when a competitor is forced out of the market, the compensation of the injured party promotes the designated purpose of the antitrust law—the preservation of competition.").

Alarm Detection alleges that Bloomingdale and Lemont exercised monopoly power over the fire alarm monitoring markets in their districts, and that they transferred this monopoly power to Tyco when they sold the alarm equipment installed in the subscribers' buildings and assigned the subscriber agreements to Tyco. But Alarm Detection also alleges that Bloomingdale, Lemont, and Tyco have agreed and informed the subscribers that they are not required to continue under their subscriber agreements with Tyco and are now free to choose any private fire alarm company to maintain and monitor their fire signaling equipment. Moreover, Alarm Detection alleges that it has been able to acquire "a handful of accounts" in Bloomingdale. R. 76 ¶ 96.

These allegations are insufficient to state a claim for an antitrust injury. Alarm Detection alleges that it is no longer being excluded from pursuing business in Bloomingdale and Lemont, and has in fact already acquired some customers in Bloomingdale. Additionally, Alarm Detection's allegation that subscribers are now free to choose any private alarm company to service and monitor their fire alarms means that competition has been returned to the Bloomingdale and Lemont districts. The return of competition among private companies can only mean that the price for such services will settle at whatever price the market will bear. Such circumstances do not plausibly state a claim for an antitrust injury.

Alarm Detection's arguments in opposition to Tyco's motion to dismiss frequently reference circumstances as they existed under the former Bloomingdale and Lemont ordinances that required customers to contract directly with the districts and use only Chicago Metro in Bloomingdale or Cross Points in Lemont to service and monitor their fire alarms. But these exclusionary policies are no longer in effect, and in any event Tyco was never a party to those policies. Alarm Detection argues that Tyco is implicated in these defunct policies because it acquired the subscriber agreements "by an illegal monopoly" that enabled it to "prevent[] other alarm contractors from competing," and "to continue . . . charging high fees." R. 140 at 19. Alarm Detection argues that the "failure of [Bloomingdale and Lemont] to completely divest their illegal monopolies by voiding the Subscriber Agreements and ceasing monitoring allowed Tyco to charge supra-competitive prices." *Id.* But Alarm Detection's allegation that it has acquired customers in Bloomingdale belies

this argument. Clearly, Alarm Detection is able to compete for business in the Bloomingdale and Lemont districts and its lower prices have already won over some customers.

Alarm Detection cites *Fishman v. Estate of Wirtz* in support of its argument that "the substitution of one monopolist for another can give rise to antitrust injury" and that it has been injured in that the Bloomingdale and Lemont monopolies have been replaced by the agreements with Tyco. R. 140 at 20 (citing 807 F.2d 520, 533, 538 (7th Cir. 1986)). But this is an inaccurate interpretation of *Fishman*. The issue in *Fishman* was whether a potential purchaser of the Chicago Bulls basketball team had suffered an antitrust injury when his offer was rejected because his competitor in the sale—who also owned Chicago Stadium where the Bulls played—refused to lease the stadium to the competing potential purchaser. The court held that the "refusal to lease the Chicago Stadium effectively cut off all competition for the acquisition of the Bulls franchise and injured plaintiffs as a result," and that "[t]here is no reason why this injury is not an antitrust injury." *Id.* at 533. In other words, the injury in *Fishman* was not the transfer of the monopoly itself, but the harm to the competition for the purchase of the Bulls' monopoly on basketball entertainment in Chicago. Indeed, contrary to Alarm Detection's argument here, the Seventh Circuit has held that "merely shift[ing] a lawful monopoly into different

hands. . . . has no antitrust significance." *Brunswick*, 752 F.2d at 266. Thus, Alarm Detection's argument on the basis of *Fishman* is not persuasive.[11]

Additionally, *Fishman's* facts and holding are inapposite to this case. Alarm Detection makes no allegation analogous to the *Fishman*-defendant's refusal to lease Chicago Stadium. Alarm Detection has not alleged that it was prevented from competing to acquire the subscriber agreements from Bloomingdale and Lemont. Rather, Alarm Detection's allegation that Tyco contacted Bloomingdale and Lemont to inform them of the Seventh Circuit's ruling in the *Lisle-Woodridge* case shows that Alarm Detection was slow to realize the potential business opportunity made available by that decision. As a practical matter, Bloomingdale and Lemont could not simply declare that all fire monitoring cease while each customer took the time to decide which vendor to utilize. Absent an allegation that Bloomingdale and Lemont's agreements with Tyco somehow decreased competition, the mere transfer of a monopoly is not an antitrust injury; at least not here where Alarm Detection has also alleged that it is now able to compete for business in Bloomingdale and Lemont.

