## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| ALARM DETECTION SYSTEMS, INC., an Illinois corporation, | |
| Plaintiff, | Case No.: 14-cv-00876 |
| vs. | |
| ORLAND FIRE PROTECTION DISTRICT; TYCO INTEGRATED SECURITY, LLC; AND DU-PAGE PUBLIC SAFETY COMMUNICATIONS, | Judge:  Thomas M. Durkin<br>Magistrate:  Jeffrey T. Gilbert |
| Defendants. | |

### SECOND AMENDED VERIFIED COMPLAINT

Plaintiff Alarm Detection Systems, Inc. ("Plaintiff" or "ADS"), by and through its attorney, Dykema Gossett PLLC, brings this action against Defendants and states as follows:

### INTRODUCTION AND SUMMARY OF CLAIM

1.    ADS is a private alarm contractor in the business of installing, maintaining, testing and monitoring its customers' fire alarm systems.  ADS brings this action for injunctive relief to restrain the Defendants from their ongoing illegal and anticompetitive conduct. Defendants have conspired and contracted to prevent ADS and other private alarm contractors from providing fire alarm monitoring and maintenance (the "Business")[1] to commercial and multifamily buildings required by ordinance to maintain fire alarm systems ("Commercial Accounts") within the boundaries of each of the Districts.   Such conduct represents unauthorized and anti-competitive behavior which: (1) restrains trade in violation

---

[1] All capitalized terms are defined within this Complaint.

of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, and (2) illegally monopolizes or attempts to do the same, all in violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2, and (3) has the effect of substantially lessening competition thus tending to create a monopoly in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18. Defendants also deprived ADS of its constitutional rights to due process and equal protection under the Fourteenth Amendment to the U.S. Constitution by depriving ADS of its property right to fully engage in the Business. Defendants' actions also involve a pattern of behavior that is not authorized by the enabling authority of the Districts under the Illinois Fire Protection District Act, 70 ILCS 705/1 *et seq.* ("District Act") or other state constitutional and statutory authority relating to the formation and operation of DU-COMM.

2. For a number of years, the Bloomingdale Fire Protection District ("Bloomingdale"), the Lemont Fire Protection District ("Lemont"), and the Orland Fire Protection District ("Orland") (collectively, the "Districts") all participated in the selling, maintaining and testing of fire alarm transmission equipment and monitoring of fire alarm monitoring systems (the "Business") by conspiring with a single licensed private alarm contractor in each District to the exclusion of all other private alarm contractors, including ADS.[2] These practices barred ADS and other private alarm contractors from contracting with Commercial Accounts for the Business.

3. To eviscerate private competition and take over the business of fire alarm monitoring of certain Commercial Accounts (the "Business"), each District adopted one or more ordinances that prohibited private alarm contractors, including ADS, from participating

---

[2] Although Bloomingdale FPD and Lemont FPD have settled with ADS and have been dismissed from this case, their illegal actions are relevant to the subsequent actions by the remaining Defendants.

LISLE\169478.7
ID\BLGO - 110623\000003

in the Business by making the District the sole authorized provider of the Business. After enacting these anticompetitive ordinances, the Districts immediately began charging all Commercial Accounts a supra-competitive monthly fee for this service. Each District also contracted with a preferred private alarm company to assist the District in setting up and operating a fire alarm monitoring system.

4. In 2010, ADS and four other alarm companies including Defendant Tyco Integrated Security, LLC ("Tyco"), formerly ADT Security Services, Inc.,[3] challenged the takeover of the Business in this fashion in a different Illinois fire protection district in *ADT Security Services, Inc. et al v. Lisle-Woodridge Fire Protection District, et al*, 10 cv-4382 (N.D. Ill.).

5. The District Court there ruled that it was illegal for an Illinois fire protection district to be in the Business; to charge residents for fire alarm monitoring; or to create a governmental monopoly. As a result, the District Court enjoined such conduct by the Lisle-Woodridge Fire Protection District ("Lisle-Woodridge"). *See ADT Sec. Servs., Inc. v. Lisle-Woodridge Fire Prot. Dist.*, 799 F. Supp. 2d 880 (N.D. Ill. 2011).

6. This ruling was affirmed in part, with the Seventh Circuit instructing the District Court to modify the scope of injunctive relief granted. *See ADT Sec. Servs., Inc. v. Lisle-Woodridge Fire Prot. Dist.*, 672 F.3d 492 (7th Cir. 2012) ("*ADT I*").

7. Upon remand and following an evidentiary hearing, the District Court entered a thirty-two (32) page Modified Permanent Injunction ("Order") barring Lisle-Woodridge from engaging in the Business and restoring the Commercial Accounts taken away by Lisle-

---

[3] ADT Security Services, Inc. was the legal entity for most of the time period at issue, but Tyco is now the legal entity and the name "Tyco" will be used throughout this Complaint.

LISLE\169478.7
ID\BLGO - 110623\000003

Woodridge back to the alarm company plaintiffs there, including ADS and Tyco. A true and correct copy of the Order is attached as Exhibit 1.

8.  Among other injunctive relief, the Court ordered that Lisle-Woodridge's subscriber agreements with commercial accounts that are receiving wireless transmitters from Lisle-Woodridge "shall become null and void." (Exhibit 1, at 39, ¶ 11.)

9.  In July 2013, the Seventh Circuit affirmed the Order in a fifty (50) page decision, finding Lisle-Woodridge's practices unlawful under the District Act as well as "monopolistic" and "anti-competitive". *See ADT Sec. Servs., Inc. v. Lisle-Woodridge Fire Prot. Dist.,* 724 F.3d 854 (7th Cir. 2013) ("*ADT II*") (The collective rulings of the Northern District of Illinois and the Seventh Circuit are referred to herein as the "*Lisle-Woodridge* Case").

10. By employing the same monopolistic, anticompetitive, and illegal means, each of the Districts made itself the sole provider of the Business in its respective Territory, an approach which thus suffers from the same legal infirmities as the one found illegal in the *Lisle-Woodridge* Case.

### The Parties

11. ADS is an Illinois corporation with its principal place of business in Aurora, Illinois. ADS is a licensed private alarm contractor under the provisions of the Private Detective, Private Alarm, Private Security, and Locksmith Act of 2004 (225 ILCS § 447/5-5 *et seq.*) ("Alarm Act") and under this license is authorized to provide fire alarm and burglar alarm services to residential and Commercial Accounts, including the Business, throughout the state of Illinois.

4

12. Defendant Orland is a fire protection district organized under the District Act to provide fire protection within the geographic boundaries of the District ("Orland Territory").[4] The Orland Territory includes Orland Park, Orland Hills, Orland Township and some unincorporated areas in Cook County.

13. Defendant Tyco is a limited liability company with its principal place of business in Boca Raton, Florida. Tyco is a licensed private alarm contractor under the Alarm Act and under this license is authorized to provide fire alarm and burglar alarm services, including the Business, throughout the state of Illinois.

14. Defendant DU-COMM is an agency of intergovernmental cooperation established under the Illinois Intergovernmental Cooperation Act, 5 ILCS 220/3. DU-COMM has no independent legal authority, but has the power to sue and be sued.

**Jurisdiction and Venue**

15. The Claims in Counts I – VIII are all based on federal antitrust claims under Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1 and 2, or Section 7 of the Clayton Act, 15 U.S.C.§ 18, which are authorized under §§ 4 and 16 of the Clayton Act, 15 U.S.C.§§ 15 and 26; or on federal constitutional issues relying on causes of action authorized under the Civil Rights Act, 42 U.S.C. § 1983. Therefore, this Court has federal question jurisdiction under 28 U.S.C. § 1331 and/or jurisdiction under 28 U.S.C. § 1337. Jurisdiction over the remaining claims for declaratory relief that the Districts exceeded their authority under state law and the Defendants were unjustly enriched is based on this Court's supplemental jurisdiction under 28 U.S.C. § 1367.

---

[4] Collectively, the Bloomingdale, Lemont, and Orland Territories are referred to as the "District Territories".

5

16. Venue is proper in the Northern District of Illinois under 28 U.S.C. § 1391, as the Districts all reside in the Northern District of Illinois; Tyco operates its Illinois operations out of an office in Oak Brook, Illinois;; ADS resides and does business in the Northern District of Illinois; the actions complained about occurred in the Northern District of Illinois; and the likely witnesses necessary for this case generally reside in the Northern District of Illinois.

## HISTORY OF FIRE ALARM MONITORING IN ILLINOIS AND THE DISTRICTS

17. Private alarm contractors have been providing fire alarm and burglar alarm services since the late 1800's.

18. A large number of national and local private alarm contractors, licensed by the State of Illinois under the Alarm Act, compete to provide fire alarm services including the sale or lease, installation, maintenance, and monitoring of fire alarm systems within the state.

19. Since 1968, ADS has been a full service private alarm contractor offering, *inter alia*, sales and installation of fire alarm systems, maintenance and testing of such systems, and the monitoring of such systems.

20. ADS opened an Underwriter's Laboratory ("UL") listed central station meeting NFPA Standards (as defined below) in 1974 to monitor the fire alarm and burglar alarm systems of its customers, including Commercial Accounts.

21. ADS now installs, services, tests and monitors fire alarm systems in Commercial Accounts required to have fire alarm systems by local building or fire codes in over three hundred (300) local jurisdictions within the Chicago metropolitan area.

22. Bloomingdale Fire Protection District ("Bloomingdale FPD") is a fire protection district organized under the District Act to provide fire protection within the geographic

6

boundaries of the District ("Bloomingdale Territory"). The Bloomingdale Territory includes the Village of Bloomingdale and portions of the municipalities of Addison, Glendale Heights, Hanover Park, Itasca, Medinah, Roselle and also portions of unincorporated DuPage County.

23. Lemont Fire Protection District ("Lemont FPD") is a fire protection district organized under the District Act to provide fire protection within the geographic boundaries of the District ("Lemont Territory"). The Lemont Territory includes the Village of Lemont, portions of the municipalities of Woodridge, Darien, Bolingbrook, and Homer Glen and some unincorporated areas in Will, DuPage, and Cook Counties.

24. Cross Points, Inc. ("Cross Points") is a corporation with its principal place of business in Elgin, Illinois. Cross Points is a licensed private alarm contractor under the Alarm Act and under this license is authorized to provide fire alarm and burglar alarm services, including the Business, throughout the state of Illinois.

25. Chicago Metropolitan Fire Prevention Company ("Chicago Metro") is an Illinois corporation with its principal place of business in Elmhurst, Illinois. Chicago Metro is a licensed private alarm contractor under the Alarm Act and under this license is authorized to provide fire alarm and burglar alarm services, including the Business, throughout the state of Illinois.

26. ADS has a number of Commercial Accounts in the Bloomingdale, Orland and Lemont Territories, but could not provide such customers the services associated with the Business due to the restrictions imposed by the Districts as described below.

**National Fire Alarm Standards and Operation of Fire Alarm Systems**

27. Fire alarm systems are generally required to meet standards outlined in the National Fire Protection Association's National Fire Alarm and Signaling Code ("NFPA 72"

or "NFPA Standards"). The NFPA Standards are nationally recognized standards promulgated by an association that represents governmental entities, testing laboratories, the alarm industry, and other stakeholders, and set forth standards for, *inter alia*, fire alarm signal transmission equipment and fire monitoring.

28. The NFPA Standards are generally treated as a primary source of standards for fire prevention across the country.

29. Pursuant to the District Act (70 ILCS § 705/11), Illinois fire protection districts are authorized to adopt fire prevention codes that parallel national standards. The Districts have adopted the NFPA Standards and are bound to follow these requirements.

30. Commercial Accounts in the Districts are required to have fire alarm systems that meet NFPA Standards. A fire alarm system installed in a Commercial Account generally includes an alarm panel, smoke and heat detectors, and a transmission device that sends any signals to either a central station or a remote supervising station.

31. Fire alarm systems generate alarm, trouble, and supervisory signals. Alarm signals indicate the possibility of a fire at the premises of a Commercial Account. Trouble and supervisory signals indicate either malfunctions of the system or some activation of a monitored device (e.g., boiler temperature). Such signals are generally then transmitted to receiving equipment at a central station.

32. Private alarm contractors like ADS use either their own central stations or third party monitoring facilities to address trouble and supervisory signals in order to ensure that Commercial Accounts' fire alarm systems are kept in working order.

33. Central stations also retransmit alarm signals to the Public Safety Answering Points (911 centers or "PSAP") which dispatch emergency personnel and equipment.

LISLE\169478.7
ID\BLGO - 110623\000003

34. ADS's central station is located in Aurora, Illinois.

35. Tyco operates central stations outside of Illinois that monitor tens of thousands of Commercial Accounts.

36. ADS's and Tyco's central stations are regularly inspected by one of the national testing agencies recognized by the NFPA to assure that they are NFPA compliant.

37. NFPA Standards recognize central station monitoring as the preferred means of monitoring fire alarm signals.

38. For this reason as well as a long standing market preference for central station monitoring, in the vast majority of communities throughout the United States, central stations provide the sole means of monitoring fire alarm systems. In those markets, private alarm contractors actively compete for the Business.

39. The practice of local governmental units displacing private alarm contractors from the Business is generally limited to some local governmental units in Illinois and areas of rural Connecticut.

40. NFPA Standards allow for several different types of transmission devices to be used in fire alarm systems, including, *inter alia,* dedicated phone lines ("Direct Wire"), dual digital dialers (regular phone lines[5]), wireless transmitters (radio and cellular devices), and IP transmitters (Internet Protocols).

41. NFPA Standards place the responsibility for all decisions regarding the fire alarm system on the owners of the premises being monitored, including the selection of transmission devices and the private alarm contractor responsible for the inspection, maintenance, and testing of those devices.

---

[5] These are sometimes referred to as POTS lines, an acronym for "Plain Old Telephone Service."

9

42. In 1997, ADS began using wireless transmitters (also known as "radio transmitters") manufactured by AES Corporation as a new transmission technology in place of Direct Wire phone lines to transmit fire alarm signals for some Commercial Accounts. ADS now operates one of the largest radio transmission networks in the country, with over ten thousand (10,000) transmitters.

43. In the Chicago metropolitan area, Tyco, Cross Points, and Chicago Metro often used Keltron Corporation ("Keltron") brand wireless transmitters to handle transmission of fire alarm system signals when working with local governmental units like Bloomingdale FPD, Lemont FPD, and Orland FPD and also DU-COMM.

