## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| ALARM DETECTION SYSTEMS, INC., an Illinois corporation, | |
| Plaintiff, | Case No.: 14-cv-00876 |
| vs. | |
| ORLAND FIRE PROTECTION DISTRICT; TYCO INTEGRATED SECURITY, LLC, | Judge:  Thomas M. Durkin<br>Magistrate:  Jeffrey T. Gilbert |
| Defendants. | |

## PLAINTIFF'S POST-TRIAL MEMORANDUM

## TABLE OF CONTENTS

|  |  |  | Page |
|---|---|---|---|

I. INTRODUCTION..............................................................................................1

        *Assoc. Gen. Contractors v. Cal. State Council of Carpenters,*
           459 U.S. 519 (1983)....................................................................1

II. STATEMENT OF FACTS...............................................................................1

    A. **Defendants' Challenged Conduct in the Orland Territory** .............1

    B. **The Establishment of Defendants' Monopoly** .............................2

        *ADT Sec. Servs., Inc. v. Lisle-Woodridge Fire Prot. Dist.,*
           724 F.3d 854 (7th Cir. 2013) (ADT II) ......................................3

    C. **The Impact of the Challenged Conduct on ADS and Other Competitors**........4

    D. **Actions Taken By Tyco and ADS after the *ADT II* Decision** .............5

    E. **Response Time – Direct Connect Versus Central Stations** ...............6

III. ARGUMENT ....................................................................................................7

    A. **Defendants' Challenged Conduct Violates Section 1 of the Sherman Act** ......7

        *Agnew v. Nat'l Collegiate Athletic Ass'n,*
           683 F. 3d 328 (7th Cir. 2012) ....................................................7

        *California Dental Ass'n v. FTC,*
           526 U.S. 756 (1999)....................................................................7

        *Cont'l Airlines, Inc. v. United Airlines, Inc.,*
           277 F.3d 499 (4th Cir. 2002) ....................................................7

        1. The *Per Se* Violation............................................................7

           *Fishman v. Estate of Wirtz,*
              807 F.2d 520 (7th Cir. 1986) ............................................7

           *Agnew v. Nat'l Collegiate Athletic Ass'n,*
              683 F. 3d 328 (7th Cir. 2012) ............................................7

           *In re Sulfuric Acid Antitrust Litig.,*
              743 F. Supp. 2d 827 (7th Cir. 2012) ..................................7

*Blackburn v. Sweeney,*
    53 F.3d 825 (7th Cir. 1995) ................................................................8

*United States v. Topco Assocs.,*
    405 U.S. 596 (1972)............................................................................8

    2.  The Quick-Look Approach ................................................................9

*Agnew v. Nat'l Collegiate Athletic Ass'n,*
    683 F. 3d 328 (7th Cir. 2012) ............................................................9

*NCAA v. Bd. of Regents,*
    468 U.S. 85 (1984).........................................................................9, 10

    3.  The Rule of Reason Approach ..........................................................10

*Agnew v. Nat'l Collegiate Athletic Ass'n,*
    683 F. 3d 328 (7th Cir. 2012) ..........................................................11

      a.    The Geographic Market is the Orland Territory ...........................11

*FTC v. Advocate Healthcare Network,*
    841 F.3d 460 (7th Cir. 2016) ...........................................................11

*Westman Comm'n Co. v. Hobart Int'l, Inc.,*
    796 F.2d 1216 (10th Cir. 1986) ........................................................11

*Stamatakis Julius v. King,*
    965 F.2d 469 (7th Cir. 1992) ...........................................................13

**B.**  **Defendants' Conduct Violates Section 2 as Well** ...........................................13

*Eastman Kodak Co. v. Image Tech. Servs., Inc.,*
    504 U.S. 451 (1992)..........................................................................13

*Fishman v. Estate of Wirtz,*
    807 F.2d 520 (7th Cir. 1986) ...........................................................14

*MCI Communications Corp. v. American Tel. & Tel. Co.,*
    708 F.2d 1081 (7th Cir. 1983) .........................................................14

15 U.S.C. § 18..................................................................................15

*United States v. UPM-Kymmene Oyj,*
    No. 03 C 2528, 2003 WL 21781902 (N.D. Ill. July 25, 2003) ........................15

*Federal Trade Commission v. Elders Grain, Inc.,*
    868 F.2d 901 (7th Cir. 1989) ...........................................................15

C.   **ADS Suffered Antitrust Injury and Damages** ........................................... 15

D.   **Safety Cannot Justify the Illegal Monopoly** ........................................... 15

*Nat'l Soc. of Prof'l Engr's v. United States,*
435 U.S. 679 (1978) ........................................... 15

*Wilk v. American Medical Association,*
895 F.2d 352 (7th Cir. 1990) ........................................... 16

*ADT Sec. Servs., Inc. v. Lisle-Woodridge Fire Prot. Dist.,*
*724 F.3d 854 (7th Cir. 2013) (ADT II)* ........................................... 16

E.   **Defendants Have Violated ADS' Constitutional Rights** ........................... 16

*Alarm Detection Sys., Inc. v. Orland Fire Prot. Dist.,*
194 F. Supp. 3d 706 (N.D. Ill. July 7, 2016) ........................................... 17

*Seventh St. v. Baldwin Cty. Planning & Zoning Comm'n,*
172 F. App'x 918 (11th Cir. 2006) ........................................... 17

*Village of Willowbrook v. Olech,*
528 U.S. 562 (2000) ........................................... 17

*Rujawitz v. Martin,*
561 F.3d 685 (7th Cir. 2009) ........................................... 17

District Act ........................................... 17, 18, 19, 20

*ADT Sec. Servs., Inc. v. Lisle-Woodridge Fire Prot. Dist.,*
*724 F.3d 854 (7th Cir. 2013) (ADT II)* ........................................... 18