Alarm Detection also alleges it has suffered injury in that it is effectively excluded from pursuing business in Bloomingdale and Lemont because "[o]nce a Commercial Account has a provider of the Business with the necessary equipment

---

[11] Moreover, many of the Seventh Circuit's decisions in antitrust cases in the nearly 30 years since *Fishman* was decided have relied on reasoning drawn from Judge Easterbrook's dissent in *Fishman*, thus calling into question whether *Fishman* remains good law. *See JamSports and Entm't, LLC v. Paradama Prod., Inc.*, 336 F. Supp. 2d 824, 835-36 (N.D. Ill. 2004) (citing cases).

installed in the premises, it is commercially difficult for the Commercial Account to change providers, even with the prospect of getting a better price for monitoring due to a predisposition to keep what is in place." R. 76 ¶ 88. But this circumstance would be true for any customer Alarm Detection tried to acquire other than new buildings that did not already have an alarm system installed. The allegation is a reflection of the alarm system market in general, not a characteristic specific to the agreements Tyco made with Bloomingdale and Lemont. Alarm Detection has provided no authority for its allegation that Tyco's success in securing access to the "inertia" of the Bloomingdale and Lemont subscribers was an anticompetitive action, as opposed to good business dealings. Indeed, since Tyco agreed that the Bloomingdale and Lemont subscribers would be free to break their agreements and choose a new alarm company without penalty, the only thing Tyco purchased was the "inertia." The freedom granted to the subscribers as part of the agreements precludes the inference that the agreements are anticompetitive.

Nevertheless, Alarm Detection contends that Bloomingdale and Lemont should be required to divest the subscriber agreements on an individual basis as each subscriber reaches an agreement with a private contractor, because that was what the district court ordered in the *Lisle-Woodridge* case. But although the Seventh Circuit held that the *Lisle-Woodridge* injunction requiring individual divestment was within the district court's discretion, neither the Seventh Circuit nor the district court held that the divestment process ordered in that case was the only possible remedy for ordinances that violate the District Act or antitrust laws.

Lastly, Alarm Detection alleges that Tyco has engaged in anticompetitive conduct by requiring subscribers to pay a penalty to switch to a new alarm company. Specifically, Alarm Detection alleges that a subscriber who sought to leave Tyco and switch to Alarm Detection was told by Tyco that "it would incur a termination fee of [$2,900] per building." R. 76 ¶ 97. This allegation, however, is belied by the provision in the Bloomingdale subscriber agreement (attached to Alarm Detection's complaint) that the agreement may be "terminated by either party in writing by registered mail, with not less than sixty (60) days['] notice." R. 76-2 at 37 (¶ 2). There is no provision in the agreement for any termination penalty. *See id.* at 37-39. Moreover, Tyco stated in its letter to subscribers that they were "free" to "contract with another alarm monitoring company." R. 76-3 at 1. Even if Tyco is attempting to coerce subscribers into keeping Tyco as their alarm service company in violation of their subscriber agreements, this is an issue for the individual subscribers. The subscriber agreements, and the Bloomingdale and Lemont ordinances, provide a basis for individual subscribers to demand that they be permitted to switch alarm service providers without penalty. Any dispute over Tyco's alleged conduct arises out of the contracts Tyco has with each individual subscriber. If the agreements actually contained an unreasonable termination penalty, Tyco's attempts to enforce such a penalty could state a claim for illegal exclusionary conduct. But Alarm Detection alleges that the agreements do not actually contain such a clause. Thus, the antitrust laws are not implicated here.[12]

---

[12] The foregoing antitrust injury analysis is dispositive of Alarm Detection's claims

2.  **Counts III and VI**, allege that the Orland-Tyco agreement is a conspiracy to restrain trade in violation of Sherman Act § 1, and an unlawful monopoly in violation of Sherman Act § 2. The Court holds that Alarm Detection fails to allege an antitrust injury sufficient to state these claims. The Court also holds that Alarm Detection's allegations regarding the technology and fees required to connect to Orland's Communication Center state a claim for violation of the Sherman Act.