44. Keltron transmitters are manufactured by AES Corporation and private labeled to Keltron. But for the label, these transmitters are identical to the AES wireless transmitters used by ADS and other private alarm contractors in the Chicago metropolitan area.

### FACTS SPECIFIC TO THE BLOOMINGDALE TERRITORY

**Bloomingdale Enters the Business and Acts to Exclude Private Alarm Contractors Other Than Chicago Metro[6]**

45. In 2004, Bloomingdale FPD entered into a Fire Alarm Monitoring System Agreement ("Bloomingdale Agreement") with a private alarm contractor, Chicago Metro, to obtain the equipment necessary to set up a wireless network to monitor Commercial Accounts within the Bloomingdale Territory. A true and correct copy of the Bloomingdale Agreement is attached as Exhibit 2.

---

[6] Although ADS has decided not to amend this complaint to assert claims against Chicago Metro or Cross Points, their conduct in the Bloomingdale FPD and Lemont FPD respectively are relevant to the claims asserted here.

LISLE\169478.7
ID\BLGO - 110623\000003

46.  The principal manufacturer of the equipment, including the wireless transmitters, sold by Chicago Metro to Bloomingdale was Keltron.

47.  Chicago Metro, as a "Keltron Dealer," had a business plan to enter into agreements with fire protection districts and municipalities to supply wireless transmitters (AES transmitters private-labeled by Keltron) and receiving equipment manufactured by Keltron.  A true and correct copy of the Keltron Dealer Agreement is attached as Exhibit 3.

48.  Chicago Metro promoted the Keltron business model to achieve 100% market share and exclude all other private alarm contractors from the Business.

49.  In 2005, Bloomingdale FPD enacted Ordinance 05-229 ("Bloomingdale 2005 Ordinance") that required all Commercial Accounts to obtain fire alarm monitoring from Bloomingdale by means of wireless transmitters owned by and leased from Bloomingdale that could only be monitored by Bloomingdale.   A true and correct copy of the Bloomingdale 2005 Ordinance is attached as Exhibit 4.

50.  Bloomingdale FPD's wireless network involved the transmission of all alarm, trouble and supervisory signals to receiving equipment at Bloomingdale FPD's Fire Station Number 21 and the retransmission of such signals to DU-COMM.

51.  The Bloomingdale 2005 Ordinance prevented all private alarm contractors from competing for existing or new Commercial Accounts in the Bloomingdale Territory, with the exception that Chicago Metro would install and maintain the wireless network for Bloomingdale FPD as Bloomingdale's building code provided that: "The designated proprietary agent [i.e., Chicago Metro] shall be the only authorized installer and repair service for the approved radio transmitters."

11

52. By adopting the Bloomingdale 2005 Ordinance and the Bloomingdale Agreement, Bloomingdale FPD, with Chicago Metro's direct involvement, effectively required all Commercial Accounts to terminate their contracts for fire alarm monitoring with their private alarm contractors in order to contract with Bloomingdale FPD for the Business, unless such Commercial Accounts were already using Bloomingdale FPD for fire alarm monitoring via Direct Wire.

53. Thus, although ADS has had Commercial Accounts in the Bloomingdale Territory for many years, ADS could not offer them fire alarm monitoring due to the Bloomingdale 2005 Ordinance.

54. Uninhibited by competition, Bloomingdale FPD proceeded to charge supra-competitive pricing to the Commercial Accounts.

55. To enforce the provisions of the Bloomingdale 2005 Ordinance, Bloomingdale FPD required all Commercial Accounts to enter into subscriber agreements ("Bloomingdale Subscriber Agreements") that obligated the Commercial Accounts to pay Bloomingdale FPD a monthly fee. A true and correct copy of the Bloomingdale Subscriber Agreement for Direct Wire customers is attached as Exhibit 5.

56. The Bloomingdale 2005 Ordinance set the cost for this equipment and service at fifty-five dollars ($55) per month. As an alternative, Commercial Accounts could continue to use Direct Wire provided by Bloomingdale at twenty dollars ($20) per month.

57. If ADS were able to compete for the Business, ADS would have been able to offer many Commercial Accounts a monthly charge of less than the fifty-five dollars ($55) for wireless service set by Bloomingdale FPD.

12

58.   Moreover, if ADS had been able to bundle services with other fire alarm and burglar alarm services – an option for Commercial Accounts not provided for and effectively prohibited by Bloomingdale FPD–the charge for fire alarm monitoring could be as low as five dollars ($5) per month.

59.   Between 2005 and April 30, 2013, with the exception of the few Commercial Accounts allowed to use private alarm contractors selected prior to 2005, Commercial Accounts in the Bloomingdale Territory contracted with Bloomingdale FPD pursuant to Subscriber Agreements ("Bloomingdale Subscriber Agreements"), paid a monthly monitoring fee to Bloomingdale FPD, and sent their Signals by Direct Wire or wireless transmitters to the alarm board at Bloomingdale FPD's Station #21. Village of Bloomingdale 2005 Ordinance (Exhibit 4); Bloomingdale Subscriber Agreement (Exhibit 5).

60.   On January 3, 2013, Bloomingdale FPD entered into an agreement with DU-COMM to have DU-COMM take over the 911 dispatch functions and fire alarm monitoring of Commercial Accounts using wireless transmitters being handled by Bloomingdale FPD and Bloomingdale FPD closed its dispatch center effective May 1, 2013.  A true and correct copy of the Bloomingdale/ DU-COMM 2013 Memorandum of Understanding is attached as Exhibit 6.

61.   Bloomingdale FPD paid DU-COMM a fee for fire alarm monitoring of $14.00 per month for each current, paid subscriber. *Id.*

62.   Starting on May 1, 2013, Bloomingdale FPD requested that Direct Wire users in the Bloomingdale Territory convert to wireless transmitters leased from Bloomingdale FPD.

63.   Bloomingdale FPD's dispatch center provided fire alarm monitoring services for Commercial Accounts in the Bloomingdale Territory that entered into Subscriber Agreements

13

from some time in 2005 until May 1, 2013, when DU-COMM took over the monitoring functions.

64.     On September 3, 2013, Tyco sent a letter to Bloomingdale FPD stating that the following conduct of the Bloomingdale FPD was illegal under both the District Act and Sherman Act: (1) "entered the fire alarm monitoring business and, in doing so, has displaced the private market for fire alarm monitoring for commercial subscribers within the political boundaries of the fire protection district"; (2) did not have the "authority under Illinois law to monitor fire alarms"; (3) "implemented or is enforcing an ordinance that requires a sole provider of fire alarm transmitters and monitoring using Keltron equipment in violation of… the Illinois Fire Protection District Act…"; (4) "requires commercial customers to obtain transmission equipment and monitoring services from a single source and a single alarm provider"; (5) "engaged in the alarm monitoring business, which is illegal under the District Act"; and (6) "charges commercial customers for alarm monitoring even though the Illinois Fire Protection District Act provides no authority to charge your residents fees for such services." A true and correct copy of the Tyco September 3, 2013 Letter is attached as Exhibit 7.

65. As of January 9, 2014, Bloomingdale FPD was monitoring 689 Commercial Accounts out of a total of approximately 690 Commercial Accounts in the Bloomingdale Territory.

66. In 2014, Bloomingdale FPD became a Covered Agency under the DU-COMM Master Agreement.

### Bloomingdale FPD Acknowledges Its Need to Exit The Business

67. Subsequently, Bloomingdale FPD decided to exit the Business in light of the litigation against other area fire departments and fire districts.

14

68. As a result, Bloomingdale terminated the Bloomingdale Agreement with Chicago Metro.

69. On January 9, 2014, Bloomingdale FPD's Board approved a purchase agreement with Tyco ("Tyco Purchase Agreement") to sell Tyco its wireless network and exit the Business. A true and correct copy of the Tyco Purchase Agreement is attached as Exhibit 8.

70. Under this agreement, Bloomingdale FPD sold Tyco all of its wireless transmitters installed in the Commercial Accounts, the receiving equipment at Fire Station 21 and at DU-COMM, and its inventory of fire monitoring equipment for Two Hundred Twenty-Five Thousand Dollars ($225,000).

71. Bloomingdale FPD also agreed to "assign all subscriber fire alarm signal monitoring agreements to TYCO" pursuant to the Tyco Purchase Agreement. *Id* at ¶ 7.

72. As a result, virtually one hundred percent (100%) of the Commercial Accounts in the Bloomingdale Territory became customers of Tyco subject to the Bloomingdale Subscriber Agreements.

73. To facilitate Tyco's participation in the control of the Business, Bloomingdale FPD leased the room at Fire Station Number 21 which housed the receiving equipment so that Tyco could continue to use Bloomingdale FPD's wireless network without any changes in the monitoring network, allowing Tyco to continue to control almost one hundred percent (100%) of the Business.

74. The Bloomingdale Board later passed Ordinance 14-291 and Ordinance 14-292 (together, the "2014 Bloomingdale Ordinances"), making certain changes to the Fire and Building Codes. True and correct copies of the 2014 Bloomingdale Ordinances are attached as Exhibit 9.

LISLE\169478.7
ID\BLGO - 110623\000003

75. The 2014 Bloomingdale Ordinances stated that Bloomingdale FPD was no longer requiring Commercial Accounts to use an exclusive fire alarm monitoring provider, which between 2004 and 2014 had been Bloomingdale FPD acting in conjunction with Chicago Metro. *See* 2014 Bloomingdale Ordinances.

76. Even though Tyco was assigned all of the Bloomingdale Subscriber Agreements, in a letter dated January 10, 2014 from Tyco to all these Commercial Accounts, Tyco sought to negotiate new Customer Contracts with five (5) year terms. A true and correct copy of this letter is attached as Exhibit 10.

77. Tyco is using DU-COMM to monitor fire alarm signals from its Commercial Accounts in the Bloomingdale Territory and pays DU-COMM a fee of $14 per Commercial Account per month for this service.

78. ADS can offer fire alarm monitoring to Commercial Accounts in the Bloomingdale Territory at a cost of service well below that required by the Bloomingdale Subscriber Agreement's fifty-five dollar ($55) monthly fee and in some instances offering its existing customers a fee as low as five dollars ($5) per month if bundled with other services. Despite offering all of these incentives, ADS was able to secure only a handful of accounts after Tyco took over the Bloomingdale FPD wireless network.

79. As of September 5, 2014, Tyco was monitoring 459 Commercial Accounts in the Bloomingdale Territory. Of this number, 333 were still subject to Subscriber Agreements and 129 had been converted to Tyco Customer Contracts.

## FACTS SPECIFIC TO THE LEMONT TERRITORY

**Lemont FPD Enters Into An Agreement And Adopts an Ordinance Designed To Take Over Fire Alarm Monitoring in the Lemont Territory**

LISLE\169478.7
ID\BLGO - 110623\000003

80. From December 4, 2000 to July 15, 2002, Commercial Accounts located in the Lemont Territory used either Direct Wire or wireless transmitters, which were provided by Tyco's predecessor, ADT Security Services, Inc., to transmit Signals to Southwest Central Dispatch. Lemont took over these functions in July of 2002.

81. Lemont FPD and Cross Points entered into an Alarm Services Agreement dated May 3, 2002 ("Lemont/Cross Points Agreement") in order to establish a wireless network, the equipment for which would be installed and maintained by Cross Points. A true and correct copy of the Lemont/Cross Points Agreement is attached as Exhibit 11.

82. In 2002, Lemont FPD implemented Ordinance 02-03 ("Lemont 2002 Ordinance") mandating that "Alarm, supervisory and trouble signals shall be distinctly different and shall be directly connected to the communications center of the Lemont Fire Protection District as defined in NFPA 72 or as required by the code official." Lemont Ordinance No. 02-03. A true and correct copy of the Lemont Ordinance No. 02-03 is attached as Exhibit 12.

83. On August 30 2002, Lemont FPD sent a letter to all Commercial Accounts in the Lemont Territory which required that these Commercial Accounts choose one of: "two options for the transmission of fire alarm signals to our Dispatch office. The options consist of the existing leased telephone company circuit [i.e., Direct Wire] or a wireless radio transceiver owned by LFPD. Because the LFPD now owns its own equipment it is necessary that new monitoring agreements be signed. This new agreement will replace the old agreements between yourself and ADT (the owners of the previous equipment at our facility)." Lemont August 30, 2002 Letter to Business Representative. A true and correct copy of the Lemont August 2002 Letter to Business Representative is attached as Exhibit 13.

LISLE\169478.7
ID\BLGO - 110623\000003

84.    Cross Points installed receiving equipment at Lemont FPD's 911 center and wireless radio transmitters in the premises of Commercial Accounts to make Lemont FPD's wireless network operational.

85.    Under the Lemont Subscriber Agreements, Commercial Accounts paid Lemont FPD a three hundred dollar ($300) initial connection fee and forty dollars ($40) per month for a radio transmission fee and fifteen dollars ($15) per month for monitoring, of which Lemont FPD paid Cross Points $5.00 per Commercial Account per month for wireless subscribers. A true and correct copy of the Lemont Fire Alarm Monitoring Subscriber Agreement is attached as Exhibit 14; Lemont FPD/Cross Points Agreement (Exhibit 11).

86.    From 2002 through April 30, 2014, Lemont FPD received Signals directly from Commercial Accounts at the Lemont FPD's Fire Station #1 dispatch room from both wireless transmitters and Direct Wire transmitters, which were handled by employees of Lemont FPD.

87.    If ADS were able to compete for the Business, ADS could have offered fire alarm monitoring by means of its wireless network for less than the fifty-five dollars ($55) per month charged by Lemont FPD to many Commercial Accounts and could offer this service for as low as five dollars ($5) per month if bundled with other services already being provided to such Commercial Accounts.

88.    ADS has had Commercial Accounts in the Lemont Territory for many years, but could not offer them the Business from the time the Lemont 2002 Ordinance was adopted and implemented.

**Lemont FPD Decides to Exit the Business**

18

LISLE\169478.7
ID\BLGO - 110623\000003

89.  On September 3, 2013, Tyco sent a letter to Lemont FPD stating that the Lemont FPD was engaged in activities that violated the District Act and the Sherman Act including *inter alia* that Lemont FPD: (1) "entered the fire alarm monitoring business and, in doing so, …displaced the private market for fire alarm monitoring for commercial subscribers within the political boundaries of the fire protection district"; (2) did not have the "authority under Illinois law to monitor fire alarms"; (3) "implemented or is enforcing an ordinance that requires a sole provider of fire alarm transmitters and monitoring using Keltron equipment in violation of… the Illinois Fire Protection District Act…"; (4) "requires commercial customers to obtain transmission equipment and monitoring services from a single source and a single alarm provider"; (5) "engaged in the alarm monitoring business, which is illegal under the District Act"; and (6) "charges commercial customers for alarm monitoring even though the Illinois Fire Protection District Act provides no authority to charge your residents fees for such services."  A true and correct copy of the Tyco September 3, 2013 Letter is attached as Exhibit 15.