*ADT Sec. Servs., Inc. v. Lisle-Woodridge Fire Prot. Dist.,*
672 F.3d 492 (7th Cir. 2012) *(ADT I)* ........................................... 18, 19

*Randle v. La Salle Telecomms., Inc.,*
697 F. Supp. 1474 (N.D. Ill. 1988) ........................................... 18

70 ILCS 705/11f ........................................... 19

*Wilkes v. Deerfield-Bannockburn Fire Prot. Dist.,*
399 N.E.2d 617 (Ill. Ct. App. 1979) ........................................... 19

*Glenview Rural Fire Prot. Dist. v. Raymond,*
311 N.E.2d 302 (Ill. App. Ct. 1974) ........................................... 19

F.   **Defendants Have Been Unjustly Enriched** ........................................... 20

*Firemen's Annuity v. Municipal Employees' Annuity & Ben. Fund*,
219 Ill. App. 3d 707, 712 (1st Dist. 1991)....................................................20

G.    **ADS Meets the Four-Factor Test for Permanent Injunctive Relief**...............20

*eBay, Inc. v. MercExchanges, LLC*,
547 U.S. 388 (2006).......................................................................................20

*Nat'l Soc. of Prof'l Engr's v. United States*,
435 U.S. 679 (1978).......................................................................................20

IV.    **CONCLUSION** ..........................................................................................**21**

## I.    <u>INTRODUCTION</u>

This case presents a stark contrast between the concept of a competitive marketplace for Commercial Accounts envisioned by ADS and the complete lack of consumer choice under the arrangement propagated by the Defendants. The established facts clearly demonstrate that this arrangement harms Commercial Accounts and ADS in the Orland Territory by: (1) removing their ability to choose between different fire alarm monitoring companies, transmission equipment, and types of monitoring; (2) forcing higher prices through monopolistic practices and price-fixing; and (3) blocking technological innovation.

The Defendants attempt to justify this illegal monopoly by making a specious analogy to exclusive agreements that ignores the exclusion of competitors and higher prices charged to Commercial Accounts. These arguments turn the antitrust laws upside down by completely disregarding the basic underlying principle of the antitrust laws – to protect consumers (the Commercial Accounts) and to prevent harm to competition (the hundreds of alarm companies licensed and qualified to conduct the Business in Illinois). *See Assoc. Gen. Contractors v. Cal. State Council of Carpenters*, 459 U.S. 519, 530-535 (1983) (the purpose of the Sherman Act is to "assure customers the benefits of price competition" and "protect the economic freedom of participants in the relevant market").

## II.    <u>STATEMENT OF FACTS</u>[1]

### A.    <u>Defendants' Challenged Conduct in the Orland Territory</u>

The Orland FPD/Tyco Agreements gives Tyco the exclusive right to provide the receiving equipment for fire alarm monitoring at Orland Central Dispatch, *i.e.*, the "board." (J-

---

[1] No material facts are in dispute, and in most cases, the facts forming the bases for Plaintiff's claims are the subject of admissions or stipulations. *See* Plaintiff's Statement of Admitted Facts for Trial, Dkt. No. 456.

002–J-007; Trial Tr. 767 (Justin)). Tyco does not charge Orland FPD for this equipment. The Ordinances require Commercial Accounts to send their Signals directly to Orland Central Dispatch (J-009; J-017; Trial Tr. 573 (Klimenko), 586-587 (Daly)), where Orland FPD performs the actual monitoring of the Signals (J-002–J-007; Trial Tr. 662-666 (Schofield)). The effect of the Agreements and Ordinances (together, the "Challenged Conduct") is that Commercial Accounts must exclusively use Tyco's Keltron radios as their transmission equipment in order to connect to and be monitored by Orland Central Dispatch. (Trial Tr. 719 (Justin)). A Commercial Account can only avoid contracting with Tyco by violating the Ordinance, thereby subjecting itself to a denial of a certificate of occupancy and fines, or shutting down/moving its business outside of the Orland Territory. (Trial Tr. 466 (Netz); 1245-1246 (Durkin).

Approximately 650 Commercial Accounts are located in the Orland Territory. (Trial Tr. 1252 (Durkin)). As a result of the Challenged Conduct, the Defendants control nearly 100% of the Business. (Trial Tr. 1239 (Durkin)). The Orland FPD/Tyco Agreements fixes the monitoring price charged to Commercial Accounts (J-002-J-007), leading to a monthly charge of $89 for leasing and maintenance of the transmitter and monitoring at Orland Central Dispatch. (Trial Tr. 459 (Netz), 724-725 (Justin). Outside of the Orland Territory, other alarm companies provide the same service for as little as $30 per month in competitive markets. (Trial Tr. 164 (Keating); 348 (Lubic); 261 (Poett); Netz Report at 20). If the Commercial Account wants to own the transmitter, or a third party alarm company wants to buy it, Tyco charges $1,580 in the Orland Territory. (Trial Tr. 362 (Lubic)). ADS buys the identical AES transmitter for under $400. (*Id.*).

     B.    The Establishment of Defendants' Monopoly

In the 2010 Rider to the Orland FPD/Tyco Agreement, the Defendants reallocated their split of the $89 monthly fee that Tyco charged to Commercial Accounts. Orland FPD increased its share from $9 to $23.50 on all wireless accounts. (J-005; Trial Tr. 769 (Justin)). The purpose of this change was to increase Orland FPD's revenue. (Trial Tr. 830-831 (Sullivan)). The $23.50 monthly fee received by Orland FPD from Commercial Accounts in the Orland Territory is allocated to the District's General Fund. (P-072 at ¶6; Trial Tr. 824-825 (Sullivan)).

Tyco is not a "vendor" for Orland FPD; it does not sell any service or goods to Orland FPD (Trial Tr. 835 (Sullivan)). Rather, Tyco remits a portion of the monthly fee to Orland FPD as "consideration" for the exclusive Agreements. (Trial Tr. 824-25 (Sullivan)). The 2014 and 2017 Agreements extended the term of each new agreement. (J-005; J-007). All three agreements were negotiated between the Defendants without any competitive bidding or RFP process or involvement of the Commercial Accounts. (P-072 at ¶¶2-3).