As an initial matter, to the extent that Alarm Detection claims that Tyco has violated the Sherman Act by agreeing to run Orland's Communication Center, that claim is dismissed. Alarm Detection has cited no authority to suggest that Orland hiring an independent contractor to manage one of its facilities is somehow anticompetitive or illegally excludes Tyco's competitors.

Alarm Detection's allegations regarding Tyco's provision of services to subscribers and other private alarm companies pursuant to its agreement with Orland, however, are another matter. In discussing Alarm Detection's claim that Orland has violated the District Act, the Court already noted that Alarm Detection has plausibly alleged that Orland has authorized Tyco to sell or lease the transmission equipment subscribers must use to connect to Orland's communications center. Alarm Detection also alleges that this exclusive agreement enables Tyco to charge higher prices to customers. *See* R. 76 ¶ 16, 66. Whether Tyco requires other alarm companies to buy or lease its transmitters, or simply requires

---

regarding Tyco's agreements with Bloomingdale and Lemont in Counts I, II, IV, V, VII, and VIII, such that the Court does not need to reach Tyco's arguments with respect to the other elements of the Sherman and Clayton Act claims. The Court notes, however, that much of its reasoning with respect to antitrust injury would also apply to whether Tyco engaged in exclusionary conduct or an unreasonable restraint of trade, and whether Tyco's actions caused a decrease in competition.

other alarm companies to use a specific technology to connect to Orland's PSAP, Alarm Detection has plausibly alleged that Tyco and Orland are "effectively precluding" Alarm Detection and other alarm companies from competing for business in Orland. *See ADT Sec.*, 724 F.3d at 865. In the *Lisle-Woodridge* case, the Seventh Circuit reasoned that if a fire protection district requires alarm companies to use a specific type of technology to connect to the district's system, alarm companies would have to "either replace all of their existing equipment and transmission technology or they [would not be able to] provide alarm monitoring services to customers in [that district]." *Id.* The Seventh Circuit continued that "[e]xcluding alarm companies from the monitoring business [in this manner] or making it unduly burdensome for them to participate raises significant concerns about the anti-competitive effects of [such a] requirement." *Id.* Alarm Detection's allegations regarding Tyco's performance under its agreement with Orland fit the paradigm described by the Seventh Circuit, and such allegations are sufficient to state a claim under the Sherman Act.

Orland argues that Alarm Detection "failed to allege against Orland specifically how it gained or maintained possession of monopoly power in the relevant market." R. 91 at 11. But Alarm Detection alleges that Orland and Tyco have agreed that Tyco will be the exclusive provider of transmission equipment in Orland. To the extent Orland challenges the sufficiency of Alarm Detection's allegation that Orland is a defined geographic market for purposes of the antitrust laws, that issue "'is a deeply fact-intensive inquiry, [and] courts hesitate to grant

motions to dismiss for failure to plead a relevant product market.'" *In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, 767 F. Supp. 2d 880, 901 (N.D. Ill. 2011) (quoting *Todd v. Exxon Corp.*, 275 F.3d 191, 199-200 (2d Cir. 2001)). Moreover, in the *Lisle-Woodridge* case the district court and the Seventh Circuit implicitly acknowledged that a fire protection district can at least plausibly meet the definition of a geographic market for purposes of antitrust laws. *See generally ADT Sec.*, 724 F.3d 854; *ADT Sec.*, 973 F. Supp. 2d 839, 842 (N.D. Ill. 2013) (noting that the case was headed for trial). Thus, the Court will not dismiss Alarm Detection's claims based on Orland and Tyco's agreement for a failure to allege a geographic market.[13]

Tyco's only argument against Alarm Detection's exclusionary claim in Orland is that "these allegations fail for the same reasons as those relating to the 'Bloomingdale Market:' [Alarm Detection] and other competitors are free to compete with Tyco for Commercial Accounts." R. 88 at 17 n.5. But unlike in Bloomingdale and Lemont, Alarm Detection has alleged that subscribers in Orland are not free to contract with any private alarm company for provision and maintenance of their

---

[13] Tyco also argues that Alarm Detection has failed to plausibly allege a relevant geographic market. *See* R. 88 at 24. Tyco's arguments on this point focus almost exclusively on its agreements with Bloomingdale and Lemont. Its only argument with respect to its agreement with Orland is that Alarm Detection "nowhere explains how it is that Tyco's municipal contract to establish and maintain the fire district's communication center alone constitutes market power or a cognizable barrier to entry." *Id.* As explained above, Alarm Detection's allegations with respect to Tyco's contract to service Orland's Communication Center fail to state a claim. Tyco does not otherwise make an argument that Alarm Detection has failed to allege a geographic market with respect to Orland, so the Court does not reach this issue.

alarm signal transmission equipment. Instead, Alarm Detection alleges that Orland subscribers must buy or lease their equipment from Tyco, and the prices Tyco charges are higher than the market would bear if other private alarm companies were permitted to compete for this business. As discussed, this is sufficient to state a claim under the Sherman Act.