90.  Lemont FPD subsequently decided to exit the Business in light of *ADT II.*

91.  On March 20, 2014, Lemont amended its Ordinances and thereby did away with the requirement that Commercial Accounts in the District use the District's vendor for transmission of fire alarm signals.   A true and correct copy of Ordinance No. 14-02 (pp. 21-24), dated March 20, 2014, is attached as Exhibit 16.

92.  On April 17, 2014, the Board of Trustees of Lemont FPD declared the fire alarm monitoring equipment surplus, approved the sale of this fire alarm monitoring equipment to Tyco for $70,000, and entered into an agreement with Tyco ("Lemont/Tyco Agreement"). A true and correct copy of the Lemont/Tyco Agreement is attached as Exhibit 17.

19

93. Lemont FPD also assigned all its Subscriber Agreements to Tyco pursuant to the agreement which provided: "Tyco and the FPD agree that the FPD is not entitled to any payment or consideration for the assignment of the Subscriber Agreements." *Id.* at p. 6.

94. As of April 11, 2014, there were approximately 320 Commercial Accounts in the Lemont Territory.

95. Lemont FPD had 322 Subscriber Agreements with such Commercial Accounts that were assigned to Tyco.

96. On May 1, 2014, Tyco took over fire alarm monitoring in the Lemont Territory and on that same date Orland Central Dispatch became responsible for handling fire alarm monitoring for Tyco's Commercial Accounts in the Lemont Territory under an arrangement whereby Tyco collected fees from Commercial Accounts and transmitted $14 per month per accounts to Orland FPD.

97. For Tyco to receive wireless radio Signals in the Lemont Territory, Tyco began using the wireless transmitters installed by Cross Points in the premises of the Commercial Accounts assigned by Lemont FPD.

98. As of September 5, 2014, Tyco had either Subscriber Agreements or Tyco Customer Contracts with 240 Commercial Accounts in the Lemont Territory.

99. As of September 5, 2014, Tyco had a total of 240 Commercial Accounts that were assigned to Tyco by Lemont FPD.

## FACTS SPECIFIC TO THE ORLAND TERRITORY

### Orland Enters Into the Business

100. In August 2003, Orland entered into a contract with Tyco to provide alarm services in the Orland Territory as extended and modified in 2010 ("Orland Agreement"). A

LISLE\169478.7
ID\BLGO - 110623\000003

true and correct copy of the Orland Agreement, dated August 13, 2003, is attached as Exhibit 18.

101. Pursuant to the Orland Agreement, Tyco had the exclusive right to install, maintain, replace, upgrade and operate an alarm monitoring and receiving system in Orland FPD's (Orland Communications Center[7]), where all transmissions from the wireless network were directed. *Id.*

102. The Orland Communications Center was also a PSAP that handles dispatching of emergency personnel and equipment.

103. In 2006, Orland adopted Ordinance 2006-003 ("Orland 2006 Ordinance")[8] which required that all fire alarm systems in Commercial Accounts be monitored by the District. A true and correct copy of the Orland 2006 Ordinance is attached as Exhibit 19.

104. The Signals from Commercial Accounts in the Orland Territory using Direct Wire were received at the Orland Central Dispatch, where all such dedicated phone lines terminated. Orland Agreement (Exhibit 18) and Second Orland Agreement. A true and correct copy of the Second Orland Agreement is attached as Exhibit 20.

105. Tyco later installed the necessary equipment in the Orland Central Dispatch to establish a wireless network for the receipt of Signals from the fire alarm systems in Commercial Accounts using wireless transmitters leased or sold by Tyco and installed by Tyco in such Commercial Accounts within the Orland Territory.

106. Orland provides fire alarm monitoring at Orland Central Dispatch, including communication with Commercial Accounts regarding trouble and supervisory signals.

---

[7] Orland Communications Center is sometimes referred to as "Orland Central Dispatch."

[8] The Bloomingdale 2005 Ordinance, the 2014 Bloomingdale Ordinances, the Lemont 2002 Ordinance, and the Orland 2006 Ordinance are collectively referred to as the "Ordinances."

21

107. Orland Central Dispatch handles both Direct Wire and wireless transmissions from Tyco customers.

108. Pursuant to the Orland Agreement, only Tyco could provide the transmission equipment in the premises of Commercial Accounts to send fire alarm signals from Commercial Accounts to the Orland Communications Center. Orland Agreement (Exhibit 18); Tyco 2014 Agreement (Exhibit 20).

109. ADS has had Commercial Accounts in the Orland Territory for many years, but could not provide the Business to such Commercial Accounts due to the Orland Agreement and the Orland 2006 Ordinance with the exception of a few older customers which were effectively grandfathered.

110. If ADS were permitted to engage in the Business in the Orland Territory, ADS could offer its services for less than the fees charged by Tyco and shared with Orland FPD.

111. For Commercial Accounts with bundled services, ADS charges as little as five dollars ($5) per month for fire alarm monitoring.

112. On October 10, 2013, Orland FPD approved a new agreement with Tyco ("Second Orland Agreement") in which it granted Tyco the exclusive right to install, maintain, and monitor all the Business of Commercial Accounts in the Orland Territory for three (3) years beginning January 1, 2014. A true and correct copy of the Second Orland Agreement is attached as Exhibit 20.

113. The Second Orland Agreement differed in material respects from the prior agreement between Orland FPD and Tyco relating to fire alarm monitoring including *inter alia*:

    a. A three year exclusive right to Tyco to provide monitoring;

b.  An inspection fee to be paid to Orland FPD of $200 per Commercial Account;

c.  Special language indicating that the Orland FPD had the legal authority to enter into the Second Orland Agreement and this agreement was binding on the District;

d.  An indemnity in favor of Tyco in the event of a violation or breach of the agreement or any representation or warranty by Orland FPD;

e.  A provision that the agreement does not confer any duties or benefits or rights on any entities other than Tyco and Orland FPD;.

114. Tyco currently remits to Orland FPD $14.00 per month for each Direct Wire customer and $23.50 per month for each wireless radio customer.  Second Orland Agreement, ¶4 (Exhibit 20).

115. There were approximately 650 Commercial Accounts located within the Orland Territory in 2014.

116. As of December 30, 2014, Orland FPD received Signals from 602 Commercial Accounts using wireless transmitters (i.e., radios) and 98 Commercial Accounts using Direct Wire, almost all of which are located in the Villages of Orland Park or Orland Hills.

117. Tyco currently charges Commercial Accounts that connect to the Orland Central Dispatch the following: (1) $30 per month for leasing the wireless transmitter; (2) $1580 for the purchase of a wireless transmitter; (3) $28 per month for Direct Wire accounts; (4) $47 per month for wireless radio accounts; and (5) $12 per month for maintenance.  All wireless customers are charged a $200 connection fee at the time of the installation of the wireless transmitters.

118. In August 2014, Orland FPD amended Ordinance 2006-003 to remove the requirement that all Commercial Accounts in the unincorporated areas of the Orland Territory must have their Signals received at Orland Central Dispatch.  At that time, there were

23

approximately eight (8) Commercial Accounts located in the Orland Territory that were outside the municipal boundaries of the two Villages. A true and correct copy of the Orland FPD Amended Ordinance is attached as Exhibit 21.

119. Orland FPD Chief Brucki requested that the Village of Orland Park adopt an ordinance requiring that all Commercial Accounts in the Village of Orland Park that were within the Orland Territory: "shall be monitored by a remote supervisory station as designated by the Village of Orland Park as the Authority Having Jurisdiction in accordance with NFPA 72-13 (2013 Edition) as listed in Chapter 80." Orland Park Ordinance No. 4978, §907.6.5.1.(1) at page 4. A true and correct copy of Orland Park Ordinance No. 4978 is attached as Exhibit 22.

120. The Village of Orland Hills adopted a similar ordinance requiring that all Commercial Accounts in the Village of Orland Hills that were within the Orland Territory: "shall be monitored by the remote supervisory station as indicated by the Village of Orland Hills as the AHJ, in accordance with NFPA 72." Orland Hills Ordinance No. 2014-005, § 2 at 2. A true and correct copy of Orland Hills Ordinance No. 2014-005 is attached as Exhibit 23.

121. Both Villages designated Orland Central Dispatch as the only approved remote supervisory station to receive signals from Commercial Accounts in the Orland Territory.

122. A "remote supervising station" is one type of "supervising station" under NFPA 72. The term applies to numerous facilities operated by private alarm contractors, including Tyco, throughout the United States.

123. ADS's central station: (a) is certified as compliant with NFPA 72; (b) is recognized as a "remote supervising station" under NFPA 72; (c) is recognized as an approved facility to monitor alarm signals by more than two hundred 200 municipalities and

24

fire protection districts; and (d) monitors over 9,000 Commercial Accounts in the Chicago Metropolitan area from its central station.

124. Orland FPD employs all the personnel at the Orland Central Dispatch.

125. Tyco collects fees from all its Commercial Accounts in the Orland Territory and remits either $14 or $23.50 per month from each Commercial Account to Orland FPD pursuant to the terms of the Second Orland Agreement.

## DU-COMM'S INVOLVEMENT IN THE BUSINESS

126. DU-COMM was formed as an association of units of local government, "as they are defined in Article VII, Section 1, of the Constitution of the State of Illinois, 1970, and is a 'public agency' as defined in the Intergovernmental Cooperation Act, 5 ILCS 220/2 (1)."

127. The sole purpose for the formation and operation of DU-COMM as set out in its charter and Bylaws was to provide a centralized public safety communications system for the benefit of its members to provide 911 functions. A true and correct copy of the Joint Public Safety Communication System Agreement (1975) is attached as Exhibit 24 and a true and correct copy of the DuPage Public Safety Communications Bylaws is attached as Exhibit 25.

128. DU-COMM is funded by monies from its member agencies. DU-COMM has no authority under its Charter or Bylaws to receive fees for services.

129. Fire alarm monitoring is not a function authorized in the DU-COMM charter or Bylaws.

130. DU-COMM entered into an agreement with Tyco in March of 2014 that made Tyco the only private alarm contractor that could provide fire alarm monitoring transmission equipment and services to certain of DU-COMM's members. Tyco also agreed to pay DU-COMM a fee for such fire alarm monitoring. A true and correct copy of the DU-

25

COMM/Tyco 2014 Agreement is attached as Exhibit 26. DU-COMM has no authority under state law to collect such fees.

131. DU-COMM took over fire alarm monitoring from Bloomingdale FPD in 2013 at which time DU-COMM and Bloomingdale FPD controlled almost the whole market for the Business in the Bloomingdale Territory

132. Once Bloomingdale FPD exited the Business, DU-COMM provide the same fire alarm monitoring for Tyco to handle Commercial Accounts in the Bloomingdale Territory for a fee.

## THE RELEVANT MARKET

133. Each combination of a District or DU-COMM and a private alarm contractor created a distinct anticompetitive environment so that the relevant geographic market was the boundaries of each District's Territory.

134. Each of the Districts, in conjunction with either Tyco, Cross Points, or Chicago Metro, entered into an agreement and adopted a complementary ordinance that effectively barred any other private alarm contractors, including ADS, from engaging in the Business in each relevant geographic market.

135. DU-COMM facilitated such market control in the Bloomingdale Territory after Bloomingdale FPD exited the Business.

136. Orland FPD facilitated such market control in the Lemont Territory after Lemont FPD exited the Business.

137. The relevant product market affected by these Districts and their partners or successors in interest is the Business.

138. The relevant geographic market and relevant product market are collectively referred to herein as the "Relevant Market" for each District Territory respectively.

## INTERSTATE COMMERCE

139. The prior acts of Bloomingdale FPD, Chicago Metro, Lemont FPD, and Cross Points, and the continuing acts of DU-COMM, Orland FPD, and Tyco represent anticompetitive activities that have impacted or will impact the substantial and uninterrupted flow of products, services, contracts, and claims in interstate commerce and the transfer of substantial sums of money across state lines. In particular, the sale of fire alarm monitoring, including central station monitoring, and other fire alarm services, as well as the equipment and products attendant thereto, are all undertaken across state lines as both local and national companies compete for all alarm business including the Business.

140. Additionally, commercial fire alarm transmission and monitoring services in the Districts are sold in interstate commerce. Defendants' actions substantially adversely impact the flow of such interstate commerce by, among other things, substantially impacting the price, quantity and availability of services in each of the Relevant Markets.

## BARRIERS TO ENTRY ESTABLISHED BY THE DISTRICTS

141. Industry-wide, Commercial Accounts contract for fire alarm monitoring and other alarm services by entering into agreements ("Customer Contracts") with fire alarm monitoring companies, including ADS. These Customer Contracts typically have multi-year terms. Such agreements are automatically renewable and remain in force unless terminated by either party, in order to maintain consistent and continuous fire alarm monitoring services. As a result,

LISLE\169478.7
ID\BLGO - 110623\000003

private alarm contractors like ADS enjoy long-lasting relationships with their Commercial Accounts.

142. Competition in jurisdictions where there is no mandate for a single provider or requirement to use one source of transmission equipment is healthy.

143. For example, in the Lisle-Woodridge FPD after the entry of the Modified Permanent Injunction, more than 20 licensed private alarm contractors competed for the Business in that territory and ADS and Tyco each captured significant portions of the market.

144. Similarly, in the Algonquin/Lake in the Hills Fire Protection District territory after an agreed order was entered dismantling the monopoly there, more than 20 licensed private alarm contractors competed for the Business in that territory leading to vigorous competition.

145. In both of these cases, ADS was able to capture 15% or more of the market with open competition.

146. In contrast, due to the Ordinances and exclusive contracts with one licensed private alarm contractor in each District, ADS had virtually no market share of the Business in Bloomingdale FPD and Lemont FPD prior to the two Districts amending their Ordinances in 2014.

147. Moreover, due to these historical restrictions and Tyco's ability to take over virtually 100% of the Commercial Accounts in the two Districts, ADS was unable to get a significant share of either market when Bloomingdale FPD and Lemont FPD exited the Business by selling it to Tyco and assigning the Subscriber Agreements to Tyco.