From 2006 to 2014, Orland FPD enforced an Ordinance that required Commercial Accounts to be monitored at Orland Central Dispatch. (J-008 at § 903.4.1; Trial Tr. 651 (Schofield); Dkt. 368 at ¶103). As a result of the decision in *ADT Sec. Servs., Inc. v. Lisle-Woodridge Fire Prot. Dist., 724 F.3d 854, 874 (7th Cir. 2013) (ADT II)*, Orland FPD rescinded its Ordinance but induced the Villages of Orland Park and Orland Hills to adopt similar Mandates in their Ordinances. (Trial Tr. 659 (Schofield); Trial Tr. 572 (Klimenko); J-009; J-017). Prior to 2014, the Village ordinances allowed the use of remote stations. (J-013-016). For example, the Village of Orland Park's fire code ordinance published on April 2, 2013 provides that all new and existing fire systems "shall be monitored by a listed remote station in accordance with NFPA 72 . . ." (J-016 at § 907.6.5.1). ADS, Tyco, and other alarm companies have NFPA 72 compliant central stations that qualify as listed remote stations. (Trial Tr. 74, 77

(Bonifas), 683 (Justin), 192 (Calderone)).    Under the Villages' Ordinances adopted in 2014/2015, the policy changed.  These Ordinances designated Orland FPD as the sole authorized provider of fire alarm monitoring in the Orland Territory and provided that Signals must be sent directly to Orland Central Dispatch.  (J-009; J-017).

      C.    <u>The Impact of the Challenged Conduct on ADS and Other Competitors</u>

Fire alarm monitoring is the key source of business for ADS and other alarm companies. (Trial Tr. 161 (Keating); 190 (Calderone); 259 (Poett)).  It is the "linchpin" to be able to "bundle" other services, such as inspection and maintenance of fire alarm systems and installation of burglar alarms, to Commercial Accounts. (Trial Tr. 104 (Bonifas)).  Bundling allows ADS and other alarm companies to offer more services at lower prices to their customers. (Trial Tr. 80 (Bonifas).  ADS and other alarm companies have also introduced new technologies with lower pricing to give Commercial Accounts both improved products and choices of providers. (Trial Tr. 99 (Bonifas); 196, 199 (Calderone)).

The Challenged Conduct precludes competition from other alarm companies. (Trial Tr. 148, 159 (Bonifas); 192 (Calderone); 347 (Lubic); 259 (Poett)).  In addition, ADS and other alarm companies lose existing business for other services to their Commercial Accounts because: (1) over time Tyco actively pursues these services once it controls the monitoring; and (2) Commercial Accounts often prefer to deal with a single vendor to provide all of their alarm services.  (Trial Tr. 260-261 (Poett); 363-365 (Lubic)).  In the absence of the Challenged Conduct, alarm company representatives testified at trial that they would actively compete in the Orland Territory. (Trial Tr. 164 (Keating); 274 (Poett); 214 (Lichtenauer); 235 (Derkacy)).  ADS and other alarm companies have successfully competed in other jurisdictions after mandates were lifted.  (Trial Tr. 194 (Calderone); 216 (Lichtenauer)).

4

D.     Actions Taken By Tyco and ADS after the *ADT II* Decision

Tyco, ADS, and several other alarm companies were the prevailing plaintiffs in *ADT II*. After the Seventh Circuit's ruling, Tyco wrote to seven fire protection districts, including Lemont FPD, advising that a fire protection district's control of the Business violated federal antitrust laws as well as the District Act. (P-031-P-037). As a result, Lemont FPD: (1) sold Tyco all its alarm monitoring equipment; (2) sold Tyco the transmitters in the premises of the Commercial Accounts; and (3) assigned its Customer Contracts to Tyco. (J-031; Trial Tr. 1118-1119 (Justin)).

Tyco uses Orland Central Dispatch to provide monitoring for the Lemont customers using direct connect, for which Tyco pays Orland FPD $14 per month per Commercial Account. (Dkt. 199 at ¶90). Tyco continues to provide fire alarm monitoring services to more than 60% of Lemont's Commercial Accounts, many of which are now monitored at Tyco's central stations. (Trial Tr. 775 (Justin)). Tyco provides central station monitoring to over 1 million customers throughout the United States. (Trial Tr. 685 (Justin)).

After *ADT II*, ADS convinced many local governmental units which had mandates and exclusive contracts with ADS to lift their mandates. (Trial Tr. 369, 376 (Lubic)). ADS has only one jurisdiction that did not lift its mandate, which is the Village of Carpentersville. (Trial Tr. 376 (Lubic)). ADS has refused to seek exclusive contracts in mandated jurisdictions for the last 10 years. (Trial Tr. 117-118 (Bonifas)).

SMG is a competitor of ADS and Tyco that provides central station monitoring for its customers. (Trial Tr. 1092-93 (Reidy)). However, after facing the prospect of losing its Commercial Accounts to new mandates in several jurisdictions, SMG entered into several exclusive contracts in mandated jurisdictions out of "self-preservation" in order to save its

5

existing Business. (Trial Tr. 1080 (Reidy)). Mr. Reidy testified that the financial component of the mandated direct connect model drives jurisdictions to adopt this model rather than any real safety concerns. (Trial Tr. 1090 (Reidy)).

     E.     <u>Response Time – Direct Connect Versus Central Stations</u>

Orland FPD conducted an alarm test comparing its direct connect response time to the response time of an ADS Commercial Account using ADS' central station service. (Trial Tr. 1009-1013 (Ercoli)). The direct connect system took 7 seconds to reach Orland Central Dispatch. (*Id.*). ADS' central station operator reached the dispatcher in 6 seconds. (Trial Tr. 1333 (Bonifas)).