Instead of more fully addressing Alarm Detection's allegations of exclusionary conduct, Tyco argues that "[c]ollecting . . . fees . . . cannot, as a matter of law, constitute exclusionary conduct under Section 2 because Tyco has no duty to deal with [Alarm Detection]." R. 88 at 16. Tyco contends that Alarm Detection has attempted to allege a "price-squeeze" claim, in which a company that participates in both the wholesale and retail market for a particular product is able to "squeeze its downstream competitors by raising the wholesale price of inputs while cutting its own retail prices." *See Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 449 (2009). In *linkLine*, the Supreme Court held that a plaintiff cannot allege such a claim unless the defendant has an "antitrust duty to deal with its rivals at wholesale," and the defendant engages in "predatory pricing" on the retail end. *Id.* at 450-51. Although Alarm Detection argues that Tyco's prices for alarm equipment are too high, it does not allege Tyco engages in predatory pricing in the retail market. To the contrary, Alarm Detection alleges that Tyco's prices are higher than a market open to competition would otherwise bear. Thus, the Court's reasoning in *linkLine* does not preclude Alarm Detection's claims.

Lastly, Orland argues that it has immunity from Alarm Detection's antitrust claims under the State Action Doctrine and the Illinois Local Government Antitrust Exemption Act. The State Action Doctrine only applies to actions "the substate governmental entity . . . has been delegated authority to . . . regulate anticompetitively." *F.T.C. v. Phoebe Putney Health Sys., Inc.*, 133 S. Ct. 1003, 1012 (2013). The Court has already held that Alarm Detection has sufficiently alleged that the District Act did not provide authority to enact its ordinance and by extension to enter the agreement with Tyco that the ordinance enables. Thus, the State Action Doctrine does not provide Orland immunity here. The Illinois Local Government Antitrust Immunity Act provides that "the 'State action exemption' to application of the federal antitrust laws [is] fully available to local governments.'" 50 ILCS 35/1(a). This provision is irrelevant here where Alarm Detection has made no claims under Illinois's antitrust laws.

## III.    The Fourteenth Amendment (Counts IX, X, and XI)

In addition to its claims under the District Act and federal antitrust laws, Alarm Detection argues that the Bloomingdale, Lemont, and Orland ordinances violate Alarm Detection's civil rights under the Fourteenth Amendment. Specifically, Alarm Detection claims that it was deprived of property in the form of customer contracts without due process of law, and that it was denied equal protection of the laws when the ordinances at issue favored Alarm Detection's competitors—Tyco, Chicago Metro, and Cross Points. Alarm Detection argues that these claims implicate the private alarm company defendants because they were

47

acting "under color of law" in performing agreements authorized by the ordinances in question.[14]

Alarm Detection brings its claims for violation of its constitutional rights pursuant to 42 U.S.C. § 1983. Defendants contend that these claims are time-barred. Section 1983 does not contain a statute of limitations, so "a federal court must adopt the forum state's statute of limitations for personal injury claims." *Ashafa v. City of Chicago*, 146 F.3d 459, 461 (7th Cir. 1998). In Illinois, the statute of limitations period for a personal injury action and thus, for a Section 1983 claim, is two years. *Id.*

Although "state law determines the period of limitations, federal law determines when a Section 1983 claim accrues." *Sellars v. Perry*, 80 F.3d 243, 245 (7th Cir. 1996). "A Section 1983 claim accrues at the point when the plaintiff knows or has reason to know of the injury that is the basis of his action." *Id.*; *Savory v. Lyons*, 469 F.3d 667, 672 (7th Cir. 2006).