LISLE\169478.7
ID\BLGO - 110623\000003

148. Moreover, Commercial Accounts often seek all their fire alarm system needs from a single vendor. The licensed private alarm contractor which installs a fire alarm system often provides maintenance, testing, and monitoring.

149. In contrast, where all Commercial Accounts, including those which have Customer Contracts with ADS or other private alarm contractors for services other than the Business, have been required to contract with fire protection districts for the Business, it is virtually impossible for new participants, or those who have previously been excluded, to gain a foothold in the Relevant Market to engage in the Business.

150. Bloomingdale FPD and Lemont FPD both controlled over 95% of the Business in their respective Territories until they exited the Business.

151. By acquiring these Businesses intact, Tyco has been able to retain over 60% of the Business in each Territory. Tyco could not achieve this market share in a competitive market. Moreover, Tyco could not have retained this high percentage of Commercial Accounts in each Territory without having the ability to use DU-COMM to monitor such accounts in the Bloomingdale Territory for a fee and for Orland FPD to monitor Commercial Accounts in the Lemont Territory for a fee. Such fees were both illegal under the District Act.

152. The control of over 60% of the Relevant Market both in the Bloomingdale Territory and the Lemont Territory constitutes monopoly power.

153. The transfer of the ownership of the equipment, especially the transmission equipment in the premises of Commercial Accounts used in the Business in the Bloomingdale Territory and Lemont Territory to Tyco, perpetuated barriers to entry into the Relevant Markets.

LISLE\169478.7
ID\BLGO - 110623\000003

154. Orland FPD and Tyco have controlled virtually all of the Business in the Orland Territory, creating a monopoly.

155. The implementation of the Second Orland Agreement furthered the ability of Orland FPD and Tyco to perpetuate their monopoly.

156. After the passage and implementation of the relevant Ordinances, the Districts were able to charge Commercial Accounts monopoly prices that were substantially higher prices than private competitors were able to offer for similar services, such as those offered in other areas where free and open competition existed.

157. Tyco has been able to preserve these monopoly pricing arrangements for its Commercial Accounts in the Bloomingdale Territory and Lemont Territory.

158. Commercial Accounts were unable to negotiate prices or services for fire alarm monitoring in the Districts, as the Districts dictated equipment, price and terms by the Ordinances and controlled the Relevant Market through mandatory subscriber agreements and Customer Contracts.

159. In particular, Commercial Accounts were initially required to: (1) use only one type of transmitter from one supplier, (2) use only one provider of fire alarm monitoring, and (3) pay a fee for fire alarm monitoring dictated by the Districts.

160. The actions of Bloomingdale FPD and Tyco in the transfer of the ownership of the wireless network to Tyco and DU-COMM'S monitoring of Tyco's Commercial Accounts in the Bloomingdale Territory by means of the DU-COMM/Tyco 2014 Agreement and the assignment of the Subscriber Agreements to Tyco by Bloomingdale FPD have the effect of substantially lessening competition and creating a monopoly controlled by Tyco.

LISLE\169478.7
ID\BLGO - 110623\000003

161. The actions of Lemont FPD and Tyco in the transfer of the ownership of the wireless network by Lemont FPD to Tyco and Orland FPD in monitoring such Commercial Accounts assigned to Tyco by Lemont FPD have the effect of substantially lessening competition and create a monopoly controlled by Tyco.

162. The District Act does not contain any specific grant of authority to allow the Districts to monopolize the Business and there exists no basis at law which would otherwise authorize the Districts to establish monopolies of the Business.

163. The Illinois Constitution, the Intergovernmental Agreement Act, the District Act, and the DU-COMM charter do not give DU-COMM any authority to engage in the Business with Tyco or collect fees.

**STATE ACTION**

164. In entering into the Business with Chicago Metro, Bloomingdale FPD engaged in state action in violation of ADS's constitutional rights.

165. The transfer of ownership to the Bloomingdale FPD's Business to Tyco and the continuing use of DU-COMM to monitor the Commercial Accounts assigned to Tyco for a fee also constituted state action in violation of ADS's constitutional rights which has resulted in ongoing harm to ADS.

166. In entering into the Business with Cross Points, Lemont FPD has engaged in state action in violation of ADS's constitutional rights.

167. The transfer of ownership of the Business from Lemont FPD to Tyco and the use of Orland FPD to monitor the Commercial Accounts assigned to Tyco for a fee also constituted state action in violation of ADS's constitutional rights which has resulted in ongoing harm to ADS.

31

168. In entering into the Business with Tyco, Orland FPD has engaged in state action in violation of ADS's constitutional rights which has resulted in ongoing harm to ADS.

## THE IMPACT OF THE *LISLE-WOODRIDGE* CASE ON THE DISTRICTS' TAKOVERS OF THE BUSINESS

169. On February 28, 2012, the Seventh Circuit found that provisions in an ordinance adopted and implemented by Lisle-Woodridge to take over the Business in that district exceeded the authority given to fire protection districts under the District Act. The Court characterized this takeover as an "illegal monopoly." *See ADT I*, 672 F.3d at 495.

170. The Court also characterized this decision as finding that a fire protection district under the District Act "had fairly broad authority in its capacity as a fire safety regulator but little if any authority to step in as a participant(or sole participant) in the competitive market for commercial fire alarm signaling and monitoring services." *See* ADT II, 724 F3d 854 at 860.

171. In August, 2012, Judge Shadur entered the Order requiring Lisle-Woodridge to exit the fire alarm monitoring market and concluded that the district's actions constituted an illegal monopoly. *See* Exhibit 1.

172. In affirming this Order, the Seventh Circuit ruled that Lisle-Woodridge's actions were beyond its legal authority under the District Act and represented "anti-competitive" behavior. *ADT II*, 724 F.3d at 858, 873-876.

173. Although the District Act authorizes the Districts to acquire and maintain fire stations, facilities, vehicles, apparatus, and equipment for the prevention and control of fire, it provides no express authority for the Districts to purchase and operate fire alarm transmission

32

and monitoring equipment in order to exclude licensed private alarm contractors, including ADS, from the Relevant Market. *See* Exhibit 1 (Order at 26 & 28) and *ADT II* at 863.

174. Moreover, the Seventh Circuit ruled that even if Lisle-Woodridge had the authority to adopt NFPA Standards, it did not have the authority to take away the right of the Commercial Accounts to choose the transmission equipment for its fire alarm system and the alarm company to provide the Business. *ADT I* at 503.

175. Like the Ordinances here, the Lisle-Woodridge ordinance analyzed in *ADT I* and *ADT II* "attempted to overhaul alarm signaling and monitoring" in a fire protection district by requiring "all commercial property owners to terminate their contracts with private alarm contractors and instead to adopt and pay for an alarm and monitoring system provided by the district." *ADT II* at 859.

176. The Seventh Circuit explained that the "more dramatic effect of the challenged [o]rdinance was to make the [Lisle-Woodridge] District . . . the exclusive provider and servicer of the necessary equipment." In flatly rejecting Lisle-Woodridge's authority to pass such an ordinance, the Seventh Circuit explained that "[n]either the NFPA code nor the [District Act] even tacitly endorses so drastic a policy change as the establishment of a *local governmental monopoly* over fire alarm transmitter devices. In view of fire protection districts' limited powers, *supplanting a competitive private market* is far too significant a change to infer from statutory silence." *ADT I* at 503 (emphasis added).

177. In *ADT II*, the Seventh Circuit explained that, like the challenged Ordinances here, an ordinance "[e]xcluding alarm companies from the monitoring business or making it

33

unduly burdensome for them to participate raises significant concerns about the anti-competitive effects of [that ordinance] . . . ."[9] *ADT II* at 865.

178. Moreover, the District Act does not allow the Districts to charge residents for any fire protection services. Moreover, fire alarm monitoring is not a fire protection service.

179. Bloomingdale FPD charged fees which it paid to DU-COMM in the Bloomingdale Territory and now DU-COMM receives fees transmitted by Tyco from Commercial Accounts in the Bloomingdale Territory.

180. Lemont FPD was directly charging all its residents for the Business, and now Tyco collects fees from Commercial Accounts in the Lemont Territory that were assigned by Lemont FPD to Tyco and Tyco pays Orland FPD fees for fire alarm monitoring from Commercial Accounts in the Lemont Territory.

181. Orland FPD is receiving fees from Tyco for fire alarm monitoring of Commercial Accounts in the Orland Territory.

182. Therefore, Orland FPD is receiving fees for fire alarm monitoring from residents of the Lemont Territory and Orland Territory that exceed the District's authority under the District Act in contravention of the legal principles enunciated in *ADT II*.

183. Similarly, DU-COMM is receiving fees for fire alarm monitoring from residents of the Bloomingdale Territory that exceed its authority under the District Act, the Illinois Constitution, the Intergovernmental Cooperation Act, and DU-COMM'S own charter. *See ADT II,* 724 F.3D at 874.

---

[9] The Court specifically found that (1) fire alarm monitoring was not authorized by the District Act; (2) the district could not charge its residents for any fire protection service, including fire alarm monitoring; and (3) the system in place was not parallel to national standards as required by the District Act. The Court noted in numerous comments that this Business was an inhibition to free competition. *ADT II* at 861-65, 875.

LISLE\169478.7
ID\BLGO - 110623\000003

184. Bloomingdale FPD's takeover of the Business in conjunction with its private alarm contractor partner Chicago Metro, pursuant to the Bloomingdale Agreement and the perpetuation of this arrangement under the Tyco Purchase Agreement and the DU-COMM /Tyco 2014 Agreement, is the same type of conduct ruled illegal and enjoined by the District Court in the *Lisle-Woodridge* case and upheld by the Seventh Circuit.

185. Lemont FPD's takeover of the Business in conjunction with its private alarm contractor partner, Cross Points, and the perpetuation of this arrangement pursuant to the Tyco Agreement in 2014 and Tyco's arrangement with Orland FPD to pay Orland FPD fees for monitoring these accounts is the same type of conduct ruled illegal and enjoined by the District Court in the *Lisle-Woodridge* Case and upheld by the Seventh Circuit.

186. Orland FPD's takeover of the Business in conjunction with its private alarm contractor partner, Tyco, as documented in the Second Orland Agreement, is the same type of conduct ruled illegal and enjoined by the District Court in the *Lisle-Woodridge* Case and upheld by the Seventh Circuit.

**COUNT I –DU-COMM'S AND TYCO'S VIOLATION OF SHERMAN ACT § 1 IN THE BLOOMINGDALE TERRITORY[10] –**
**(Contract or Combination in Restraint of Trade)**

---

[10] In Counts I – VI, ADS alleges violations under Sections 1 and 2 of the Sherman Act based on conduct of the Defendants within the Bloomingdale, Lemont and Orland Territories. Based on the settlements with Bloomingdale FPD and Lemont FPD and ADS's decision not to replead against Chicago Metro and Cross Points, ADS is not asserting any claims against Bloomingdale FPD and Lemont FPD, but there are allegations in this Second Amended Complaint as to their conduct only as the basis for establishing liability against one or more of the Defendants. Second, the Court has dismissed, without prejudice, the Sherman Act claims in the First Amended Complaint against Tyco that were based on its conduct within the Bloomingdale and Lemont Territories. ADS has included Tyco in these Counts as new facts are alleged that implicate Tyco. ADS also includes such claims to preserve the claims against Tyco for possible appeal. Third, ADS continues to pursue all asserted Sherman Act and pendent claims against Orland FPD and against Tyco for their conduct in the Orland Territories as this Court denied motions to dismiss these claims. The number of the Counts is preserved, with the exception that Count XII of the Amended Complaint is now Count XIII of this complaint. A new claim is also added as to all Defendants as Count XVI.

35

187. ADS realleges and incorporates by reference paragraphs 1-11, 13-79, 126-153, 156-160, 162-163, 169-179, and 183-184 as though fully set forth herein.

188. Bloomingdale FPD, DU-COMM, and Tyco have combined, conspired and contracted, through the anticompetitive means described above, to restrain trade and commerce among the several states and to suppress and prevent competition in the Relevant Market in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

189. Bloomingdale FPD and Chicago Metro originally combined, conspired and contracted, through the anticompetitive means described above, to restrain trade and commerce among the several states and to suppress and prevent competition in the Relevant Market in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

190. The combinations, conspiracies and contracts entered into between Bloomingdale FPD, DU-COMM, and Tyco were undertaken with the express purpose and intent of unlawfully restraining competition and thereby excluding ADS and other potential market competitors from the Relevant Market.

191. DU-COMM'S and Tyco's anticompetitive agreements, schemes, acts, and practices described herein have substantially and adversely impacted and unreasonably restrained, and continue to substantially and adversely impact and restrain, interstate commerce in the Relevant Market.

192. No valid reasons exist for DU-COMM'S and Tyco's anticompetitive agreements, schemes, acts and/or practices.

193. ADS initially lost market share and the ability to compete in the Bloomingdale Territory due to the Bloomingdale Agreement with Chicago Metro.

36

194. ADS continues to lose market share in the Bloomingdale Territory as the result of the Bloomingdale/Tyco Agreement executed in 2014 and the reliance on DU-COMM under the DU-COMM/Tyco 2014 Agreement that allowed Tyco to use DU-COMM for monitoring to the exclusion of all other private alarm contractors.

195. As a direct and proximate result of DU-COMM'S and Tyco's unlawful conduct as described herein, ADS has previously suffered and will continue to suffer economic injury and damage in its business, property, and other economic interests in an amount difficult to determine given the substantial exclusion of competition created by Bloomingdale FPD transferred to Tyco making such injury irreparable.

196. In addition, as a direct and proximate result of DU-COMM'S and Tyco's unlawful conduct as described herein, ADS has suffered lost profits.

197. There exists no express grant of authority under the District Act to allow DU-COMM in conjunction with Tyco to monopolize the Business.

198. Unless enjoined, DU-COMM and Tyco will cause irreparable harm and damage to ADS and the general public, for which ADS and the general public have no adequate remedy at law.