Regardless, any purported difference in response times between direct connect to Orland Central Dispatch and the use of central stations would be eliminated by: (1) allowing ADS and other alarm companies to use the same frequency being used by Tyco on their own radios[2]; (2) pre-populating the District's computer-aided dispatch system ("CAD") with information on all Commercial Accounts in the Orland Territory (Trial Tr. 928-929 (Tegtmeyer)); 1334-1335 (Bonifas)); (3) allowing ADS and other alarm companies to automatically retransmit Signals to Orland Central Dispatch; or (4) adopting the ASAP to PSAP protocol. (Trial Tr. 1287, 1288 (Devereaux)). ADS, Quality Alarm, and E-24 are already using automatic retransmission in other local jurisdictions, establishing its reliability and "instantaneous" response time. (Trial Tr. 1287-1288 (Devereaux); 1331 (Bonifas)). Automatic retransmission also results in a lower cost to Commercial Accounts. (Trial Tr. 1289 (Deveraux)).

---

[2] However, sending the Signals directly to Orland Central Dispatch on the same frequency would eliminate ADS' access to information about trouble and supervisory Signals (Trial Tr. 91 (Bonifas)), thereby diminishing the quality of ADS' service. This potential solution would also continue to limit the type of transmission device that can be used to wireless mesh radios, which is an older technology. (Trial Tr. 1127-1128 (Justin)).

## III.    ARGUMENT

### A.    Defendants' Challenged Conduct Violates Section 1 of the Sherman Act

ADS established at trial that the Challenged Conduct exhibits each of the elements of a Section 1 claim: (1) a contract, combination, or conspiracy (Orland FPD/Tyco Agreements plus Village Ordinances passed at the urging of and for the benefit of Orland FPD); (2) a resultant unreasonable restraint of trade in the relevant market (virtually 100% control of the Business); and (3) an accompanying injury (Commercial Accounts have no choice, pay higher prices, and ADS cannot actively compete for the Business). *See Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F. 3d 328, 335 (7th Cir. 2012).

There are three potential methods of analysis for evaluating the presence of a Section 1 violation. The level of detail of facts necessary to determine a Section 1 violation depends on the factual context of the claim. *California Dental Ass'n v. FTC,* 526 U.S. 756, 780-781 (1999). Where the anticompetitive conduct is obvious, a *per se* analysis is appropriate. If there are some procompetitive benefits, which is not the case here, then a "quick look" analysis is utilized. When the "net impact on competition is difficult to determine" a full Rule of Reason analysis is employed. *Cont'l Airlines, Inc. v. United Airlines, Inc.,* 277 F.3d 499, 509 (4th Cir. 2002).

### 1.    The *Per Se* Violation

The *per se* rule applies when "surrounding circumstances make the likelihood of anticompetitive conduct so great as to render unjustified further examination of the challenged conduct." *Fishman v. Estate of Wirtz*, 807 F.2d 520, 541 (7th Cir. 1986). Under the *per se* framework, the court does not have to look into the market context in which the restraint operates. *Agnew*, 683 F.3d at 336. Horizontal price fixing and market allocation between potential competitors are classic examples of *per se* violations. *Id.*; *In re Sulfuric Acid Antitrust*

7

*Litig.*, 743 F. Supp. 2d 827, 864 (7th Cir. 2012); *Blackburn v. Sweeney*, 53 F.3d 825, 827 (7th Cir. 1995); *United States v. Topco Assocs.*, 405 U.S. 596, 610-11 (1972).

Tyco and Orland FPD are potential competitors. Absent the mandate, Tyco could provide monitoring services through its central stations that would compete with Orland FPD's direct connect. Tyco and Orland FPD eliminated any competition and entered into an arrangement to allocate: (1) the provision of alarm receiving equipment, transmission equipment, and maintenance to Tyco; and (2) the monitoring to Orland FPD. Then, the two parties agreed to a monthly monitoring price to be charged to Commercial Accounts and further agreed to divide the proceeds from those fees. As such, this is a *per se* violation.

Contrary to their claim, the Defendants' Challenged Conduct is not vertical in nature. It is simply an agreement between two parties on the price to charge to a captive market and how to divide the profits. (Trial Tr. 478 (Netz)). A vertical agreement is one between two parties located at different stages of the production and distribution chain. These parties might, for example, be a distributor and a local retailer. Whinston, Lectures on Antitrust Economics, at 133 (2006); (Trial Tr. 477 (Netz)). The Challenged Conduct does not involve the sale of any service or product by Tyco to Orland FPD. (Trial Tr. 835 (Sullivan)). Rather, Orland FPD simply receives a share of the proceeds from the monopoly. (Trial Tr. 830-831 (Sullivan)).

Defendants try to avoid recognizing this anticompetitive relationship by incorrectly re-characterizing it as analogous to an exclusive vertical contract. Unlike such an exclusive contract, the Challenged Conduct involves the **combined** effect of the Orland FPD/Tyco Agreements and the Mandates, which Orland enforced until 2014 when it obtained the cooperation of the Villages. (Trial Tr. 477 (Netz)). Tyco's expert, Dr. Durkin, on cross-

examination, conceded that his exclusive contract analogy does not "completely" fit these circumstances because it leaves out the Mandates. (Trial Tr. 1209 (Durkin)).[3]

In his report, Dr. Durkin asserted that Defendants' arrangement was comparable to an exclusive agreement between McDonalds and Coke. (Trial Tr. 1208 (Durkin); P-052)). He later acknowledged at trial that this comparison was wrong—it failed to consider the mandate that eliminated all consumer choice. (Trial Tr. 1209 (Durkin)). To put this in perspective, McDonalds' customers do not have to buy Cokes, but Commercial Accounts in the Orland Territory must contract with Tyco for transmitters and must have monitoring at Orland Central Dispatch. The price is then set by the Defendants and is non-negotiable for the Commercial Accounts.