A. **Counts IX, X, and XI**, allege that the Bloomingdale ordinance enabling its agreement with Chicago Metro, the Lemont ordinance enabling its agreement with Cross Points, and the Orland ordinance enabling its agreement with Tyco, violate the Due Process and Equal Protection Clauses of the Fourteenth Amendment. The Court holds that these claims are untimely.

As discussed, the injuries Alarm Detection complains of are its exclusion from the pursuit of customers in Lemont, Bloomingdale, and Orland due to the 2002, 2005, and 2006 ordinances, respectively, and the agreements with Cross Points,

---

[14] None of the defendants challenge Alarm Detection's allegations that all of them were acting "under color of law."

Chicago Metro, and Tyco. Alarm Detection alleges that it was the coordinated adoption of the ordinances and agreements in each fire district that prevented it from competing for customers in the districts. R. 76 at ¶¶ 64-65, 104-06, 145-48. Lemont's ordinance was adopted in 2002 and its agreement with Cross Points was executed that same year, *see id.* ¶¶ 99, 104; Bloomingdale's ordinance was adopted in 2005 and its agreement with Chicago Metro was executed in 2004, *see* R. 76 at ¶¶ 52, 61; Orland's ordinance was adopted in 2006 and its agreement with Tyco was executed in 2003, *see id.* ¶¶ 130, 145. Certainly, as of the later date in each fire district, Alarm Detection knew or had reason to know that the alleged violations of its due process and equal protection rights had occurred.

Despite these facts alleged in its complaint, Alarm Detection contends that its claim cannot be dismissed as untimely because its complaint does not include allegations regarding when it became aware of the constitutional violations. But this argument rings hollow because Alarm Detection also alleges that its customer accounts in Bloomingdale were canceled when the Bloomingdale ordinance and agreement with Chicago Metro went into effect. Alarm Detection certainly had reason to know of its injury at that point. This result certainly would have alerted it to how other similar ordinances would affect its ability to compete for business. Having waited until 2014 to bring claims based on injuries of which it was aware at least nine years earlier, Alarm Detection's Fourteenth Amendment claims against Chicago Metro, Cross Points, Tyco, and Orland are time-barred.

Alarm Detection contends that its claims are not time-barred because it suffered a continuing violation of its constitutional rights up until the ordinances were repealed. R. 125 at 13. "The continuing violation doctrine allows a plaintiff to get relief for a time-barred act by linking [the alleged violation] with an act that [occurred] within the limitations period." *Selan v. Kiley*, 969 F.2d 560, 564 (7th Cir. 1992). The doctrine, however, applies only in instances where "the plaintiff could not reasonably be expected to perceive the alleged violation before the limitations period has run" or where "the violation only becomes apparent in light of later events." *Savory*, 469 F.3d at 672; *Garrison v. Burke*, 165 F.3d 565, 569 (7th Cir. 1999) (The continuing violation doctrine applies "*only* if a reasonable person in the position of the plaintiff would not have known, at the time the untimely acts occurred, that [he] had a claim.") (emphasis added).

In support of its view that the violations of its constitutional rights were ongoing, Alarm Detection advances the same arguments it makes for the application of the continuing violation doctrine to the antitrust claims—that every time Chicago Metro, Cross Points, or Tyco serviced fire alarm monitoring system equipment or sold a wireless transmitter, they engaged in new and discrete acts that injured Alarm Detection. R. 125 at 14. Even if such acts constituted fresh injuries to Alarm Detection's constitutional rights (in contrast to antitrust injury), they are insufficient to trigger the application of the continuing violation doctrine, because the doctrine is reserved for only those cases where a plaintiff could not reasonably be expected to have perceived or known about the alleged violation. As

discussed, Alarm Detection's allegations demonstrate that it did in fact know, or at least should reasonably have known, about the injury it complains of, when it lost its Bloomingdale accounts in 2005 as a result of Bloomingdale's adoption of its ordinance and its agreement with Chicago Metro. Thus, the continuing violation doctrine does not save Alarm Detection's Fourteenth Amendment claims.