WHEREFORE, Plaintiff moves this Honorable Court for the following relief:

1. A declaratory judgment that the Tyco Purchase Agreement and DU-COMM Tyco 2014 Agreement violate ADS's rights under Section 1 of the Sherman Act;

2. An order preliminarily and permanently enjoining DU-COMM and Tyco from engaging in the Business;

LISLE\169478.7
ID\BLGO - 110623\000003

3.    An order preliminarily and permanently requiring Tyco and DU-COMM to completely divest from the Business in a manner that will ensure that all licensed private alarm contractors in the Business will be able to freely and openly compete for Commercial Accounts in the Relevant Market;

4.    An award of monetary damages against Tyco in the amount of ADS's lost profits from ADS's loss of business with Commercial Accounts and treble that amount as authorized under the Clayton Act, 15 U.S.C. § 15(a);

5.    An award of monetary damages against DU-COMM in the amount of ADS's lost profits from ADS's loss of business with Commercial Accounts and treble that amount as authorized under the Clayton Act, 15 U.S.C. § 15(a)

6.    An award of costs and reasonable attorney's fees in favor of ADS and against DU-COMM and Tyco as authorized under 15 U.S.C. § 15(a); and,

6.    Such other relief as this Court may deem just and reasonable.

### COUNT II –TYCO'S AND ORLAND FPD'S VIOLATION OF SHERMAN ACT § 1 IN THE LEMONT TERRITORY– (Contract or Combination in Restraint of Trade)

199. ADS realleges and incorporates by reference paragraphs 1-13, 15-44, 80-99, 133-153, 156-159, 161-162, 169-178, 180, 182, and 185 as though fully set forth herein.

200. Lemont FPD and Cross Points combined, conspired and contracted, through the anticompetitive means described above, to restrain trade and commerce among the several states and to suppress and prevent competition in the Relevant Market in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

38

201. Lemont FPD and Tyco then combined, conspired and contracted, through the anticompetitive means described above, to restrain trade and commerce among the several states and to suppress and prevent competition in the Relevant Market in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, by entering into the Lemont/Tyco Agreement in 2014.

202. Orland FPD and Tyco then combined, conspired and contracted, through the anticompetitive means described above, to restrain trade and commerce among the several states and to suppress and prevent competition in the Relevant Market in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, by using Orland FPD to monitor Tyco's Commercial Accounts in the Lemont Territory.

203. The combinations, conspiracies and contracts entered into between Orland FPD and Tyco were undertaken with the express purpose and intent of unlawfully restraining competition and thereby excluding ADS and other potential market competitors from the Relevant Market.

204. Lemont FPD's, Orland FPD's and Tyco's anticompetitive agreements, schemes, acts, and practices described herein have substantially and adversely impacted and unreasonably restrained, and continue to substantially and adversely impact and restrain, interstate commerce in the Relevant Market.

205. No valid reasons exist for Lemont FPD's, Orland FPD's, and Tyco's anticompetitive agreements, schemes, acts and/or practices.

206. ADS was not able to compete in the Lemont Territory due to the acts of Lemont FPD and Cross Points and ADS is still handicapped by the implementation of the

LISLE\169478.7
ID\BLGO - 110623\000003

Lemont/Tyco Agreement in 2014 and Orland FPD's illegal monitoring of Tyco's Commercial Accounts in the Lemont Territory for a fee. Such injury represents antitrust injury.

207. As a direct and proximate result of Tyco's and Orland FPD's unlawful conduct as described herein, ADS has previously suffered and will continue to suffer economic injury and damage in its business, property, and other economic interests in an amount difficult to determine given the substantial exclusion of competition created by the actions of Lemont FPD, Orland FPD, and Tyco, where Tyco is now the principal provider of fire alarm monitoring transmission equipment and fire alarm monitoring in the Lemont Territory, pursuant to the Lemont-Tyco Agreement, the assignment of the Subscriber Agreements by Lemont FPD to Tyco, and Tyco's use of Orland FPD for monitoring.

208. In addition, as a direct and proximate result of Tyco's and Orland FPD's unlawful conduct as described herein, ADS has suffered lost profits.

209. There exists no express grant of authority under the District Act to allow Lemont FPD to monopolize the Business or to transfer the Business to Tyco under the Lemont/Tyco Agreement and there is no authority under the District Act to allow Orland FPD to monitor Tyco's Commercial Accounts in the Lemont Territory for a fee.

210. Orland FPD is immune from antitrust damages under the Local Government Antitrust Immunity Act, 15 U.S.C. §§ 34-36, and therefore ADS has no adequate remedy at law against Orland FPD.

211. Unless enjoined, Tyco's engaging in the Business in the Lemont Territory with Orland FPDs involvement will cause irreparable harm and damage to ADS and the general public for which ADS and the general public have no adequate remedy at law.

WHEREFORE, Plaintiff moves this Honorable Court for the following relief:

LISLE\169478.7
ID\BLGO - 110623\000003

1.     A declaratory judgment that the Lemont/Tyco Agreement and the monitoring arrangement between Tyco and Orland FPD violate ADS's rights under Section 1 of the Sherman Act;

2.     An order preliminarily and permanently enjoining Orland FPD and Tyco from collectively engaging in the Business;

3.     An order preliminarily and permanently enjoining Orland FPD and Tyco from continuing to operate the Business together so that all licensed private alarm contractors, including ADS, will be able to freely and openly compete for Commercial Accounts in the Relevant Market and that the provider in the Business selected by such Commercial Accounts;

4.     An award of monetary damages against Tyco in the amount of ADS's lost profits from ADS's loss of Business with Commercial Accounts and treble that amount as authorized under the Clayton Act, 15 U.S.C. § 15(a);

5.     An award of costs and reasonable attorney's fees in favor of ADS and against Orland FPD and Tyco as authorized under 15 U.S.C. § 15(a); and,

6.     Such other relief as this Court may deem just and reasonable.

## COUNT III – ORLAND FPD'S AND TYCO'S VIOLATION OF SHERMAN ACT § 1 IN THE ORLAND TERRITORY – (Contract or Combination in Restraint of Trade)

212. ADS realleges and incorporates by reference paragraphs 1-13, 15-44, 100-125, 133-145, 148-149, 154-156, 158-159, 162, 169-178, 181-182, and 186 as though fully set forth herein.

213. Orland FPD and Tyco have combined, conspired and contracted, through the anticompetitive means described above, to restrain trade and commerce among the several

LISLE\169478.7
ID\BLGO - 110623\000003

states and to suppress and prevent competition in the Relevant Market in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

214. The combinations, conspiracies and contracts entered into between Orland FPD and Tyco were undertaken with the express purpose and intent of unlawfully restraining competition, and thereby excluding ADS and other potential market competitors from the Relevant Market.

215. Orland FPD's and Tyco's anticompetitive agreements, schemes, acts, and practices described herein have substantially and adversely impacted and unreasonably restrained, and continue to substantially and adversely impact and restrain, interstate commerce in the Relevant Market.

216. No valid reasons exist for Orland FPD's and Tyco's anticompetitive agreements, schemes, acts and/or practices.

217. Orland FPD and Tyco operate an illegal monopoly in the Orland Territory that excludes ADS and other licensed private alarm contractors from the Business with existing Commercial Accounts or from gaining new Commercial Accounts in the Orland Territory for the Business.

218. As a direct and proximate result of Orland FPD's and Tyco's unlawful conduct as described herein, ADS has previously suffered and will continue to suffer economic injury and damage to its business, property, and other economic interests in an amount difficult to determine given the absolute exclusion of competition created by Orland FPD and Tyco through the Second Orland Agreement.

219. In addition, as a direct and proximate result of Orland's FPD and Tyco's unlawful conduct as described herein, ADS has suffered lost profits.

LISLE\169478.7
ID\BLGO - 110623\000003

220. There exists no express grant of authority under the District Act to allow Orland FPD to monopolize the Business.

221. Orland FPD is immune from antitrust damages under the Local Government Antitrust Immunity Act, 15 U.S.C. §§ 34-36, and therefore ADS has no adequate remedy at law against Orland.

222. Unless enjoined immediately, the Second Orland Agreement will cause irreparable harm and damage to ADS and the general public, for which ADS and the general public have no adequate remedy at law.

WHEREFORE, Plaintiff moves this Honorable Court for the following relief:

1. A declaratory judgment that the Second Orland Agreement violates ADS's rights under Section 1 of the Sherman Act;

2. An order preliminarily and permanently enjoining Orland FPD and Tyco from engaging in the Business together;

3. An order preliminarily and permanently requiring Orland FPD and Tyco to completely divest themselves from the Business in a manner that will ensure that all private alarm contractors in the Business, including ADS, will be able to freely and openly compete for Commercial Accounts in the Relevant Market;

4. An award of monetary damages against Tyco in the amount of ADS's lost profits from the loss of business with Commercial Accounts and treble that amount as authorized under the Clayton Act, 15 U.S.C. § 15(a);

5. An award of costs and reasonable attorney's fees in favor of ADS and against Orland FPD and Tyco as authorized under 15 U.S.C. § 15(a); and,

6. Such other relief as this Court may deem just and reasonable.

**COUNT IV –DU-COMM'S AND TYCO'S VIOLATIONS OF SHERMAN ACT § 2 IN THE BLOOMINGDALE TERRITORY –**
**(Unlawful Monopolization, Attempted Monopolization and Conspiracy to Monopolize)**

223. ADS realleges and incorporates by reference paragraphs 1-11, 13-79, 126-153, 156-160, 162-163,169-179, and 183-184 as though fully set forth herein.

224. DU-COMM'S and Tyco's anticompetitive conduct, agreements, schemes, acts and practices constitute intentional and unlawful monopolization of interstate trade and commerce in the Relevant Market, and the intentional and unlawful maintenance and use of monopoly power in the Relevant Market, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

225. Tyco and DU-COMM have acted with the specific intent to attempt to monopolize the Relevant Market, and have sufficient market power to create a dangerous probability of success of monopolizing the Relevant Market by controlling over 60% of the Business in the Bloomingdale Territory.

226. Additionally, DU-COMM'S and Tyco's active participation in various agreements and combinations constitutes a conspiracy to monopolize the Relevant Market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

227. DU-COMM and Tyco have excluded, or attempted to exclude, competition in the Relevant Market by preventing or impeding competition in the Relevant Market.

228. As described above, the acquisition or attempted acquisition of a monopoly in the Relevant Market has been secured by illegal means.

229. DU-COMM'S and Tyco's anticompetitive conduct, agreements, schemes, acts and practices have injured competition and consumers in the Relevant Market by eliminating all competition in the Relevant Market and increasing prices to customers.

230. ADS has been injured by not being able to effectively compete for the Business in the Bloomingdale Territory due to the acts of Tyco and DU-COMM.

231. As a direct and proximate result of DU-COMM'S and Tyco's unlawful conduct as described herein, ADS has suffered economic injury and has been damaged in its business, property, and other economic interests in an amount difficult to determine given Bloomingdale FPD's transfer of its control of the Business to DU-COMM and Tyco.

232. In addition, as a direct and proximate result of DU-COMM'S and Tyco's unlawful conduct as described herein, ADS has suffered lost profits.

233. There exists no express grant of authority under the District Act or any other authority to allow DU-COMM to provide fire alarm monitoring and collect fees in the Bloomingdale Territory for Tyco's Commercial Accounts.

234. Unless enjoined immediately, DU-COMM'S and Tyco's continued monopolization, attempted monopolization, and conspiracy to monopolize the Relevant Market will cause irreparable harm and damage to ADS and the consumers in the Relevant Market, for which ADS and such consumers have no adequate remedy at law.

WHEREFORE, Plaintiff moves this Honorable Court for the following relief:

1.     A declaratory judgment that the Tyco Purchase Agreement and the DU-COMM Tyco 2014 Agreement violated ADS's rights under Section 2 of the Sherman Act;

2.     An order preliminarily and permanently enjoining DU-COMM and Tyco from engaging in the Business together;

3.     An order preliminarily and permanently requiring DU-COMM and Tyco to completely divest themselves of the Business they operate together that will ensure that all licensed private alarm contractors in the Business will be able to freely and openly compete for

45

Commercial Accounts in the Relevant Market and that Commercial Accounts will have the benefits of free competition in their selections of licensed private alarm contractors, including ADS, to provide them with the Business;

4.     An award of monetary damages against Tyco in the amount of ADS's lost profits from ADS's loss of business with Commercial Accounts and treble that amount as authorized under the Clayton Act, 15 U.S.C. § 15(a);

5.     An award of monetary damages against DU-COMM in the amount of ADS's lost profits from ADS's loss of business with Commercial Accounts and treble that amount as authorized under the Clayton Act, 15 U.S.C. § 15(a)

5.     An award of costs and reasonable attorney's fees to ADS and against DU-COMM and Tyco as authorized under 15 U.S.C. § 15(a); and,

6.     Such other relief as this Court may deem just and reasonable.

## COUNT V – ORLAND FPD'S AND TYCO'S VIOLATIONS OF SHERMAN ACT § 2 IN THE LEMONT TERRITORY
### (Unlawful Monopolization, Attempted Monopolization and Conspiracy to Monopolize)

235. ADS realleges and incorporates by reference paragraphs 1-13, 15-44, 80-99, 133-153, 156-159, 161-162, 169-178, 180, 182, and 185 as though fully set forth herein.

236. Tyco's and Orland FPD's anticompetitive conduct, agreements, schemes, acts and practices constitute intentional and unlawful monopolization of interstate trade and commerce in the Relevant Market or the Lemont Territory, and the intentional and unlawful maintenance and use of monopoly power in the Relevant Market, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

237. Tyco's and Orland FPD's anticompetitive conduct, agreements, schemes, acts and practices constitute intentional and unlawful attempted monopolization of interstate trade and

46

commerce in the Relevant Markets defined above, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

238. Tyco and Orland FPD have acted with the specific intent to attempt to monopolize the Relevant Market, and have sufficient market power to create a dangerous probability of success of monopolizing the Relevant Market.

239. Additionally, Tyco's and Orland FPD's active participation in various agreements and combinations constitutes a conspiracy to monopolize the Relevant Market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

240. Tyco and Orland FPD have excluded, or attempted to exclude, competition in the Relevant Market by preventing or impeding competition in the Relevant Market.

241. As described above, the acquisition or attempted acquisition of a monopoly in the Relevant Market has been secured by illegal means including, but not limited to, the limitations on Orland FPD imposed by the District Act.

242. Tyco's and Orland FPD's anticompetitive conduct, agreements, schemes, acts and practices have injured competition and consumers in the Relevant Market by eliminating all competition in the Relevant Market and increasing prices to customers.

243. Due to these acts, ADS and other licensed private alarm contractors cannot effectively compete in the Relevant Market.

244. As a direct and proximate result of Tyco's and Orland FPD's unlawful conduct as described herein, ADS has suffered economic injury and has been damaged in its business, property, and other economic interests in an amount difficult to determine given the significant diminishment in competition created by Tyco in cooperation with Orland FPD.