### 2. The Quick-Look Approach

Using the quick look analysis shows there is no procompetitive impact from the Challenged Conduct. This analysis is used when "an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets . . . but there are nonetheless reasons to examine potential procompetitive justifications." *Agnew*, 683 F.3d at 336 (citation omitted). It eliminates the need for an "elaborate industry analysis" of the anticompetitive character of such an agreement. *See NCAA v. Bd. of Regents*, 468 U.S. 85, 89 (1984). This approach, often applied when there is an agreement not to compete in terms of price, is especially suited to the

---

[3] Dr. Durkin's faulty approach in separating the Orland FPD/Tyco Agreements from the Mandates is further highlighted by the fact that, in jurisdictions with a mandated direct connect requirement, but no exclusive contract, competition is present. For example, in the City of Naperville, ADS has approximately 30-35% of the market – more than Tyco or any other competitor. (Trial Tr. 341 (Keating); 352 (Lubic)).

Defendants' arrangement to preclude other alarm companies from competing for the Business and establish supracompetitive prices. *Id.*

In these situations, the defendant "bears a heavy burden of establishing an affirmative defense which competitively justifies this apparent deviation from the operations of a free market." *Id.* at 113. Yet, the Defendants did not present any evidence of procompetitive benefits. The one purported procompetitive benefit – a cost savings for not creating a "second board" – is unsupported. Dr. Durkin came up with the notion of a second board out of whole cloth. The record demonstrates four ways to send Signals to Orland Central Dispatch from other alarm companies using central stations without a second board. (Trial Tr. 286, 289 (Devereaux)). Moreover, Dr. Durkin conceded that he did not calculate the "savings" and did not know its magnitude. (Trial Tr. 1256 (Durkin)). In contrast, the anticompetitive effects of the arrangement were well-established at trial – (1) supracompetitive prices (Trial Tr. 471 (Netz)); and (2) no consumer choice (Trial Tr. 471 (Netz); 1229 (Durkin)).

Simply put, there is no justification for depriving Commercial Accounts of any choice regarding transmission equipment, use of equivalent or innovative technology, any ability to negotiate price, or the choice of providers (based on price or quality). All these benefits would be achieved if competition existed. (Trial Tr. 475-476, 487 (Netz)). Commercial Accounts simply pay more for less choice and lower quality in the Orland Territory.

### 3. The Rule of Reason Approach

Finally, Defendants' conduct does not pass muster under a rule of reason analysis that takes into account the full record. The imposition of an $89 price for the Business is supracompetitive. Fire alarm monitoring is available at a much lower cost from competitors that were excluded from the Orland Territory. Dr. Durkin conceded that consumers in the Orland

10

Territory do not have any choice. (Trial Tr. 1229, 1246 (Durkin)). Dr. Durkin further conceded that Tyco, in conjunction with Orland FPD, has virtually all the Business in the Orland Territory. (Trial Tr. 1211 (Durkin)). This demonstrates that the Challenged Conduct has "an anticompetitive effect on a given market within a geographic area" by showing in part that the Defendants have market power. *See Agnew*, 683 F.3d at 335.

a.    The Geographic Market is the Orland Territory

In determining whether an illegal monopoly is present, an initial step is to define the geographic market.[4] The relevant geographic market is "the area in which consumers can practically turn for alternative sources of the product and in which the antitrust defendants face competition." *FTC v. Advocate Healthcare Network,* 841 F.3d 460, 468 (7th Cir. 2016) (citing with approval the use of the hypothetical monopolist test to define the geographic market in a hospital merger case); *see also* FTC's Horizontal Merger Guidelines, at § 4.2 (2010). Put another way, the market is determined by taking the "narrowest market which is wide enough so that products from adjacent areas… cannot compete on substantial parity with those included in the market." *Westman Comm'n Co. v. Hobart Int'l, Inc.*, 796 F.2d 1216, 1222 (10th Cir. 1986).

Here, the relevant geographic market is the Orland Territory as Dr. Netz explained. (Trial Tr. 465-68 (Netz)). This geographic market is limited to the Orland Territory because: (1) all Commercial Accounts affected by the Challenged Conduct are located in the Orland Territory; (2) the Orland FPD/Tyco Agreements only apply to the Orland Territory; (3) the Ordinances only apply to the Orland Territory; (4) the Orland FPD has no authority to provide the Business outside the Orland Territory; and (5) the Commercial Accounts cannot connect to a remote

---

[4] The relevant product market is undisputed. Dr. Netz defined the product market as the market for fire alarm monitoring services. (Trial Tr. 465 (Netz)). Dr. Durkin agreed. (Trial Tr. 1175 (Durkin)).

station located outside of the Orland Territory. (Trial Tr. 467-68; 1238 (Durkin)). Moreover, Tyco has admitted that the jurisdictional boundaries of fire protection districts define the geographic market for antitrust purposes. (P-031-P-037).

There are no practical alternatives to contracting with Tyco in the Orland Territory. Dr. Netz rightly noted that Commercial Accounts would either have to move their businesses outside of the Orland Territory or pay substantial fines for non-compliance. (Trial Tr. 492 (Netz); Netz Report at 9). Dr. Netz thus concluded that given the lack of options, the Orland Territory is the geographic market. (Trial Tr. 465-468; Netz Report at 9-10).

Dr. Netz also applied other analytical tools to reach this conclusion. She used the well-established hypothetical monopolist test to define the geographic market. (Trial Tr. 464 (Netz)). This test begins with the products and geography that are at issue in the instant case and determines, hypothetically, if there was an entity that had a monopoly over those products in that geographic area, whether the entity would be able to increase prices above the competitive level or whether it would be prevented from doing so because consumers would be able to turn to alternatives. (*Id*.). She also relied on Example 13 for the Horizontal Merger Guidelines to define the geographic market. (Trial Tr. 465, 467 (Netz)). She explained how the location of the customers is crucial to defining the geographic market. (Trial Tr. 467 (Netz)). She also used direct and indirect analyses to show supracompetitive pricing in this market. (Trial Tr. 469-471 (Netz)). In contrast, Dr. Durkin did not use the hypothetical monopolist test, even though he recognized its goal is to define a geographic market. (Trial Tr. 1232, 1236-1237 (Durkin)). Indeed, he did not use any established antitrust methodology but simply made an assertion that the Chicago area was the geographic market. (Trial Tr. 480 (Netz)).