Alternatively, Alarm Detection argues that its claims are not time-barred because the statute of limitations did not begin to run until 2012 or 2013, when its injury allegedly became actionable in the Seventh Circuit. R. 125 at 14-15. To support this argument, Alarm Detection states that at the time of the injury, it was unclear whether it had an action at law based on the Bloomingdale and Lemont ordinances until the Seventh Circuit issued its first decision in the *Lisle-Woodridge* case in 2012. *Id.* Alarm Detection argues further that it was not until the Seventh Circuit held that the practices of Lisle-Woodridge were unlawful and monopolistic one year later in its second decision *Lisle-Woodridge* decision that it became clear that it could bring a lawsuit based on the Bloomingdale and Lemont ordinances. The Seventh Circuit, however, has held that the statute of limitations begins to run regardless of "whether the plaintiff knows the injury is actionable—[t]he [plaintiff] need only know that he has been injured." *Fayoade v. Spratte*, 284 Fed. App'x. 345, 347 (7th Cir. 2008); *Massey v. United States*, 312 F.3d 272, 276 (7th Cir. 2002) (A federal claim "accrues when the plaintiff knows both the existence and cause of his injury, and not at a later time when [the plaintiff] also knows that the acts inflicting the injury" can support a legal claim.). Having established that Alarm Detection

knew about the injury it complains of, at the latest, in 2005, it was then that a cause of action accrued and the statute of limitations began to run. In any case, Alarm Detection thought it had enough of a claim to file the *Lisle-Woodridge* action in 2010. Alarm Detection also argues that the *Lisle-Woodridge* holdings are a basis to award it relief in this case. The reasoning that led it to sue Lisle-Woodridge should have applied equally to the ordinances in Bloomingdale, Lemont, and Orland, yet Alarm Detection did not file suit against these defendants until 2014, well outside the statute of limitations.

> **B.** **Counts IX and X,** allege that the Bloomingdale ordinance enabling its agreement with Tyco, and the Lemont ordinance enabling its agreement with Tyco, violate the Due Process and Equal Protection Clauses of the Fourteenth Amendment. The Court holds that Alarm Detection has failed to allege that these ordinances are "arbitrary and unreasonable" or are not "rationally related to a legitimate state interest."

The Court has held that Alarm Detection has failed to allege an antitrust injury arising from Tyco's agreements with Bloomingdale and Lemont. It is difficult to see how Alarm Detection has suffered any injury arising from these agreements, whether of the antitrust variety or otherwise, since Alarm Detection is now able to compete for business in those districts as a result of these agreements.

But even if Alarm Detection has been injured by Bloomingdale and Lemont in some sense favoring Tyco to Alarm Detection's detriment, Alarm Detection has failed to state a claim for violation of either the Due Process or the Equal Protection Clauses. To state a claim for a Due Process violation a plaintiff must show that the ordinance was "arbitrary and unreasonable," *Frey Corp. v. City of Peoria*, 735 F.3d

505, 508 (7th Cir. 2013), and to state a claim for an equal protection violation a plaintiff must show that the ordinance "was not rationally related to a legitimate state interest." *Rosario v. Retirement Bd. of the Policemen's Annuity and Benefit Fund for the City of Chi.*, 743 F.3d 531, 539 (7th Cir. 2014). Alarm Detection argues that its allegations that the ordinances were "adopted without authority" satisfy these elements. *See* R. 140 at 34. But the Court has held that Bloomingdale and Lemont had authority under the District Act to make their agreements with Tyco. Thus, the basis for Alarm Detection's Fourteenth Amendment claims concerning Tyco's conduct in Bloomingdale and Lemont has been eliminated and those claims are dismissed.

## Conclusion

For the foregoing reasons, Cross Points's motion to dismiss, R. 95, is granted; Chicago Metro's motion to dismiss, R. 99, is granted; Orland's motion to dismiss, R. 91, is granted in part and denied in part; and Tyco's motion to dismiss, R. 86, is granted in part and denied in part. Counts I, II, IV, V, VII, VIII, IX, X, XI, XII, and XIII, are dismissed without prejudice; and Counts III, VI, and XIV, remain. Alarm Detection has until October 8, 2015 to replead any of the claims the Court has dismissed if it can cure any of the defects noted above. Additionally, Alarm Detection's motion to strike, R. 123, is denied, and Alarm Detection's motions for a preliminary injunction, R. 107; R. 108; R. 184, are denied without prejudice as a number of the parties implicated by those motions are no longer in the case. A status hearing is set for September 17, 2015, at which the parties should be

prepared to discuss whether briefing on Alarm Detection's motion for summary judgment should proceed with respect to Orland and Tyco, and whether the case should be referred to Judge Gilbert to discuss settlement among the remaining parties.

ENTERED:

_____
Honorable Thomas M. Durkin
United States District Judge

Dated:  September 8, 2015