47

245. In addition, as a direct and proximate result of Tyco's and Orland FPD's unlawful conduct as described herein, ADS has suffered lost profits.

246. There exists no express grant of authority under the District Act to allow Orland FPD in conjunction with Tyco to monopolize the Business.

247. Orland FPD is immune from antitrust damages under the Local Government Antitrust Immunity Act, 15 U.S.C. §§ 34-36, and therefore ADS has no adequate remedy at law against Lemont.

248. Unless enjoined immediately, the continued monopolization, attempted monopolization, and conspiracy to monopolize the Relevant Market by Orland FPD and Tyco will cause irreparable harm and damage to ADS and the consumers in the Relevant Market, for which ADS and such consumers have no adequate remedy at law.

WHEREFORE, Plaintiff moves this Honorable Court for the following relief:

1.     A declaratory judgment that the arrangements between Orland FPD and Tyco in the Lemont Territory violate ADS's rights under Section 2 of the Sherman Act;

2.     An order preliminarily and permanently enjoining Orland FPD and Tyco from engaging in the Business together in the Lemont Territory;

3.     An order preliminarily and permanently requiring Orland FPD and Tyco to completely divest themselves from their joint engagement in the Business in the Lemont Territory in a manner that will ensure that all licensed private alarm contractors in the Business will be able to freely and openly compete for Commercial Accounts in the Relevant Market and that Commercial Accounts will have the benefits of free competition in their selections of licensed private alarm contractors, including ADS, to provide them with the Business;

LISLE\169478.7
ID\BLGO - 110623\000003

4.     An award of monetary damages against Tyco in the amount of ADS's lost profits from ADS's loss of business with Commercial Accounts and treble that amount as authorized under the Clayton Act, 15 U.S.C. § 15(a); and,

5.     An award of costs and reasonable attorney's fees to ADS and against Orland FPD and Tyco as authorized under 15 U.S.C. § 15(a);

6.     Such other relief as this Court may deem just and reasonable.

## COUNT VI – ORLAND FPD'S AND TYCO'S VIOLATIONS OF SHERMAN ACT § 2 IN THE ORLAND TERRITORY
### (Unlawful Monopolization, Attempted Monopolization and Conspiracy to Monopolize)

249. ADS realleges and incorporates by reference paragraphs 1-13, 15-44, 100-125, 133-145, 148, 149, 154-156, 158-159, 162, 169-178, 181-182, and 186 as though fully set forth herein.

250. Orland FPD's and Tyco's anticompetitive conduct, agreements, schemes, acts and practices constitute intentional and unlawful monopolization of interstate trade and commerce in the Relevant Market(the Orland Territory), and the intentional and unlawful maintenance and use of monopoly power in the Relevant Market, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

251. Orland FPD's and Tyco's anticompetitive conduct, agreements, schemes, acts and practices constitute intentional and unlawful attempted monopolization of interstate trade and commerce in the Relevant Market defined above, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

252. Orland FPD and Tyco have acted with the specific intent to attempt to monopolize the Relevant Market, and have sufficient market power to create a dangerous

49

probability of success of monopolizing the Relevant Market and almost 100% of the Orland Territory is controlled by these arrangements.

253. Additionally, Orland FPD's and Tyco's active participation in various agreements and combinations constitutes a conspiracy to monopolize the Relevant Market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

254. Orland FPD and Tyco have excluded, or attempted to exclude, competition in the Relevant Market by preventing or impeding competition in the Relevant Market.

255. As described above, the acquisition or attempted acquisition of a monopoly in the Relevant Markets has been secured by illegal means including, *inter alia*, violations of the District Act.

256. Orland FPD's and Tyco's anticompetitive conduct, agreements, schemes, acts and practices have injured competition and consumers in the Relevant Market by eliminating all competition in the Relevant Market and increasing prices to customers.

257. As a direct and proximate result of Orland FPD's and Tyco's unlawful conduct as described herein, ADS has suffered economic injury and has been damaged in its business, property, and other economic interests in an amount difficult to determine given the absolute exclusion of competition created by Orland FPD in conjunction with Tyco.

258. In addition, as a direct and proximate result of Orland FPD's and Tyco's unlawful conduct as described herein, ADS has suffered lost profits.

259. There exists no express grant of authority under the District Act to allow Orland FPD to monopolize the Business.

LISLE\169478.7
ID\BLGO - 110623\000003

260. Orland FPD is immune from antitrust damages under the Local Government Antitrust Immunity Act, 15 U.S.C. §§ 34-36, and therefore ADS has no adequate remedy at law against Orland.

261. Unless enjoined immediately, Orland FPD's mandate of Tyco as the sole provider of the Business in the Orland Territory, and the continued monopolization, attempted monopolization, and conspiracy to monopolize the Orland Territory will cause irreparable harm and damage to ADS and the consumers in the Relevant Market, for which ADS and such consumers have no adequate remedy at law.

WHEREFORE, Plaintiff moves this Honorable Court for the following relief:

1. A declaratory judgment that the Second Orland Agreement and the business relationship between Orland FPD and Tyco violate ADS's rights under Section 2 of the Sherman Act;

2. An order preliminarily and permanently enjoining Orland FPD and Tyco from engaging together in the Business;

3. An order requiring Orland FPD and Tyco to completely divest themselves from engaging in the Business together in a manner that will ensure that all licensed private alarm contractors in the Business will be able to freely and openly compete for Commercial Accounts in the Relevant Market and that Commercial Accounts will have the benefits of free competition in their selections of licensed private alarm contractors, including ADS, to provide them with the Business;

4. An award of monetary damages against Tyco in the amount of ADS's lost profits from ADS's loss of business with Commercial Accounts and treble that amount as authorized under the Clayton Act, 15 U.S.C. § 15(a);

51

5.    An award of costs and reasonable attorney's fees in favor of ADS and against Orland FPD and Tyco as authorized under 15 U.S.C. § 15(a); and,

6.    Such other relief as this Court may deem just and reasonable.

**COUNT VII –VIOLATION OF CLAYTON ACT § 7 IN THE LEMONT TERRITORY–**
**(Acquisition Lessening Competition and Creating a Monopoly)**

262. ADS realleges and incorporates by reference paragraphs 1-13, 15-44, 80-99, 133-153, 156-159, 161-162, 169-178, 180, 182, and 185 as though fully set forth herein.

263. The activities of Orland FPD and Tyco in the Lemont Territory have impacted the substantial and uninterrupted flow of products, services, contracts, and claims in interstate commerce and the transfer of substantial sums of money across state lines.  Both are involved in activities affecting commerce in the United States.

264. Tyco's acquisition of the Lemont FPD's wireless network, including the wireless transmitters in Commercial Accounts and receiving equipment used in the wireless network from Lemont FPD, are asset acquisitions within the meaning of Section 7 of the Clayton Act, 15 U.S.C. § 18.

265. The effect of this acquisition has been to substantially lessen competition and to create or maintain a monopoly in this Relevant Market within the United States in violation Section 7 of the Clayton Act, 15 U.S.C. § 18.

266. The effect of the acquisition has directly diminished ADS's ability to provide full services to its Commercial Accounts or to engage its customer base, and therefore has impaired past and future sales and profit opportunities, as well as increased ADS's marginal operating costs and prevented ADS from offering competing products and lower prices to Commercial Accounts in the Relevant Market.

LISLE\169478.7
ID\BLGO - 110623\000003

267. There exists no express grant of authority under the District Act to allow Lemont FPD to transfer its alarm monitoring network to Tyco.

268. There exists no express grant of authority under the District Act for Orland FPD in conjunction with Tyco to monopolize the Business in the Lemont Territory.

269. Orland FPD has no grant of authority under the District Act to collect fees for monitoring Commercial Accounts in the Lemont Territory.

270. Orland FPD is immune from antitrust damages under the Local Government Antitrust Immunity Act, 15 U.S.C. §§ 34-36, and therefore ADS has no adequate remedy at law against Lemont.

271. Lemont FPD's transfer of the wireless network to Tyco and Orland FPD's and Tyco's perpetuation of the monopoly in the Relevant Market will cause irreparable harm and damage to ADS and the general public, for which ADS and the general public have no adequate remedy at law.

272. In addition, as a direct and proximate result of Lemont's and Tyco's unlawful conduct as described herein, ADS has suffered lost profits.

WHEREFORE, Plaintiff moves this Honorable Court for the following relief:

1. A declaratory judgment that the Lemont-Tyco Agreement violates ADS's rights under Section 7 of the Clayton Act;

2. An order preliminarily and permanently enjoining Orland FPD and Tyco from continuing in the Business together;

3. An order requiring Tyco and Orland FPD to completely divest itself from engaging in the Business together in a manner that will ensure that all licensed private alarm contractors in the Business will be able to freely and openly compete for Commercial Accounts

in the Relevant Market and that Commercial Accounts will have the benefits of free competition in their selections of licensed private alarm contractors, including ADS, to provide them with the Business;

    4.    An award of monetary damages against Tyco in the amount of ADS's lost profits from ADS's loss of business with Commercial Accounts and treble that amount as authorized under the Clayton Act, 15 U.S.C. § 15(a);

    5.    An award of costs and reasonable attorney's fees to ADS and against Orland FPD and Tyco as authorized under 15 U.S.C. § 15(a); and

    6.    Such other relief as this Court may deem just and reasonable.

### COUNT VIII –VIOLATIONS OF THE
### CLAYTON ACT § 7 IN THE BLOOMINGDALE TERRITORY
### (Acquisition Lessening Competition and Creating a Monopoly)

273. ADS realleges and incorporates by reference paragraphs 1-11,13-79, 126-153, 156-160, 162, 163,169-179, and 183-184 as though fully set forth herein.

274. The activities of DU-COMM and Tyco have impacted the substantial and uninterrupted flow of products, services, contracts, and claims in interstate commerce and the transfer of substantial sums of money across state lines. Both are involved in activities affecting commerce in the United States.

275. Tyco's acquisition of the Bloomingdale FPD's alarm monitoring network, including the wireless transmitters in Commercial Accounts and receiving equipment used in the wireless network from Bloomingdale, are asset acquisitions within the meaning of Section 7 of the Clayton Act, 15 U.S.C. § 18.

LISLE\169478.7
ID\BLGO - 110623\000003

276. The effect of this acquisition has been to substantially lessen competition and to create or maintain a monopoly in this Relevant Market of the Bloomingdale Territory within the United States in violation Section 7 of the Clayton Act, 15 U.S.C. § 18.

277. The effect of the acquisition has directly diminished ADS's ability to provide full services to its Commercial Accounts or to engage its customer base, and therefore has impaired past and future sales and profit opportunities, as well as increased ADS's marginal operating costs and prevented ADS from offering competing products and lower prices to Commercial Accounts in the Relevant Market.

278. DU-COMM has facilitated this anticompetitive conduct by monitoring all Commercial Accounts under Subscriber Agreements assigned to Tyco or who executed Customer Contracts with Tyco in the Bloomingdale Territory and collecting fees for this service.

279. In addition, as a direct and proximate result of DU-COMM'S and Tyco's unlawful conduct as described herein, ADS has suffered lost profits.

280. There exists no express grant of authority under the District Act to allow DU-COMM to monopolize the Business or collect fees from Commercial Accounts in the Bloomingdale Territory or to enter into the DU-COMM/Tyco Agreement in 2014, nor is there any authority under the Illinois Constitution, the Intergovernmental Cooperation Act, nor under the DU-COMM Master Agreement for DU-COMM to engage in such actions as DU-COMM was formed and empowered solely to perform 911 functions.

281. The perpetuation of the monopoly in the Relevant Market by Tyco and DU-COMM will cause irreparable harm and damage to ADS and the general public, for which ADS and the general public have no adequate remedy at law.

55

WHEREFORE, Plaintiff moves this Honorable Court for the following relief:

1. A declaratory judgment that the 2014 Tyco Purchase Agreement and the DU-COMM/Tyco Agreement in 2014 violate ADS's rights under Section 7 of the Clayton Act;

2. An order preliminarily and permanently enjoining DU-COMM and Tyco from together engaging in the Business in the Bloomingdale Territory;

3. An order requiring Tyco and DU-COMM to completely divest from engaging in the Business together in a manner that will ensure that all private alarm contractors in the Business will be able to freely and openly compete for Commercial Accounts in the Relevant Market of the Bloomingdale Territory and that Commercial Accounts will have the benefits of free competition in their selections of private alarm contractors, including ADS, to provide them with the Business;

4. An award of monetary damages against Tyco in the amount of ADS's lost profits from ADS's loss of business with Commercial Accounts in the Bloomingdale Territory and treble that amount as authorized under the Clayton Act, 15 U.S.C. § 15(a);

5. An award of monetary damages against DU-COMM in the amount of ADS's lost profits from ADS's loss of business with Commercial Accounts in the Bloomingdale Territory and treble that amount as authorized under the Clayton Act, 15 U.S.C. § 15(a)

6. An award of costs and reasonable attorney's fees in favor of ADS and against DU-COMM and Tyco as authorized under 15 U.S.C. § 15(a); and,

6. Such other relief as this Court may deem just and reasonable.

## COUNT IX-VIOLATIONS OF THE
## CLAYTON ACT § 7 IN THE ORLAND TERRITORY
### (Acquisition Lessening Competition and Creating a Monopoly)

LISLE\169478.7
ID\BLGO - 110623\000003

282.    ADS realleges and incorporates by reference paragraphs 1-13, 15-44, 100-125, 133-145, 148, 149, 154-156, 158-159, 162, 169-178, 181-182, and 186 as though fully set forth herein.

283. The activities of Orland FPD and Tyco have impacted the substantial and uninterrupted flow of products, services, contracts, and claims in interstate commerce and the transfer of substantial sums of money across state lines.   Both are involved in activities affecting commerce in the United States.

284. Tyco's exclusive rights under the Second Orland Agreement to provide the wireless transmitters in Commercial Accounts and receiving equipment used in the wireless network in the Orland Territory, are asset acquisitions within the meaning of Section 7 of the Clayton Act, 15 U.S.C. § 18.

285. The effect of this acquisition has been to substantially lessen competition and to create or maintain a monopoly in this Relevant Market of the Orland Territory within the United States in violation Section 7 of the Clayton Act, 15 U.S.C. § 18.