Further undermining Dr. Durkin's opinions, Tyco has consistently admitted to both the definition of this market as the Orland Territory and its implication in antitrust terms. Tyco's letters to Bloomingdale FPD and Lemont FPD reference each jurisdiction as the geographic market in which an illegal monopoly exists for fire alarm monitoring. (P-031, P-032). The Orland Territory is indistinguishable.

The result of such conduct on Commercial Accounts is uncontroverted. Consumers pay $89 for a service that should be much lower if competition were present.[5] As a result, Tyco's price is supracompetitive. *See Stamatakis Julius v. King*, 965 F.2d 469, 471 (7th Cir. 1992).

### B. Defendants' Conduct Violates Section 2 as Well

The Challenged Conduct established a monopoly in violation of Section 2. The testimony of Dr. Netz established Tyco's monopoly power in the Orland Territory. Both experts agreed that Tyco possessed almost 100% of the Commercial Accounts. This dominance was achieved by the combined effect of the exclusive contract and the enforcement of the Mandates. In other words, it did not arise as a consequence of a "superior product" or "business acumen." *See Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 481 (1992). The same geographic market analysis used under Section 1 applies under Section 2.

Since Tyco and many other alarm companies including ADS use the same AES/Keltron transmitters, no credible argument can be made that the monopoly is due to superior services or equipment.[6] Instead, Tyco received the exclusive contract because it agreed to pay a significant portion of the monitoring fee to Orland FPD. Moreover, the Defendants renewed their exclusive

---

[5] Even Tyco's average price in areas where there is real competition is $68.98 (Durkin Report at p. 25, ¶75), again substantially less than the $89 charged by Tyco in the Orland Territory.
[6] Dr. Durkin contended that Tyco is a premium brand, but did not have any analysis or evidence to support his assertion. (Trial Tr. 1221-1224 (Durkin)).

contracts without any competitive considerations. Commercial Accounts simply had no input or choice of any kind in these arrangements. Thus, by virtue of their monopoly power, Tyco was able to change supracompetitive prices.

Defendants' conduct also constitutes a violation under Section 2's "essential facilities doctrine." The "essential facilities doctrine" imposes upon a party controlling an essential facility – defined as a facility that cannot reasonably be duplicated and to which access is necessary if one wishes to compete - the obligation to make that facility available to competitors on nondiscriminatory terms. *Fishman v. Estate of Wirtz*, 807 F.2d 520, 539 (7th Cir. 1986) (finding that that the Chicago Stadium was an essential facility because it was not duplicable without an unreasonable expenditure). The refusal to allow potential competitors to use such a facility gives rise to antitrust liability where the purpose of the denial is to restrain competition. *MCI Communications Corp. v. American Tel. & Tel. Co.*, 708 F.2d 1081, 1132-33 (7th Cir. 1983).

The Ordinances make Orland Central Dispatch an essential facility – all Commercial Accounts in the Orland Territory must send their Signals to Orland Central Dispatch for monitoring. Even though ADS is capable of using the same frequency to send Signals or alternatively automatically retransmit Signals to Orland Central Dispatch to match or exceed the performance of the direct connect model, only Tyco equipment can send Signals under the exclusive agreements. ADS is unable to duplicate Orland Dispatch as an essential facility and the Defendants have for all purposes refused ADS access to Orland Dispatch. This establishes a violation of the essential facilities doctrine and Section 2 of the Sherman Act.[7]

---

[7] Defendants' conduct also violates Section 7 of the Clayton Act because Tyco's acquisition of assets from Lemont FPD (fire alarm monitoring equipment and Customer Contracts), combined with the oral Orland FPD-Tyco Agreements allowing Tyco to exclusively monitor those customers at Orland Dispatch,

### C.    ADS Suffered Antitrust Injury and Damages

ADS suffered an antitrust injury resulting in damages due to the Challenged Conduct. Dr. Netz determined the amount by first selecting jurisdictions as benchmarks or "reasonable proxies" for ADS to determine damages (Trial Tr. 473-474 (Netz)), a methodology that Tyco agreed was correct (Trial Tr. 1185 (Durkin)). The jurisdictions were ones for which she had complete data for the number of Commercial Accounts. (Trial Tr. 474-75 (Netz)). Using this data, Dr. Netz calculated the market share for each benchmark jurisdiction and, from these, a weighted average of 33.4 percent for the market share that ADS would have obtained, if the Challenged Conduct had not occurred. (Trial Tr. 476-77 (Netz)). Dr. Netz also took a random sample of ADS' customers to determine the average price to customers. (Trial Tr. 491 (Netz)). Using the analysis, the total lost profits from fire alarm monitoring and ancillary services was $1,552,788, before trebling, as of May 2017. Dr. Netz also calculated that Tyco had collected $2.92 million as unjust enrichment.

### D.    Safety Cannot Justify the Illegal Monopoly

Orland FPD contended at trial that Tyco is a reliable vendor and the system in place improves response times over central station monitoring. (Trial Tr. 654-657 (Schofield)). However, the Supreme Court has unequivocally held that safety is not a valid justification for a monopoly under the antitrust laws. *Nat'l Soc. of Prof'l Engr's v. United States*, 435 U.S. 679, 695 (1978) (an attempt to justify anticompetitive conduct "on the basis of the potential threat that

---

has substantially lessened competition and has a tendency to create a monopoly. 15 U.S.C. § 18. This is evidenced by the fact that Tyco continues to have over 60% of these customers three years after Lemont FPD exited the Business. *See United States v. UPM-Kymmene Oyj*, No. 03 C 2528, 2003 WL 21781902 at *12 (N.D. Ill. July 25, 2003); *Federal Trade Commission v. Elders Grain, Inc.*, 868 F.2d 901, 906 (7th Cir. 1989).