286. The effect of the acquisition has directly diminished ADS's ability to provide full services to its Commercial Accounts or to engage its customer base, and therefore has impaired past and future sales and profit opportunities, as well as increased ADS's marginal operating costs and prevented ADS from offering competing products and lower prices to Commercial Accounts in the Relevant Market.

287. Orland FPD has facilitated this anticompetitive conduct by continuing to monitor virtually all the Commercial Accounts in the Orland Territory, by making Tyco the exclusive provider and servicer of transmission devices, and collecting fees for this service.

LISLE\169478.7
ID\BLGO - 110623\000003

288. In addition, as a direct and proximate result of Orland FPD's and Tyco's unlawful conduct as described herein, ADS has suffered lost profits.

289. There exists no express grant of authority under the District Act to allow Orland FPD to monopolize the Business with Tyco or collect fees from Commercial Accounts in the Orland Territory or to enter into Second Orland Agreement in 2014.

290. Orland FPD is immune from antitrust damages under the Local Government Antitrust Immunity Act, 15 U.S.C. §§ 34-36, and therefore ADS has no adequate remedy at law against DU-COMM.

291. Orland FPD's actions in conjunction with Tyco and the perpetuation of the monopoly in the Relevant Market by Orland FPD and Tyco will cause irreparable harm and damage to ADS and the general public, for which ADS and the general public have no adequate remedy at law.

WHEREFORE, Plaintiff moves this Honorable Court for the following relief:

1. A declaratory judgment that the Second Orland Agreement violates ADS's rights under Section 7 of the Clayton Act;

2. An order preliminarily and permanently enjoining Orland FPD and Tyco from engaging together in the Business in the Orland Territory;

3. An order requiring Orland FPD and Tyco to completely divest from engaging in the Business together in a manner that will ensure that all private alarm contractors in the Business will be able to freely and openly compete for Commercial Accounts in the Relevant Market and that Commercial Accounts will have the benefits of free competition in their selections of private alarm contractors, including ADS, to provide them with the Business;

LISLE\169478.7
ID\BLGO - 110623\000003

4.     An award of monetary damages against Tyco in the amount of ADS's lost profits from ADS's loss of business with Commercial Accounts in the Bloomingdale Territory and treble that amount as authorized under the Clayton Act, 15 U.S.C. § 15(a);

5.     An award of costs and reasonable attorney's fees in favor of ADS and against Orland FPD and Tyco as authorized under 15 U.S.C. § 15(a); and,

6.     Such other relief as this Court may deem just and reasonable.

## COUNT X—DU-COMM'S AND TYCO'S VIOLATION OF ADS'S FOURTEENTH AMENDMENT RIGHTS IN THE BLOOMINGDALE TERRITORY
### Allegations Common to Both Sub-Counts

292. ADS realleges and incorporates by reference paragraphs 1-11, 13-79, 126-132, 164-179, 183-184 as though fully set forth herein.

293. ADS, as a licensed private alarm contractor, is authorized by the Alarm Act to install and monitor fire alarm and burglar alarm systems anywhere in the State of Illinois, including within the Bloomingdale Territory.

294. Bloomingdale FPD requires that licensed private alarm contractors install fire alarm systems meeting NFPA Standards.

295. ADS offers Commercial Accounts fire alarm systems, including the Business, in compliance with NFPA Standards.

296. Tyco, by acquiring the assets and assignment of the Subscriber Agreements under the Bloomingdale Agreement in 2014, with monitoring provided by DU-COMM, interfered with and took away ADS's valid property rights under its license to provide the Business to existing Commercial Accounts or offering the Business to prospective customers, by Tyco's using DU-COMM to perform monitoring to Commercial Accounts even though DU-COMM has no right 1) engage in fire alarm monitoring; or 2) to collect fees for such monitoring.

59

297. But for DU-COMM'S facilitation of the transfer of the Subscriber Agreements at the time of the assignment of these agreements under the Bloomingdale Agreement, Tyco could not have taken control over all these Commercial Accounts in the Bloomingdale Territory and such accounts would have been able to use any licensed private alarm contractors, including ADS, for the Business.

298. Both the *Lisle-Woodridge* case and *Algonquin/Lake in the Hills* case demonstrate that these illegal Business arrangements in fire protection districts can be unwound without transferring all the Commercial Accounts to a single provider, effectively perpetuating such illegal conduct by a transfer to a single provider.

299. In all respects, DU-COMM's involvement in fire alarm monitoring in the Bloomingdale Territory and collecting fees paid by Commercial Accounts to Tyco is in violation of the District Act and the DU-COMM Master Agreement.

300. The actions of DU-COMM in conjunction with Tyco are actions under color of law within the meaning of the Fourteenth Amendment to the U.S. Constitution.

### Sub-Count A-- Substantive Due Process
**(Arbitrary and Capricious Administration of the DU-COMM Master Agreement Under the Color of Law)**

301. ADS has valid property rights in its license.

302. The arrangement between DU-COMM and Tyco in effectively excluding ADS from engaging in the Business as it would in an open market was arbitrary and capricious and designed to give DU-COMM an illegal revenue stream.

303. These actions by DU-COMM and Tyco were irrational and wholly arbitrary as any licensed private alarm contractors licensed are entitled to provide fire alarm services, including the Business, in the Bloomingdale Territory without Tyco having an illegal

60

arrangement with DU-COMM that results in DU-COMM receiving fees collected by Tyco from such Commercial Accounts.

304. DU-COMM, in conjunction with Tyco, interfered with and took away ADS's rights under its license under the Alarm Act to provide fire alarm services, including the Business, to existing Commercial Accounts or offering the Business to prospective customers, which actions were irrational and wholly arbitrary as all licensed private alarm contractors meeting NFPA 72 are entitled to provide fire alarm services, including the Business, in the Bloomingdale Territory and should be able to freely compete for the Business.

305. Accordingly, DU-COMM, in conjunction with Tyco, deprived ADS of its property rights in violation of the Due Process Clause of the Fourteenth Amendment.

### Sub-Count B—Unequal Treatment
### (Different Treatment of Similarly Situated Entities Under the Color of Law)

306. ADS is similarly situated to Tyco because, as licensed private alarm contractors under the Alarm Act, they are *prima facie* identical in all relevant respects.

307. Even though DU-COMM had no constitutional or statutory authority to engage in fire alarm monitoring or collecting fees from Commercial Accounts in the Bloomingdale Territory, and no authority under the DU-COMM Master Agreement to engage in such activities and work exclusively with one private alarm contractor, it only worked with Tyco in the Bloomingdale Territory pursuant to the DU-COMM/Tyco 2014 Agreement.

308. DU-COMM was formed and organized solely to provide 911 services for its member units of local government.

309. ADS and other private alarm contractors were being treated differently than DU-COMM and Tyco as similarly situated entities in violation of the Equal Protection Clause.

61

310. Such disparate treatment is wholly unrelated to any legitimate governmental interest.

311. Accordingly, DU-COMM'S intentional preferential treatment of Tyco constitutes a violation of ADS's constitutional rights under the Equal Protection Clause of the Fourteenth Amendment.

312. As a result thereof, ADS has suffered harm including loss of: (1) revenue from their existing Commercial Accounts for their Business or alarm services; (2) referrals from existing customers for new Business; (3) reputation and standing in the commercial community and the interruption of long-standing relationships with their Commercial Accounts and the expectation that these relationships would continue for many years; (4) the ability to sell the Business to new Commercial Accounts and other fire alarm and burglar alarm services as well; and (5) good will.

313. As the nature of the harm suffered is difficult to calculate due to the exclusion of ADS from contracting for the Business with Commercial Accounts, the harm is irreparable.

314. In addition, as a direct and proximate result of DU-COMM'S and Tyco's unlawful conduct as described herein, ADS has suffered lost profits.

WHEREFORE, Plaintiff moves this Honorable Court for the following relief:

1.  A declaratory judgment that the 2014 Tyco Purchase Agreement and the 2014 DU-COMM/Tyco Agreement violated ADS's rights under the Fourteenth Amendment to the U.S. Constitution;

2.  An order preliminarily and permanently enjoining DU-COMM and Tyco from acting under the 2014 DU-COMM/Tyco Agreement and the continuation of their business relationship as it relates to fire alarm monitoring;

62

3.      An award of monetary damages against DU-COMM and Tyco as authorized under 42 U.S.C. § 1983;

4.      An award of costs and reasonable attorney's fees in favor of ADS and against DU-COMM and Tyco as authorized under 42 U.S.C. § 1988;

5.      Such other relief as this Court may deem just and reasonable.

## COUNT XI –ORLAND FPD'S AND TYCO'S VIOLATIONS OF ADS'S FOURTEENTH AMENDMENT RIGHTS IN THE LEMONT TERRITORY

### Allegations Common to Both Sub-Counts

315. ADS realleges and incorporates by reference paragraphs 1-13, 15-44, 80-99, 164-178, 180 and 185 as though fully set forth herein.

316. ADS, as a licensed private alarm contractor, is authorized by the Alarm Act to install and monitor fire alarm and burglar alarm systems anywhere in the State of Illinois, including within the Lemont Territory.

317. The actions of Orland FPD in engaging in the Business in the Lemont Territory in conjunction with Tyco are actions under color of law within the meaning of the Fourteenth Amendment to the U.S. Constitution.

### Sub-Count A-- Substantive Due Process
### (Arbitrary and Capricious Administration of Local Ordinance Under the Color of Law)

318. By Tyco's entering into the Lemont/Tyco 2014 Agreement, acquiring the equipment used in the Lemont FPD network, and arranging with Orland FPD to provide monitoring to all the Commercial Accounts assigned to Tyco pursuant to Subscriber Agreements for a fee, Tyco and Orland FPD interfered with and took away ADS's rights under the Alarm Act to provide fire alarm services, including the Business, to existing Commercial Accounts or offering the Business to prospective customers, which actions are

63

irrational and wholly arbitrary as any licensed private alarm contractor could provide the Business in the Lemont Territory but for the illegal arrangements between Tyco and Orland FPD.

319. Orland FPD had no authority under the District Act to enter into a monitoring arrangement with Tyco, receive fees paid to Tyco by Commercial Accounts in the Lemont Territory, and monitor such accounts for Tyco in contravention of the due process provisions of the Fourteenth Amendment to the U.S. Constitution.

320. Accordingly, Orland FPD and Tyco deprived ADS of its property right.

**Sub-Count B—Equal Protection**
**(Different Treatment of Similarly Situated Entities Under the Color of Law)**

321. ADS is similarly situated to Tyco because, as licensed private alarm contractors under the Alarm Act, they are *prima facie* identical in all relevant respects.

322. ADS and other licensed private alarm contractors are being treated differently than Tyco due to the illegal arrangements and agreements with between Tyco and Orland FPD in violation of the Equal Protection Clause.

323. Orland FPD's and Tyco's joint actions constitute violations of ADS's constitutional rights under the equal protection provisions of the Fourteenth Amendment.

324. As a result thereof, ADS has suffered harm including loss of: (1) revenue from their existing Commercial Accounts for their Business or alarm services; (2) referrals from existing customers for new Business; (3) reputation and standing in the commercial community and the interruption of long-standing relationships with their Commercial Accounts and the expectation that these relationships would continue for many years; (4) the

LISLE\169478.7
ID\BLGO - 110623\000003

ability to sell the Business to new Commercial Accounts and other fire alarm and burglar alarm services as well; and (5) good will.

325. As the nature of the harm suffered is difficult to calculate due to the exclusion of ADS from contracting for the Business with Commercial Accounts, the harm is irreparable.

326. In addition, as a direct and proximate result of Orland FPD's and Tyco's unlawful conduct as described herein, ADS has suffered lost profits.

WHEREFORE, Plaintiff moves this Honorable Court for the following relief:

1. A declaratory judgment that the Lemont-Tyco Agreement of 2014 and the Orland monitoring arrangement with Tyco to engage together in the Business in the Lemont Territory violated ADS's rights under the Fourteenth Amendment to the U.S. Constitution;

2. An order preliminarily and permanently enjoining Orland FPD and Tyco from continuing their monitoring arrangement in the Lemont Territory;

3. An award of monetary damages against Orland FPD as authorized under 42 U.S.C. § 1983;

4. An award of monetary damages against Tyco as authorized under 42 U.S.C. § 1983;

5. An award of costs and reasonable attorney's fees as authorized under 42 U.S.C. § 1988; and,

6. Such other relief as this Court may deem just and reasonable.

## COUNT XII–ORLAND FPD'S AND TYCO'S VIOLATIONS OF ADS'S FOURTEENTH AMENDMENT RIGHTS IN THE ORLAND TERRITORY
### Allegations Common to Both Sub-Counts

327. ADS realleges and incorporates by reference paragraphs 1-13, 15-44, 100-125, 164-178, 181-182, and 186 as though fully set forth herein.

328. ADS, as a licensed private alarm contractor, is authorized by the Alarm Act to install and monitor fire alarm and burglar alarm systems anywhere in the State of Illinois, including within the Orland Territory.

329. The actions of Orland FPD in granting Tyco exclusive rights without legal authority are actions under color of law within the meaning of the Fourteenth Amendment to the U.S. Constitution.

### Sub-Count A--Violation of Substantive Due Process
**(Arbitrary and Capricious Administration of Governmental Activities Under the Color of Law)**

330. Orland FPD, in conjunction with Tyco, is interfering with and taking away ADS's rights under its license under the Alarm Act to provide fire alarm services, including the Business, to existing Commercial Accounts or offering the Business to prospective customers, which actions are irrational and wholly arbitrary as licensed private alarm contractors are all authorized to provide fire alarm services, including the Business.

331. In particular, the Orland Second Agreement with Tyco entered into in 2014 is not grounded in authority that Orland FPD has under the District Act and by excluding other licensed private alarm contractors from providing fire alarm monitoring equipment including transmitters and services in the Orland Territory even though such contractors are licensed and comply with NFPA Standards and offer the same services and comparable transmission equipment to that provided by Tyco with its exclusive business partner Orland FPD, such acts are in contravention of ADS's due process rights as extended under the Fourteenth Amendment to the U.S. Constitution.

### Sub-Count B—Equal Protection
**(Different Treatment of Similarly Situated Entities Under the Color of Law)**

LISLE\169478.7
ID\BLGO - 110623\000003

332. As a result, ADS and other private alarm contractors are being treated differently than Tyco as similarly situated entities in violation of ADS's right to equal protection under the Fourteenth Amendment, due to Orland FPD's exclusive arrangements with Tyco.