15

competition poses to public safety . . . is nothing less than a frontal assault on the basic policy of the Sherman Act"); *Wilk v. American Medical Association*, 895 F.2d 352, 361 (7th Cir. 1990).

Nor is the safety defense factually supportable. The District Court in *Lisle-Woodridge* rejected the same response time rationale asserted by Orland FPD here, by finding that pre-populating the CAD at DU-COMM eliminated any gap in response time. (P-022, Modified Permanent Injunction Order at ¶ 85). The Seventh Circuit relied on these findings in affirming. *ADT II,* 724 F.2d at 867.

The testimony here indicated that this purported "gap" could also be eliminated by allowing all alarm companies to use the same frequency as used by Tyco, pre-populating the CAD at Orland Central Dispatch[8], or alternatively allowing the use of automatic retransmission from central stations to the alarm computer at Orland Central Dispatch or directly to the CAD by ASAP to PSAP. It is uncontested that any of these alternative would allow equal or faster response times.

### E.     Defendants Have Violated ADS' Constitutional Rights

As the evidence shows that Defendants' scheme changed with the adoption of the Village's Mandates in 2014 to attempt to avoid the import of *ADT II*, ADS asks this Court to reconsider its dismissal of the Civil Rights claims against the Defendants due to expiration of the statute of limitations in the Orland Territory.[9] (Dkt. 237 at 47-52). The changes in the Mandates

---

[8] It is instructive to note that the Executive Director of DU-COMM, Brian Tegtmeyer, testified that in spite of the ability to eliminate the gap at DU-COMM by prepopulating the CAD, DU-COMM has never done so. (Trial Tr. 918 (Tegtmeyer)).

[9] ADS has filed a Motion for Reconsideration contemporaneously with the filing of this Memorandum.

occurred in 2014 and 2015 and thus the claims were timely, as Orland FPD dropped its mandate and thereafter was implementing the Villages' Mandates.[10]

As this Court has already explained, the threshold inquiry in applying the rational basis test is to determine whether Defendants have the authority to engage in their Exclusive Arrangement. *See Alarm Detection Sys., Inc. v. Orland Fire Prot. Dist.*, 194 F. Supp. 3d 706, 726 (N.D. Ill. July 7, 2016), quoting *Lieb v. Hillsborough Cnty. Pub. Trans. Comm'n*, 558 F.3d 1303, 1306 (11th Cir. 2009) ("The rational basis test asks (1) whether the government has the power or authority to regulate the particular area in question . . . ."). A governmental actor does not have a legitimate purpose to regulate beyond the authority conferred to it and conduct that exceeds this authority is necessarily arbitrary. *Seventh St. v. Baldwin Cty. Planning & Zoning Comm'n*, 172 F. App'x 918, 921 (11th Cir. 2006).

Defendants violated ADS' equal protection rights in the Orland Territory because Orland FPD lacked a rational basis to treat ADS differently from a similarly-situated entity (Tyco). *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). Defendants also violated ADS' due process rights because: (1) ADS is licensed under the Alarm Act and has a protected property interest in engaging in the Business; and (2) ADS was deprived of its property interest due to Defendants' arbitrary conduct. *See Rujawitz v. Martin*, 561 F.3d 685, 688 (7th Cir. 2009). A similar analysis applies to the ADS' Civil Rights claim in the Lemont Territory.

The scope of a fire protection district's authority to engage in the Business has already been decided by the Seventh Circuit. Orland FPD is not authorized by the District Act to exclusively engage in fire alarm monitoring; control the decision over transmission equipment;

---

[10] The Villages allowed "approved remote stations" for years, but Orland FPD eliminated this option by enforcing its own Mandate.

reject equivalent technology; or collect fees from its residents. Thus, the Defendants' conduct fails the rational basis test. *ADT II*, 724 F.3d at 874; *ADT Sec. Servs., Inc. v. Lisle-Woodridge Fire Prot. Dist.*, 672 F.3d 492, 499 (7th Cir. 2012) (*ADT I*).

In the Lemont Territory, Orland FPD is providing monitoring outside its jurisdictional boundaries and collecting fees, both without authority under the District Act. As a result, ADS cannot effectively compete for the 60% of the Commercial Accounts that remain under contract with Tyco. No further inquiry is necessary.

Even if Defendants could satisfy step one of the rational basis test, Defendants' conduct is not rationally related to their purported objectives. "Rationally related" means that there is reason to believe that the governmental actor will actually achieve its purpose. *Randle v. La Salle Telecomms., Inc.*, 697 F. Supp. 1474, 1481, n.7 (N.D. Ill. 1988). The only possible justification for the exclusive contracts and the Mandates is reducing response times. Jurisdictions using central station monitoring or other methods show that response time is not a concern. This objective can be achieved without either in place. The fact that Orland FPD lifted its Mandate in the unincorporated areas to allow competition demonstrates that this putative safety concern is illusory.

Moreover, there is no rationale for Orland FPD to monitor in the Lemont Territory. Lemont FPD had no concern about response time, as it allowed licensed private alarm companies to monitor Commercial Accounts in the Lemont Territory after Lemont FPD lifted its mandate in 2014 and terminated its exclusive contract with Cross Points. Further, most of the Commercial Accounts assigned to Tyco by Lemont FPD are now being monitored at Tyco's central stations. (Trial Tr. 1118-1119 (Justin)). Thus, safety cannot be the justification for Orland FPD

18

monitoring Commercial Accounts in the Lemont Territory, even if Orland FPD had authority over this extra-territorial area.