333. Orland FPD's and Tyco's joint actions constitute violations of ADS's constitutional rights under the Equal Protection Clause of the Fourteenth Amendment.

334. As a result thereof, ADS has suffered harm including loss of: (1) revenue from their existing Commercial Accounts for their Business or alarm services; (2) referrals from existing customers for new Business; (3) reputation and standing in the commercial community and the interruption of long-standing relationships with their Commercial Accounts and the expectation that these relationships would continue for many years; (4) the ability to sell the Business to new Commercial Accounts and other fire alarm and burglar alarm services as well; and (5) good will.

335. As the nature of the harm suffered is difficult to calculate due to the exclusion of ADS from contracting for the Business with Commercial Accounts, the harm is irreparable.

336. In addition, as a direct and proximate result of Orland's and Tyco's unlawful conduct as described herein, ADS has suffered lost profits.

WHEREFORE, Plaintiff moves this Honorable Court for the following relief:

1.     A declaratory judgment that the Second Orland Agreement violate ADS's rights under the Fourteenth Amendment to the U.S. Constitution;

2.     An order preliminarily and permanently enjoining Orland FPD from enforcing the Orland Second Agreement;

3.     An award of monetary damages against Orland FPD as authorized under 42 U.S.C. § 1983;

LISLE\169478.7
ID\BLGO - 110623\000003

4.      An award of monetary damages against Tyco as authorized under 42 U.S.C. § 1983;

5.      An award of costs and reasonable attorney's fees in favor of ADS and against Tyco and Orland FPD as authorized under 42 U.S.C. § 1988; and,

6.      Such other relief as this Court may deem just and reasonable.

## COUNT XIII–PENDENT CLAIM FOR DECLARATORY JUDGMENT THAT DU-COMM AND TYCO ARE VIOLATING THE DISTRICT ACT AND OTHER STATE LAWS IN THE BLOOMINGDALE TERRITORY

337. ADS incorporates by reference and restates paragraphs 1-11, 13-79, 126-132, 169-179, and 183-184 as though more fully set forth herein.

338. ADS has a clearly ascertainable right and/or protectable interest in its Customer Contracts with its Commercial Accounts within the Bloomingdale Territory as granted by Article 1, § 10 of the U.S. Constitution and under Article 1, § 16 of the Illinois Constitution.

339. The DU-COMM/Tyco 2014 Agreement provided the following new arrangements between the parties *inter alia*: (1) Tyco would be able to charge an End-User fee of $200; (2) Tyco would work to eliminate reverse polarity (Direct Wire) transmissions by Commercial Accounts; (3) any changes in fees would require an adjustment in the agreement; (4) Tyco to install new work stations and install radios at 6 new locations without charge; and (5) DU-COMM represented that it "has full legal authority to charge and collect the fee described in 7.1 and 7.2 of the agreement."

340. DU-COMM had no statutory authority to enter into the DU-COMM/Tyco 2014 Agreement to the extent it involved DU-COMM in being the provider of fire alarm

LISLE\169478.7
ID\BLGO - 110623\000003

monitoring services to Tyco for Commercial Accounts in the Bloomingdale Territory and allowed DU-COMM to receive fees paid to Tyco by such Commercial Accounts.

341. DU-COMM's performance of fire alarm monitoring for Bloomingdale FPD and then Tyco was in contravention of the Illinois Constitution and Intergovernmental Cooperation Act.

342. DU-COMM had no authority under the DU-COMM Master Agreement or By-Laws to engage in fire alarm monitoring or charge fees for such activities.

343. The DU-COMM/Tyco 2014 Agreement was executed after the Seventh Circuit's decision in *ADT II* and although the Seventh Circuit had already ruled DU-COMM could not collect fees from Commercial Accounts in the Lisle-Woodridge territory, the newly added language about the legality of such arrangements was contrary to that ruling.

344. The ruling bound DU-COMM pursuant to FRCP 65 in the Lisle-Woodridge territory and has similar application to the Bloomingdale Territory.

345. To the extent DU-COMM were to claim authority through Bloomingdale FPD, DU-COMM has no authority under the District Act to effectively subvert the limitations under the District Act on charging residents fees by charging Commercial Accounts in the Bloomingdale Territory for services provided by Tyco and sharing in the revenue collected by Tyco for the same services as DU-COMM has no such authority under the District Act.

346. As an agency of intergovernmental cooperation, DU-COMM is not vested with any independent authority as there is no state statute giving DU-COMM any express authority to engage in fire alarm monitoring or collecting fees.

347. ADS will suffer irreparable injury if it is substantially limited in offering its Commercial Accounts the Business or unable to offer the Business to new Commercial

LISLE\169478.7
ID\BLGO - 110623\000003

Accounts in the Bloomingdale Territory as ADS will lose: (1) revenue from their existing Commercial Accounts for their Business; (2) referrals from existing customers for new Business; (3) reputation and standing in the commercial community and the interruption of long-standing relationships with their Commercial Accounts and the expectation that these relationships would continue for many years; and (4) the ability to sell the Business to new Commercial Accounts and other fire alarm and burglar alarm services as well.

348. There is no adequate remedy at law to fully and adequately compensate ADS, as the denial of a constitutional and statutory right constitutes irreparable injury.

WHEREFORE, Plaintiff moves this Honorable Court for the following relief:

1.    A declaratory judgment that DU-COMM is exceeding its authority under the District Act and any other authority it may have under state law and therefore is engaged in unlawful activity; and,

2.    Such other relief as this Court may deem just and reasonable.

### COUNT XIV–PENDENT CLAIM FOR DECLARATORY JUDGMENT THAT ORLAND FPD DOES NOT HAVE THE AUTHORITY UNDER THE DISTRICT ACT TO ENGAGE IN FIRE ALARM MONITORING WITH TYCO IN THE LEMONT TERRITORY

349. ADS incorporates by reference and restates paragraphs 1-13, 15-44, 80-99, 169-178, 180, 182, and 185 as though more fully set forth herein.

350. ADS has a clearly ascertainable right and/or protectable interest in its Customer Contracts with its Commercial Accounts within the Lemont Territory as granted by Article 1, § 10 of the U.S. Constitution and under Article 1, § 16 of the Illinois Constitution.

LISLE\169478.7
ID\BLGO - 110623\000003

351. Orland FPD had no authority to enter into an arrangement with Tyco to provide fire alarm monitoring to Commercial Accounts in the Lemont Territory and to collect fees for such monitoring.

352. Orland FPD has no authority under the District Act to effectively subvert the limitations under the District Act on charging residents by receiving fees from Tyco that were collected from Commercial Accounts in the Lemont Territory for monitoring services.

353. ADS will suffer irreparable injury if it is barred from being able to offer its Commercial Accounts the Business or unable to offer the Business to new Commercial Accounts in the Lemont Territory as ADS will lose: (1) revenue from their existing Commercial Accounts for their Business; (2) referrals from existing customers for new Business; (3) reputation and standing in the commercial community and the interruption of long-standing relationships with their Commercial Accounts and the expectation that these relationships would continue for many years; and (4) the ability to sell the Business to new Commercial Accounts and other fire alarm and burglar alarm services as well.

354. There is no adequate remedy at law to fully and adequately compensate ADS, as the denial of a constitutional right constitutes irreparable injury.

WHEREFORE, Plaintiff moves this Honorable Court for the following relief:

1.      A declaratory judgment that the arrangement between Orland FPD and Tyco to monitor Commercial Accounts in the Lemont Territory for a fee exceeded the authority of Orland FPD and therefore is unlawful; and,

2.      Such other relief as this Court may deem just and reasonable.

**COUNT XV – PENDENT CLAIM FOR DECLARATORY JUDGMENT
THAT ORLAND FPD DOES NOT HAVE THE AUTHORITY TO ADOPT AND ACT
UPON THE SECOND ORLANDAGREEMENT IN THE ORLAND TERRITORY**

71

355. ADS incorporates by reference and restates paragraphs 1-13, 15-44, 100-125, 169-178, 181-182 and 186 as though more fully set forth herein.

356. ADS has a clearly ascertainable right and/or protectable interest in its Customer Contracts with its Commercial Accounts within the Orland Territory as granted by Article 1, § 10 of the U.S. Constitution and under Article 1, § 16 of the Illinois Constitution.

357. Orland has no authority under the District Act to take over the Business from licensed private alarm contractors, and yet Orland FPD is now barring ADS and licensed private alarm contractors other than Tyco from the Business by contracting with Tyco under the Second Orland Agreement to give Tyco the exclusive right to provide transmission devices, fire alarm monitoring with Orland FPD's direct involvement, and collection of fees from Commercial Accounts in the Orland Territory.

358. Orland has no authority under the District Act to effectively subvert the limitations under the District Act on charging residents by having Tyco charge all Commercial Accounts in the Orland Territory for the same service Orland FPD is barred by the District Act from exclusively providing and then paying Orland FPD fees for such services.

359. By excluding the ability of private alarm contractors other than Tyco to provide fire alarm monitoring to their Commercial Accounts consistent with NFPA Standards, Orland FPD has adopted a standard in the Second Orland Agreement that does not parallel the NFPA Standards and thus violates the District Act.

360. By requiring the installation of radio transmitters by Tyco as established by the Second Orland Agreement and excluding the use of identical radio transmitters or comparable radio transmitters installed by licensed private alarm contractors, Orland FPD has effectively

72

adopted a standard that does not parallel the NFPA Standards and thus violates the District Act.

361. ADS will suffer irreparable injury if it is barred from being able to offer its Commercial Accounts the Business or unable to offer the Business to new Commercial Accounts in the Orland Territory as ADS will lose: (1) revenue from their existing Commercial Accounts for their Business; (2) referrals from existing customers for new Business; (3) reputation and standing in the commercial community and the interruption of long-standing relationships with their Commercial Accounts and the expectation that these relationships would continue for many years; and (4) the ability to sell the Business to new Commercial Accounts and other fire alarm and burglar alarm services as well.

362. There is no adequate remedy at law to fully and adequately compensate ADS, as the denial of a constitutional right constitutes irreparable injury.

WHEREFORE, Plaintiff moves this Honorable Court for the following relief:

1.    A declaratory judgment that the Second Orland Agreement exceeds the authority of Orland FPD and therefore is unlawful; and,

2.    Such other relief as this Court may deem just and reasonable.

## COUNT XVI – UNJUST ENRICHMENT AGAINST ORLAND FPD, TYCO, AND DU-COMM

363.    ADS realleges and incorporates by reference 1-132 and 169-186 as though fully set forth herein.

364.    Orland FPD through Tyco, receives fees for fire alarm monitoring from Commercial Accounts which are residents of the Orland Territory that are not authorized by the District Act.

365.     Orland FPD, through Tyco, receives fees for fire alarm monitoring from Commercial Accounts in the Lemont Territory that are not authorized by the District Act.

366.     DU-COMM, through Tyco, receives fees for fire alarm monitoring from Commercial Accounts which are residents of the Bloomingdale Territory that are not authorized by the Illinois Constitution, Intergovernmental Cooperation Act, or the District Act.

367. As a result of Orland FPD's and Tyco's illegal conduct, ADS was unable to compete at all for the Business of Commercial Accounts in the Orland Territory.

368. .     As a result of Tyco's and Orland FPD's illegal conduct, ADS was unable to effectively compete for the Business of Commercial Accounts in the Lemont Territory.

369. As a result of DU-COMM'S and Tyco's illegal conduct, ADS was unable to effectively compete for the Business of Commercial Accounts in the Bloomingdale Territory.

370. By retaining revenues paid by Commercial Accounts pursuant to Subscriber Agreements and Customer Contracts in Bloomingdale, Lemont, and Orland, Defendants unjustly retained a benefit to ADS's detriment.

371.     Defendants continue to unjustly retain profits received from Commercial Accounts that Defendants never had the legal authority to receive.

372. Defendants procured the benefit from Commercial Accounts through Defendants' wrongful and illegal conduct.

373. Defendants' retention of these revenues violates the fundamental principles of justice, equity, and good conscience.

374. As a result, ADS has suffered damages.

WHEREFORE, ADS moves this Honorable Court for the following relief:

LISLE\169478.7
ID\BLGO - 110623\000003

1.    A declaration that Defendants Orland FPD, Tyco, and DU-COMM have been unjustly enriched;

2.    A money judgment in the amount of damages sustained by ADS as a result of Defendants' illegal conduct.

3.    An award of costs and reasonable attorney's fees based on the fee shifting provisions of the federal claims above.

4.    Such other relief as this Court may deem just and reasonable.

Dated: October 15, 2015

Respectfully submitted,

|  | By:  Bruce L. Goldsmith |
|---|---|
|  | Bruce L. Goldsmith – ARDC No. 0996939<br>David J. Bressler – ARDC No. 6182549<br>Michele K. Schindler – ARDC No. 6293710<br>Kara B. Murphy - ARDC No. 6309748<br>DYKEMA GOSSETT PLLC<br>4200 Commerce Court, Suite 300<br>Lisle, Il  60532<br>630-245-0400<br><br>*Attorneys for Alarm Detection Systems, Inc.* |

STATE OF ILLINOIS    )
                           )    SS.
COUNTY OF KANE     )

## VERIFICATION

    ROBERT LUBIC, Vice President of ALARM DETECTION SYSTEMS, INC., being duly sworn on oath states that to the best of his knowledge, the information set forth in the foregoing Second Amended Verified Complaint is true and correct and that he has the authority to make this verification on behalf of himself and ALARM DETECTION SYSTEMS, INC.

Robert Lubic, Vice President
Alarm Detection Systems, Inc.

SUBSCRIBED & SWORN to
Before me this 12th day of
October, 2015

Notary Public

LINDA S. HAMILTON
OFFICIAL SEAL
Notary Public, State of Illinois
My Commission Expires
August 01, 2019

## CERTIFICATE OF SERVICE

    The undersigned certifies that on October 15, 2015,  he caused the foregoing Amended Verified Complaint to be filed electronically with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all parties to this action via their counsel of record at their e-mail addresses on file with the Court.

                                              Bruce L. Goldsmith

Bruce L. Goldsmith – ARDC No. 0996939
David J. Bressler – ARDC No. 6182549
Molly Thompson-ARDC No.6293942
Kara B. Murphy - ARDC No. 6309748
DYKEMA GOSSETT PLLC
4200 Commerce Court, Suite 300
Lisle, Il  60532
630-245-0400

*Attorneys for Alarm Detection Systems,
Inc.*

LISLE\169478.7
ID\BLGO - 110623\000003