This Court asked at trial whether Orland FPD should be allowed to pursue an objective of fire safety through the direct connect arrangement. (Trial Tr. 1033-1034 (J. Durkin)). Seventh Circuit authority forbids such a direct connect scheme because Orland FPD lacks authority under the District Act. Orland FPD cannot operate outside of these limits, as it does today. The Seventh Circuit held that a fire protection district cannot charge residents a fee, as the District Act only allows charges to non-residents for certain services. *See* 70 ILCS 705/11f ("The board of trustees of a fire protection district may fix, charge, and collect fees . . . against persons, businesses and other entities **who are not residents** of the fire protection district. Such charge may not be assessed against residents of the fire protection district . . .") (emphasis added). Clearly, the fees being paid to Orland FPD in both the Orland Territory and Lemont Territory are *ultra vires*. This fact is underscored as Orland FPD also collects millions of dollars in ambulance fees from residents' insurance carriers without any authority. If the District's primary motivation was safety, it could have set up a system that required the use of one of the many technologies that delivered Signals to Orland Central Dispatch without any lag in response time.

Similarly, fire protection districts that wanted to engage in ambulance services and building code enforcement were once barred from such activities even though the functions would seem a first blush reasonable functions of fire protection districts. Yet, they were not lawful until the District Act was amended in each instance. *Wilkes v. Deerfield-Bannockburn Fire Prot. Dist.*, 399 N.E.2d 617 (Ill. Ct. App. 1979); *Glenview Rural Fire Prot. Dist. v. Raymond*, 311 N.E.2d 302 (Ill. App. Ct. 1974); *ADT I*, 672 F.3d at 495 ("[W]e...hold that the District does not have the authority to displace the entire private market by requiring all

19

customers to buy alarm signaling services and equipment from itself or just one private company."). Absent express state legislative authorization, Orland FPD cannot evade the strictures placed the District Act as delineated by the Seventh Circuit.

### F.    Defendants Have Been Unjustly Enriched

Defendants have received their ill-gotten profits as a result of their monopolistic scheme and violations of ADS' constitutional rights. Therefore, Defendants have unjustly retained a benefit to ADS' detriment and Defendants' retention of that benefit violates fundamental principles of justice, equity, and good conscience. *See Firemen's Annuity v. Municipal Employees' Annuity & Ben. Fund*, 219 Ill. App. 3d 707, 712 (1st Dist. 1991).

### G.    ADS Meets the Four-Factor Test for Permanent Injunctive Relief

Based on the rulings in *ADT I* and *ADT II*, ADS is entitled to a permanent injunction. To be awarded permanent injunctive relief, ADS must show: (1) it has suffered an irreparable injury (2) for which legal remedies are inadequate; (3) that the balance of hardships between ADS and Defendants favors ADS; and (4) that the public interest would not be disserved by this relief. *eBay, Inc. v. MercExchanges, LLC*, 547 U.S. 388, 391 (2006).

Harm is irreparable if it cannot be prevented or fully remedied by a final judgment. *Girl Scouts of Manitou Council, Inc.*, 549 F.3d 1079, 1089 (7th Cir. 2008). If an award of damages is seriously deficient or if damages are difficult to calculate, then it is inadequate and injunctive relief is appropriate. *Id.; Girl Scouts of Manitou Council, Inc.*, 549 F.3d 1079, 1095 (7th Cir. 2008). Judges have the power to implement injunctive relief to remedy Sherman Act violations "to avoid a recurrence of the violation and to eliminate its consequences." *National Soc. of Professional Engineers*, 435 U.S. at 697.

20

First, ADS has suffered irreparable injury by being excluded from the market for the Business in the Orland Territory due to the Challenged Conduct. Second, a legal remedy is inadequate because it can neither prevent Defendants from continuing their exclusive and anti-competitive behavior nor fully compensate ADS for its lost business because the loss of future customers and revenues is very difficult to quantify. Third, the balance of the harms favors ADS since while under the current arrangement ADS is completely excluded from providing the Business and cannot profitably provide related services to Commercial Accounts in Orland, Tyco would merely have to compete to provide the Business at the Commercial Account level and Orland FPD would simply have to allow other providers to use available technology. Fourth, ADS has demonstrated violations of the District Act have resulted in an illegal monopoly as well as violations of ADS' rights under the Fourteenth Amendment. Finally, the public interest is served as the injunction will provide Commercial Accounts real competition for their Business and Orland FPD would have to allow new technology aimed at reducing response times and ensuring the public's safety.

## IV.  CONCLUSION

ADS seeks to open up a market for the Business that has for some time been closed to any competition. Defendants have enacted an anticompetitive scheme to share control of the market and split the supracompetitive prices that they fix – to the detriment of Commercial Accounts and ADS. By violating the District Act, Defendants violate ADS' 14th Amendment rights. Defendants have also been unjustly enriched. The evidence at trial established that ADS can meet the four tests for obtaining permanent injunctive relief and also a significant damage award.

Dated:  June 19, 2017

Respectfully submitted,

DYKEMA GOSSETT PLLC

By:  /s/ Bruce L. Goldsmith
Attorney for Plaintiff
Alarm Detection Systems, Inc.

Bruce L. Goldsmith – ARDC No. 0996939
David J. Bressler – ARDC No. 6182549
Jonathan S. Feld – ARDC No. 6270992
Melanie J. Chico – ARDC No. 6294469
Michael F. Derksen – ARDC No. 6296212
DYKEMA GOSSETT PLLC
2300 Cabot Drive – Suite 505
Lisle, IL  60532
630-245-0400

22

## CERTIFICATE OF SERVICE

The undersigned certifies that on June 19, 2017 he caused the foregoing Plaintiff's Post-Trial Memorandum to be filed with the Clerk of the Court using the ECF system, which sent electronic notification of the filing on the same day to all registered participants.

/s/ Bruce L. Goldsmith